# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | : No: 1:05-CR-00264 |
| | : |
| v. | : CAPITAL § 2555 PROCEEDINGS |
| | : |
| THOMAS MOROCCO HAGER, | : HON. T.S. ELLIS III |
| | : |
| Defendant. | : |

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255

Blair G. Brown
(Va. Bar No. 29706)
bbrown@zuckerman.com
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Phone:  (202) 778-1829
Fax:     (202) 822-8106

Julie Brain
juliebrain1@yahoo.com
916 South 2nd Street
Philadelphia, PA 19147
Phone: (267) 639-0417

**APPOINTED COUNSEL FOR DEFENDANT**

# TABLE OF CONTENTS

PROCEDURAL HISTORY ....................................................................................1

CLAIMS FOR RELIEF .....................................................................................4

I.    TRIAL COUNSEL RENDERED CONSTITUTIONALLY
INEFFECTIVE ASSISTANCE AT THE GUILT PHASE OF TRIAL ..........................4

II.   TRIAL COUNSEL RENDERED CONSTITUTIONALLY
INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE WITH
RESPECT TO THE GOVERNMENT'S PRESENTATION OF
AGGRAVATING EVIDENCE ...........................................................................44

III.  TRIAL COUNSEL RENDERED CONSTITUTIONALLY
INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE WITH
RESPECT TO THE PRESENTATION OF MITIGATING EVIDENCE....................94

IV.  THE GOVERNMENT'S CONDUCT VIOLATED MR. HAGER'S
RIGHT TO A FAIR TRIAL ...........................................................................186

V.   MR. HAGER IS INELIGIBLE FOR A SENTENCE OF DEATH
BECAUSE HE IS A PERSON WITH INTELLECTUAL DISABILITY ...................195

PRAYER FOR RELIEF....................................................................................198

VERIFICATION UNDER PENALTY OF PERJURY ..........................................199

## PROCEDURAL HISTORY

1.      On January 12, 2006, Mr. Hager was charged, in a superseding indictment, with the intentional killing of Barbara White while engaged in a conspiracy to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. § 848(e)(1)(A).

2.      On May 4, 2006, the grand jury returned a second superseding indictment against Mr. Hager.  The second superseding indictment charged Mr. Hager with the intentional killing of Barbara White while engaged in a conspiracy to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. § 848(e)(1)(A).  It also contained a section entitled "Notice of Special Findings," which alleged eligibility factors under 21 U.S.C. § 848(n) for seeking the death penalty against Mr. Hager.

3.      On May 30, 2006, the Government filed notice of its intent to seek the death penalty.  The notice set forth the eligibility factors contained in the second superseding indictment as well as all of the non-statutory aggravating factors the government would seek to prove at a capital sentencing hearing.

4.      Mr. Hager's trial commenced with jury selection on October 1, 2007.  Mr. Hager was represented by Joseph J. McCarthy and John C. Kiyonaga.  The government was represented by James L. Trump and Steven D. Mellin of the United States Attorney's Office for the Eastern District of Virginia.

5.      On October 11, 2007, following the completion of jury selection, this Court gave initial instructions and excused the jury until the following Monday, October 15, 2007.

6.      The Government began its guilt phase case on October 15, 2007, and rested its case the following day, October 16, 2007.  Mr. Hager's counsel put on no evidence. After closing arguments, this Court gave the jury final guilt phase instructions and then excused the jurors for the day.

7.     On October 17, 2007, the jury began and concluded its deliberations, finding Mr. Hager guilty of the single charged count of violating 21 U.S.C. § 848(e)(1)(A).

8.     The penalty phase began the following week with the eligibility phase.  The eligibility phase took one day, October 22, 2007.  Again, Mr. Hager's counsel presented no evidence.  The jury determined that Mr. Hager was eligible for the death penalty.

9.     On October 23, 2007, the selection phase began.  The government rested its selection phase case the next day.  Defense counsel presented Mr. Hager's mitigation case on October 24, 25, and 29, 2007.  On October 29, 2007, the government presented its rebuttal case.

10.     On October 30, 2007, this Court gave the final jury instructions for the selection phase, and the jury began its deliberations.

11.     The jury continued its deliberations on October 31 and November 1, 2007.  At 1:49 p.m., on November 1, 2007, the jury returned a sentencing verdict of death.

12.     After excusing the jury, the court imposed the sentence of death.

13.     On November 13, 2007, the Court issued a written order denying Mr. Hager's Rule 29 motion for acquittal, which had been filed and denied in open court at the conclusion of the government's case.  The Court issued a nearly identical order again denying the Rule 29 motion for acquittal on January 9, 2008.

14.     On January 9, 2008, the Court also issued a memorandum opinion explaining its reasons for its March 30, 2007 order denying Mr. Hager's motion to dismiss the government's notice of special findings and notice of intent to seek the death penalty, and to further explain the applicability of the Anti-Drug Abuse Act and the Federal Death Penalty Act to the sentencing of Mr. Hager.

15. On April 28, 2008, the Court denied Mr. Hager's motion for a new trial, which was filed on November 8, 2007 and amended on November 29, 2007.

16. On May 14, 2008, Mr. Hager filed a notice of appeal to the United States Court of Appeals for the Fourth Circuit. On appeal, Mr. Hager was represented by Barry Fisher and Robert Tucker. The government was represented by James L. Trump and Richard D. Cooke of the United States Attorney's Office for the Eastern District of Virginia.

17. Following briefing and oral argument, Mr. Hager's conviction and death sentence were affirmed on June 20, 2013, by a divided panel of the United States Court of Appeals for the Fourth Circuit, *United States v. Hager*, 721 F.3d 167 (4th Cir. 2013).

18. On July 4, 2013, Mr. Hager filed a petition for rehearing and rehearing *en banc*. The Court of Appeals denied the petition on July 19, 2013.

19. On December 16, 2013, Mr. Hager filed a petition for writ of certiorari in the United States Supreme Court. The Supreme Court denied Mr. Hager's petition for a writ of certiorari on April 28, 2014, *Hager v. United States*, 134 S. Ct. 1934 (2014).

20. On May 2, 2014, this Court appointed undersigned counsel Blair G. Brown and Julie Brain to represent Mr. Hager in the preparation of this Motion under 28 U.S.C. § 2255.

## CLAIMS FOR RELIEF

## I.     TRIAL COUNSEL RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE AT THE GUILT PHASE OF TRIAL

Mr. Hager was convicted and sentenced to death in violation of his constitutional rights to counsel, the effective assistance thereof, a fair and impartial jury, the presumption of innocence, present a defense, confrontation, compulsory process, due process, freedom from cruel and unusual punishment and a fair, reliable and accurate determination of his sentence as guaranteed by the Fifth, Sixth and Eighth Amendments because his trial counsel's representation during the guilt phase was woefully deficient. Counsel's multiple errors and omissions resulted in overwhelming prejudice to Mr. Hager. Separately, and cumulatively, those deficiencies in the investigation, preparation and presentation of the defense to the government's case at the guilt phase of trial require that Mr. Hager's conviction and sentence of death be vacated.

In support of this claim, Mr. Hager alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.     **Trial Counsel Unreasonably Based Mr. Hager's Defense on a Legal Theory That Was Foreclosed by Precedent and Bound to be Rejected by this Court and the Court of Appeals.** The government indicted Mr. Hager under 21 U.S.C. § 848(e)(1)(A), which provides:

> [A]ny person engaging in or working in furtherance of a continuing criminal enterprise [CCE], or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsel, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

2.     Mr. Hager was not charged with a CCE, so it was the third prong of section 848(e)(1)(A) that was at issue in the trial: the intentional killing of another while "engaging in an offense punishable under section 841(b)(1)(A). . . ." The charged offense that the government alleged was "punishable under section 841(b)(1)(A)" was a conspiracy to distribute more than 50 grams of crack cocaine.

3.     A critical issue at the guilt phase of the trial was the nexus between the two elements of the offense: the drug conspiracy Mr. Hager allegedly was "engaging in" and the killing of Barbara White. The government's evidence of that nexus also was the weakest link of its guilt phase case. Yet trial counsel sought no ruling prior to trial on the legal standard that would be applied to the required nexus—a ruling that necessarily dictated whether their defense could possibly be successful or whether the jury would be required by law to reject it. Instead, defense counsel proceeded to trial blindly with a defense premised on the hope that the Court would require the government to prove that the killing occurred during an ongoing drug transaction in order to satisfy the nexus requirement.

4.     Trial counsel also decided that they would lie in wait with their proposed legal standard—springing it on the Court and the government in a Rule 29 motion at the end of the government's case and conducting their cross-examinations so as not to tip their hand. Trial counsel's decision to proceed in this manner was plainly unreasonable: there was no controlling precedent for the defense's proposed standard and there was binding authority for the contrary position, so there was a substantial risk, if not certainty, that the Court would reject the defense standard. This Court did indeed reject the defense argument, and the court of appeals affirmed that decision. Yet defense counsel had available, and chose to forego, evidence that they could

have used to challenge even the much weaker "meaningful connection" nexus standard that the Court adopted and the court of appeals affirmed.

5. Trial counsel's unreasonable decisions had disastrous consequences for Mr. Hager's defense. Putting all of the defense eggs in the wrong legal basket and hiding that basket until the end of the government's case prejudiced Mr. Hager in numerous ways, including, but not limited to, a defense closing argument that stated the wrong legal standard, a government rebuttal argument that exploited counsel's error, a devastating concession, the failure to investigate, develop, and present exculpatory evidence, the elicitation of harmful evidence on cross-examination, and numerous lost opportunities to elicit favorable evidence on cross-examination.

6. That trial counsel acted unreasonably in relying on their proposed nexus standard already has been determined. Both this Court and the court of appeals held: (1) trial counsel believed that in order to satisfy the nexus requirement of section 848(e)(1)(A), the government had to prove that the killing occurred during the course of a drug transaction; (2) that belief was mistaken; and (3) there was no legal support for it. The Court of Appeals stated:

> [T]rial counsel thought that the government had to establish that a drug transaction occurred at the time of the murder for § 848(e)(1)(A) to apply. . . . [H]e was mistaken in thinking that a drug transaction had to occur at the time of the murder for liability pursuant to § 848(e)(1)(A).

*Hager*, 721 F.3d 167, 182 (4th Cir. 2013). There was no justification for counsel to take that position, the court of appeals ruled, because it was foreclosed by *United States v. Tipton*, 90 F.3d 861, 868-70 (4th Cir. 1996), which was decided before Mr. Hager's trial. *Hager*, 721 F.3d at 180. ("We are bound by that precedent [*Tipton*.]").

7. The district court record also clearly reflects this Court's identical views. Counsel argued at trial that the nexus requirement could only be satisfied if the killing occurred in the

course of a drug transaction. *See* Trial Tr. Vol. 9 141-42, Oct. 17, 2007 (trial counsel's Rule 29 argument); 144-45 (government response to argument); 147:23-24 (court's description of defense argument as killing "has to be in the course of a drug trafficking transaction."). And this Court indisputably held that there was no legal authority supporting that position. *See also id.* at 147:25-148:1 (denying Rule 29 motion, noting "[n]o authority I found supports that construction."); Orders regarding Rule 29 Motion 4-5, filed Nov. 13, 2007 & Jan. 9, 2008, ECF Nos. 371 & 378 ("Specifically, defendant argued that the statute required proof that the killing occurred in the course of a drug transaction. . . . In fact, there is no authority requiring the government to prove that a defendant charged under 848(e)(1)(A) was actually engaging in an act punishable under § 841 at the time of the alleged killing.").

8.      The record also reflects counsel's unreasonable decisions to lie in wait with its unsupported nexus argument and to conduct cross-examination in a manner intended to disguise the misguided strategy. At the end of his Rule 29 argument, trial counsel submitted a proposed jury instruction incorporating the defense nexus theory after other jury instructions had been submitted because, he explained, "we were afraid it might telegraph concerns we had about the evidence, that could be remedied if we had submitted them in advance." Trial Tr. Vol. 9 143:20:22.

9.      **Improper Closing Argument Based on the Unsupported Legal Standard**. Trial counsel's reliance on the erroneous legal standard was so entrenched that even after the Court rejected the defense argument about the required nexus and articulated the legal standard that would apply, counsel clung hopelessly to his untenable theory in closing argument:

> Was there a drug deal going on? Is there any testimony that the defendant, Ms. King, Mr. Johnson, Mr. Barnett, brought drugs to Barbara's home for a sale? Is there any testimony that they purchased drugs there, and left? Respectfully, a killing, to occur while he is engaged in a drug conspiracy,

to be connected in what the Court will tell you is the meaningful way, would require that level of connection; that level of connection . . . [r]espectfully, you are going to have to find that for a meaningful connection to exist, the government would have had to have shown you that on the day, there was an event related to a violation of our narcotics laws, a drug trafficking—

*Id.* at 203:23-204:15.

10.     Those statements by trial counsel led to an immediate objection from the prosecutor that the argument "is completely contrary to your ruling." *Id.* at 204:17-18.   In response, the Court agreed, stating "I certainly have not ruled what you just argued."   *Id.* at 204:25-205:1.   The defense argument premised on the rejected statement of the law drew a devastating response from the prosecutor in rebuttal:

It's certainly ironic that [trial counsel] asked you to adhere to the law, because what he just told you about a drug conspiracy and its connection to this crime is not the law.   That is not the instruction that you are going to get from the Court and he knows it.   And he knows that there was a ruling, right before we came out and argued the case, that contradicted exactly what he told you.   He told you that at the time of this death, that you must find on that very day, that some sort of drug deal was going on. And that is not the law, and that is not what you are going to be instructed by the judge.   And he knows it.   It was a trick.   It was a gimmick, to try to focus you—

*Id.* at 209:3-17.   The Court overruled trial counsel's objection to that argument by the prosecutor, stating that "it was a characterization of [trial counsel's] argument," *id.* at 212:7-8, which "was clearly contrary to my ruling," *id.* at 210:16.

11.     Trial counsel's decision to misstate the law in closing argument after the Court had ruled was both deficient and prejudicial.   The government was able to use misstatement to attack the credibility of trial counsel and therefore the entirety of Mr. Hager's defense.

12.     **Trial Counsel's Unreasonable Reliance on the Wrong Legal Standard Also Led to a Devastating and Wholly Unnecessary Concession**.   During the argument on the Rule 29 motion, trial counsel stated:

> Now clearly, clearly, this killing, based on the evidence that the government has offered, certainly furthered drug trafficking, his conspiracy. It certainly furthered it. . . . Clearly, this could further an 841 violation. But that's not the law. The law requires that the government prove affirmatively that he is actively engaged in, at the time, an act directly punishable under 841, and that the killing is substantively connected.

*Id.* at 142:10-21. That concession proved to be a significant factor in the court of appeals' decision to find that the evidence was sufficient to convict Mr. Hager:

> But, even if that was not enough to sustain Hager's conviction, we note that Hager's trial counsel conceded at the Rule 29 motion hearing in the district court that "clearly, clearly, this killing, based on the evidence that the government has offered, certainly furthered drug trafficking, his conspiracy. It certainly furthered it."
>
>    *   *   *
>
> [I]t appears that Hager's trial counsel admitted that White's murder furthered Hager's drug conspiracy because: (1) the evidence overwhelmingly demonstrated that fact and (2) trial counsel thought that the government had to establish that a drug transaction occurred at the time of the murder for § 848 (e)(1)(A) to apply. Because there was no evidence that any drug activity transpired at the time of White's murder, trial counsel assumed that his acknowledgement was not dispositive. But, of course, although he was mistaken in thinking that a drug transaction had to occur at the time of the murder for liability pursuant to § 848(e)(1)(A), his concession that White's murder furthered Hager's drug conspiracy remains intact.

791 F.3d at 181-82. Providing an unnecessary concession relied on to support the sufficiency of the evidence against one's client is patently unreasonable and prejudicial.

  13. Trial counsel's unreasonable decision to conduct the entire defense in reliance on the wrong legal standard also caused or contributed to the failure to investigate, develop, and present exculpatory evidence, the solicitation of harmful evidence on cross-examination, deficient cross-examination, and other deficient representation detailed *infra* in the following paragraphs of this Claim I. In addition, all of counsel's deficiencies during the guilt phase of the

case, even if they had been conducted with a proper understanding of the applicable law, were unreasonable and were prejudicial to Mr. Hager.

14.     **Trial Counsel's Failure to Investigate, Develop, Elicit, and Present Evidence Contesting the Government's Theories Regarding the Nexus Between the Drug Conspiracy and the Killing of Barbara White.**  The government's evidence of the purported link between the charged drug conspiracy and the killing of Barbara White was circumstantial and tenuous and required multiple inferences.   The government heavily relied on its contentions that:  (1) Mr. Hager shot Ric Pearson and Chris Fletcher in a dispute over a gun, (2) Pearson and Fletcher were members of a rival drug gang, (3) William Seals ("Wee Wee"), the father of Ms. White's child, was a member of that gang, (4) Ms. White learned where Mr. Hager was living, and (5) Mr. Hager's motive to kill Ms. White was his fear that Ms. White would tell Seals where Mr. Hager lived, allowing Pearson, Fletcher, Seals, or someone associated with them to more easily kill him.  Trial counsel did nothing at trial to elicit or present evidence contesting these contentions, although there was substantial evidence available that rebutted the most significant ones.  Trial counsel's failure to investigate, develop, or present evidence to contest the government's contentions was inadequate performance as defense counsel and severely prejudiced Mr. Hager.

<u>**Shenita King's Threats to Kill Barbara White**</u>

15.     Trial counsel unreasonably failed to investigate, develop, elicit, and present, available evidence of an alternative motive for the killing unrelated to any drug conspiracy or dispute over a gun.  The evidence at trial showed that Shenita King, with whom Mr. Hager was living, aided and abetted in the killing of Barbara White.   Known to the defense, but unbeknownst to the jury, King had threatened to kill Ms. White just two weeks before the killing. That threat had nothing to do with any drug conspiracy, but instead arose from a dispute about a

sexual relationship between Ms. White and a man named Ronthony (a/k/a Rodney) Ward. Ward was having sex not only with Ms. White, but also with King and her friend Cassandra (a/k/a Cindy) Robinson. King and Robinson had admitted to the police both the relationship with Ward and the threat to kill Ms. White. Other witnesses also corroborated the relationship, the threats, and the existence of animosity between King and Ms. White. The evidence incriminating King was so strong that after more than six months of investigation, Investigator Robert J. Murphy of the Fairfax County Police Department, the lead detective in the investigation of Barbara White's death, concluded that Shenita King "has emerged as the main suspect in the case."

16. On December 8, 1993, days after the killing of Ms. White, an application for a search warrant and a supporting affidavit were submitted to a judge of the Superior Court for the District of Columbia seeking a search warrant for the District of Columbia residence of King. The supporting affidavit stated that it was based on information provided by Detective Investigator Murphy. The affidavit states in pertinent part as follows:

> Witnesses were located and interviewed by Inv. Murphy. These interviews revealed that approximately two weeks prior to the victim's death, she was visited at her apartment by three black females, who confronted the victim relative to an alleged love affair between the victim, and the boyfriend of SHENITA N. KING.

> SHENITA N. KING was interviewed by Inv. Murphy at which time she revealed that indeed she did visit the victim, and the reason for the visit and confrontation was to assault her due to her dissatisfaction with the victim's association with KING's boyfriend.

> A witness to the confrontation related to Inv. Murphy that during the confrontation the victim was threatened that she would be killed if additional evidence surfaced regarding the alleged affair.

17. The affidavit and application contained the handwritten notation "Approved, AUSA David Schertler, Chief, Homicide," who at that time was the Chief of the Homicide Section of the Office of the United States Attorney for the District of Columbia. Based on the

affidavit and application, a Superior Court judge approved the application and issued the search warrant. As part of pretrial discovery, the government provided to Mr. Hager's trial counsel the search warrant, the supporting application and affidavit, and related documents.

18.    Based on the same information provided by Detective Murphy and described above, including King's threats to kill Ms. White as a result of the affair, an application for a search warrant for the Maryland residence of King was submitted on December 10, 1993, to a judge in Prince Georges' County Maryland. The judge issued the search warrant, and it was executed. As part of pretrial discovery, the government provided to Mr. Hager's trial counsel the search warrant, the supporting application and affidavit, and related documents.

19.    After almost six months of investigation, which included interviews of numerous witnesses, Detective Murphy secured another search warrant. On May 23, 1994, based on the same information provided by Detective Murphy and described above, including Shenita King's threats to kill Ms. White as a result of the affair, an application for a search warrant to take a blood sample from King was submitted to a judge in Prince Georges' County, Maryland. The judge issued the warrant and it was executed. As part of pretrial discovery, the government provided to Mr. Hager's trial counsel the search warrant, the supporting application and affidavit, and related documents.

20.    In addition to producing the search warrant materials to defense counsel prior to trial, the government also produced to defense counsel notes and reports of Detective Murphy regarding his investigation of Ms. White's murder. The notes and reports identified several witnesses who had provided information confirming that Barbara White had been threatened by Cassandra Robinson and Shenita King as a result of Ms. White's relationship with another woman's boyfriend. Those witnesses included King herself, who Detective Murphy stated had

admitted making the threat, and also Cassandra Robinson, who also admitted the threats.  Alex Patton, a friend of Ms. White, and his friend Marcus Clinkscale also provided information about the threats.

21.     Murphy's report of the investigation included the following description of Patton's visit with Ms. White one to two weeks before her murder:  "Patton stated that Cassandra Robinson and Shenita King were leaving White's apartment as they [Patton and Clinkscale] were arriving and White told Patton and Clinkscale that Robinson and King had just threatened her about her having an affair with Rodney (Ronthony Ward).  Patton stated that White and King did not get along for unknown reasons."   Murphy observed that "Patton was cooperative and appeared truthful."

22.     Other witnesses identified in Detective Murphy's notes and reports provided further corroborating information.  Detective Murphy interviewed Ronthony Ward, who "admitted to having an affair with White after meeting her through Robinson and King."  A note containing Ronthony Ward's name and telephone number written by Ms. White in her own hand was discovered amongst her personal papers recovered from her desk at work.  Natasha Fultz, a close friend of Ms. White, stated in an interview that "[Ms.] White had several boyfriends and was very active sexually, inclusive of African American males."  Anita Allen, whom Detective Murphy described in his report as "a good friend of White's," told Murphy that "White was very active sexually and had numerous boyfriends, all of them being African American.  Allen stated that Ms. White recently became pregnant and had an abortion, which was confirmed by medical documents found in Ms. White's residence.  It is unknown to Allen who the father of this baby was."   Detective Murphy's notes indicated that Allen also told him that Ms. White kept her boyfriend's secret from William Seals, the father of her daughter, that "Barbara said that guys

would call her late at night and come over for sex," and that Ms. White did not know whether the pregnancy that was terminated shortly before she was killed was caused by Seals or someone else.

23.     Trial counsel unreasonably failed to conduct any investigation into the information produced in discovery about Shenita King's and Cassandra Robinson's threats against Ms. White, including failing to interview any of the witnesses identified in the law enforcement reports and notes.  Trial counsel also unreasonably failed to introduce into evidence at trial the search warrant materials and unreasonably failed to use at trial the information contained in those documents and in the police investigative reports and notes.  Trial counsel also unreasonably failed to call at trial any of the witnesses identified in the reports and notes, including Robinson, Fultz, Allen, Clinkscale, and Ward, who could have testified about King's threats and animosity towards Ms. White and the surrounding circumstances.  Trial counsel also failed to elicit on cross-examination of King and Patton and other witnesses who testified in the government's case evidence about the threats and animosity of King toward Ms. White, or to call them as defense witnesses.  These and other deficiencies in trial counsel's cross-examinations of King and other witnesses also are described *infra*.

24.     Trial counsel's deficient performance with respect to the threats to kill Ms. White prejudiced Mr. Hager.  Trial counsel presented to the jury no alternative motive for the killing of Ms. White other than one arising from the shooting of Pearson and Fletcher, which the government argued was linked to Hager's drug dealing conspiracy.  Trial counsel could have developed and used the evidence to argue, among other things, that King had a motive to kill Ms. White unrelated to any drug conspiracy.  They could have used it to argue that the killing was the result of animosity between King and Ms. White.  They could have used it to argue that King

wanted to kill Ms. White to hide evidence of her affair with Ward from Hager, with whom she was living.  They could have used it to show that it was King who wanted to kill Ms. White in order to hide her residence from Seals, who may have retaliated against King for threatening to kill the mother of his child.  They could have used it to impeach King, including King's testimony about the events that preceded the killing and her description of the killing itself.  They could have used it to argue that King had a strong motive to provide a description of the killing desirable to the government in order to escape prosecution, as she did, for her role in the killing.  Trial counsel could have argued that King's threats to kill Ms. White were more likely the cause of the killing because the threats occurred only two weeks before the killing whereas the shooting of Pearson and Fletcher occurred more than five weeks before the killing, especially in light of the fact that King did not move into her apartment in Maryland until mid-November, 1993—a  month after the shooting of Pearson and Fletcher had occurred but around the same time that she had threatened to kill Ms. White.  All of those arguments and more were available to counsel, even in the face of evidence that Mr. Hager participated in the murder.  Counsel argued none of those things and was not in a position to do so because they completely failed to investigate or develop the evidence in their possession regarding King's threats to kill Ms. White.  The failure to pursue any of these plausible arguments severely prejudiced Mr. Hager.

### The Government's "Rival Drug Gang" Theory

25.     An essential component of the government's circumstantial case of a nexus between the killing of Barbara White and a drug conspiracy was the government's "rival drug gang" theory.  The rival drug gang theory was an important link in the government's evidence of the alleged nexus between the killing and the drug conspiracy: "And in terms of the nexus, in a meaningful way, . . . [w]hat could be more meaningful than avoiding the attack from a rival drug

dealer?" Trial Tr. Vol. 9, 213:17-20, Oct. 16, 2007 (government rebuttal argument). The principal problem with the rival drug gang theory was that it was a fiction. It appears to have been concocted in order to shoehorn this case into section 848, which provided federal jurisdiction and allowed the death penalty, and to exploit stereotypical images associated with wars between urban gangs of drug dealers.

26. Trial counsel failed to investigate, develop, elicit, or present evidence contesting the rival drug gang theory, although evidence refuting it could easily be found in the discovery material and through basic investigation. First, witnesses whose interviews by the government were memorialized in reports and notes provided to defense counsel would have testified that there was no dispute about territory between those who sold drugs on and near Nelson Place and those, such as Pearson and Fletcher, who sold on and near Ely Place. The witnesses who would have provided that information included Shenita King, Cassandra Robinson, Pearson, and Seals. Those witnesses and others also would have testified, and a simple map would have illustrated, that many city blocks and natural geographic boundaries, including a wooded area, separated the relevant blocks of Ely Place and Nelson Place. Those witnesses and others also would have testified that individuals, including Fletcher and Pearson, who sold drugs on Ely Place and those who sold drugs on Nelson Place did not compete for customers. Those witnesses and others also would have testified that drug sellers from each area could and did walk into commercial establishments in the other area without fear of retribution, such as Fletcher and Pearson shopping at the G&G grocery store located near Nelson Place. Those witnesses and others would have testified that individuals who sold drugs at Ely Place and those that sold at Nelson Place also intermingled at a nearby park and recreation center, playing basketball and riding dirt bikes together.

27.     Second, witnesses whose interviews by the government were memorialized in reports and notes provided to defense counsel would have testified that in the Fall of 1993, Seals was not part of a drug-selling "gang," "crew" or other group that included Fletcher and Pearson. Those witnesses included Pearson, King, Cassandra Robinson, and Seals himself. In fact, in an interview with police investigators in 2004, Seals told them that he had been a competitor of Pearson and Fletcher, not a member of a joint operation. Seals said he sold crack in one of the same locations that Fletcher sold and that he "competed selling drugs" with Fletcher and Pearson. Seals also testified before the grand jury that he had learned of the shooting of Pearson and Fletcher via "the word on the street," not from Pearson or Fletcher. While in a liquor store in the Nelson Place neighborhood, some men asked Seals whether he intended to retaliate for the shooting. Seals denied that he would, stating "I ain't worried about that" and "I'm my own man." Seals also told police that he did not know who shot Pearson and Fletcher. With respect to Hager, Seals testified that he "never met" him and did not have any problems with him. Seals' response to the shooting of Pearson and Fletcher is hardly that of a member of a rival drug gang intent on avenging the shooting of his fellow gang members.

28.     The jury heard none of the evidence described above or other evidence that would have rebutted the government's "rival drug gang" theory because trial counsel did not investigate, develop, or elicit any of it at trial. Their failure to do so was unreasonable, and it seriously prejudiced Mr. Hager by depriving the jury of critical evidence that would have rebutted the government's claim of a nexus between the charged drug conspiracy and the shooting of White.

29.     **Failure to Cross-Examine Shenita King.** Shenita King was a very important witness for the government. She provided testimony about, among other subjects, Barbara

White's visit to the apartment a week before she was killed and events that took place on the night that Ms. White was killed. King also testified that Mr. Hager was concerned about Ms. White's knowledge of his whereabouts and linked that concern to Ms. White's relationship with Seals and potential retaliation against him for the shooting of Pearson and Fletcher.

30.    Trial counsel conducted no cross-examination of King. Their failure to do so was unreasonable and prejudiced Mr. Hager. Each of the areas of cross-examination described in the following paragraphs, as well as other subjects, provided fertile ground to impeach Ms. King's version of events, rebut the government's efforts to link the killing to the drug conspiracy, and/or undermine the government's portrayal of Mr. Hager as the leader and architect of the killing.

31.    Trial counsel failed to cross-examine King about her threats and animosity against White and the related information detailed in paragraphs 15-24, *supra*. Trial counsel also failed to cross-examine King about information detailed in paragraphs 25-28, *supra*, rebutting the government's rival drug gang theory. Those paragraphs are incorporated as if fully set forth herein.

32.    Trial counsel also failed to cross-examine King about the massive incentives provided to her to cooperate and testify in the manner desired by the government. Those incentives included her complete immunity from prosecution for the killing of Ms. White and the considerable financial benefits she received from the government. Although the government elicited testimony regarding some of those benefits in sterile form on direct examination, competent counsel would have used cross-examination to develop and emphasize the extreme value of those benefits to King and their capacity to incentivize King to testify in the manner desired by the government.

33.     Competent counsel would have elicited, for example, that the immunity agreement effectively protected King from receiving a life sentence, or even the death penalty, for her role in the killing of Ms. White.  Competent counsel would also have exposed the fact that after King signed the immunity agreement in 1999, she continued to sell crack, with impunity, until at least 2002, a fact known to the government.

34.     Competent counsel would have elicited on cross-examination the fact that King received at least $72,935 from the government for her cooperation between 1999 and 2005, including money for housing and assistance in moving.  These payments were intended to allow King to hide her location from Mr. Hager in order to ensure her safety.  King accepted them even though she and her daughter were in touch with Mr. Hager at all times by telephone and mail and so he was always aware of her location.  Competent counsel would have emphasized on cross-examination the fact that King dealt crack independently of Mr. Hager and regularly carried a gun.  Competent counsel would have elicited from King the fact that she was suspicious of why Ms. White was visiting her at the Maryland apartment.

35.     Those facts and others gave King an incentive to keep the location of the Maryland apartment a secret.

36.     Competent counsel would have elicited testimony from King that upon her demand, Arlington Johnson, Jr. and Lonnie Barnett accompanied her to locations without Mr. Hager.  One of those locations was Ms. White's apartment which King, Johnson, and Barnett visited on multiple occasions together to smoke marijuana with Ms. White, unbeknownst to Mr. Hager.

37.     All of the information in the preceding paragraphs 15 through 36 was available to trial counsel in the discovery material produced to them by the government.  Their failure to use

that information and additional information derived from it to cross-examine Ms. King was unreasonable and prejudicial to Mr. Hager.

38.     **Failure to Adequately Cross-Examine Key Government Witness Charles Johnson.**  Charles Johnson was a vitally important witness for the government. He claimed to have had two conversations about the death of Barbara White with Mr. Hager.  During the first, Johnson claimed, Mr. Hager told him that he was going to kill Barbara White because she had been to his apartment in Maryland and clearly knew where he lived and he was afraid that she would tell her baby's father, Wee Wee, of the apartment's location.  According to Johnson, Mr. Hager was afraid that Wee Wee would then try to harm him in retaliation for the shooting of Wee Wee's associates, Chris Fletcher and Rick Pearson.  Also during that conversation, Johnson claimed, Mr. Hager discussed the fact that he was going to kill Barbara White with a knife instead of a gun because a gun would be too loud, on account of the fact that Barbara White lived across the street from a multiplex movie theater.  In other words, Johnson's testimony, and *only* Johnson's testimony, allowed the government to erroneously argue that the homicide was cold-bloodedly planned by Mr. Hager in advance to occur in exactly the gruesome manner in which it later took place.

39.     The second alleged conversation between Johnson and Mr. Hager supposedly took place later the same night.  Johnson testified that Mr. Hager, Arlington Johnson and Lonnie Barnett came to one of the crack houses on Nelson Place and Mr. Hager told him that they had just killed Barbara White.  Johnson claimed that Mr. Hager told him they had stabbed Ms. White, tried to electrocute her and put her in a tub, and that Arlington Johnson and Lonnie Barnett helped him.  In addition to this supposed confession, Johnson prejudicially claimed that Mr.

Hager bragged about the roles of Arlington Johnson and Lonnie Barnett with seemingly paternalistic pride.

40.     Inexplicably, and prejudicially, trial counsel failed to cross-examine Johnson with the mountain of available evidence that would have destroyed Johnson's credibility and clearly demonstrated his powerful biases and motives to fabricate.  Instead, the jury was left with the impression that Johnson had received no benefits for cooperating with law enforcement against Mr. Hager and no rewards or other advantages for testifying against him in such a devastating fashion, and could have concluded only that Johnson was a concerned citizen helping the authorities solve the region's violent crimes out of the goodness of his heart.  For its part, the government elicited from Johnson that it had agreed to give him immunity from any charges of drug dealing or other crimes that he told them about during his cooperation sessions, in exchange for Johnson's complete disclosure of any information in his possession regarding the activities of Mr. Hager and for his agreement to testify whenever and wherever he was asked to do so. However, given that, as far as the record showed, Johnson was under no compulsion to enter into cooperation sessions with the government to begin with, this arrangement appeared to offer no inducement whatsoever to Johnson to provide information to law enforcement or testify against Mr. Hager beyond his own sense of civic duty.

41.     The government also elicited on direct examination that Johnson had an agreement with the United State Attorney's Office for the District of Columbia, pursuant to which he would plead guilty to one count of Conspiracy to Murder, for which he faced a maximum sentence of 5 years in jail and no minimum sentence, and agree to disclose all information about Mr. Hager and to testify against him as and when requested.  In return, the government agreed not to prosecute him for any narcotics offenses committed prior to the

agreement, not to charge him with any offenses arising out of the murder of one William Roberts in 1992, not to charge him with any offenses arising out of a non-fatal shooting on the 2900 block of Nelson Place, S.E. in 1993, not to revive charges previously dismissed against Johnson in case F-5055-94 in the D.C. Superior Court, and not to bring any charges other than the Conspiracy to Murder charge in connection with the murder of Calvin Spriggs.

42.     If the jury had any notion that this second agreement might have served Johnson's self-interest in some way, it was quickly disabused of the thought by the government's redirect examination. After defense counsel ineffectually reiterated some of the terms of the agreement on cross-examination, the government was permitted to elicit from Johnson that he was not the person who shot Calvin Spriggs; that he did not kill William Roberts, but merely provided information to police about the incident; that he was not the person who shot the gun in the 2900 block of Nelson Place, S.E. and merely provided information about what happened; and that the case in which the charges were previously dismissed against him was one in which he himself was shot, and he was not the person who shot anybody in that case either. And so, once again, the net result was to leave the jury with the distinct, but false, impression that Johnson received no benefit to himself by testifying against Mr. Hager and must therefore have been driven by the purest of motivations. Nothing could have been further from the truth.

43.     Counsel's failures include, but are not limited to:

44.     **Failure to Impeach Johnson With His Prior Criminal Convictions.** Unbeknownst to Mr. Hager's jury, Johnson was a convicted felon. He also had a prior conviction for a misdemeanor involving dishonesty or moral turpitude. Specifically, Johnson was convicted in 1998 of felony Malicious Wounding in the Circuit Court of Stafford County, Virginia. Additionally, Johnson was convicted in Stafford County District Court of Obstruction

of Justice in March, 2007.  Both convictions were admissible and relevant to impeach Johnson's credibility as a witness but neither was mentioned on cross examination by trial counsel.

45.  **Failure to Expose Johnson's Motivation to Cooperate With Law Enforcement to Save Himself From Lengthy or Permanent Imprisonment.**  To undersigned counsel's current knowledge, the first contact that Charles Johnson had with law enforcement authorities regarding the Barbara White case took place on June 3, 1997.  On that date, Johnson met with Detective Robert J. Murphy of the Fairfax County Police Department and Virginia Commonwealth's Attorney Ray Morragh at the Stafford County Jail in Stafford, Virginia, where Johnson was then incarcerated.  During the meeting, Johnson provided Det. Murphy with information incriminating Mr. Hager in Barbara White's murder consisting of statements allegedly made by Mr. Hager to Johnson.

46.  At the time that he provided information incriminating Mr. Hager, Johnson was being held pending trial in the Stafford County Circuit Court in a case in which he had shot a man and was charged with one count of Malicious Wounding, one count of Breaking and Entering, one count of Use of a Firearm During the Commission of a Felony and one count of Possession of a Firearm After being Convicted of a Felony.  On the charge of Malicious Wounding, he was facing 5-20 years in prison and a fine of up to $100,000.  On the charge of Breaking and Entering with the Intent to Murder, he could receive up to Life, or any term not less than 20 years, and a fine of up to $100,000.  On the charge of Use of a Firearm While Committing a Malicious Wounding, he was facing a mandatory 3 years in prison to run consecutive to the sentence imposed for the underlying felony.  And on the charge of Possession of a Firearm After Being Convicted of a Felony, he was facing a sentence of up to 1-5 years in prison.  In total, then, if convicted Mr. Johnson faced imprisonment for the rest of his life, or for

a term of up to 48 years. These pending charges alone constituted considerable incentive for Johnson to try to save his own skin by working with law enforcement against Mr. Hager.

47.    The charges pending against Johnson in Virginia, however, were far from the full extent of the legal jeopardy Johnson was in at the time of his first statements to Det. Murphy. In addition, he was under indictment in the District of Columbia in F-5055-94, a double homicide case in which he was charged with two counts of First Degree Murder While Armed, one count of Assault With Intent to Kill While Armed, Assault with Intent to Murder While Armed, Possession of a Firearm During a Crime of Violence, and Carrying a Pistol without a License. In that case, he faced life sentences on each of the First Degree Murder While Armed charges and in no event could he receive sentences of less than 30 years without possibility of parole for those offenses. He also faced life imprisonment on the charges of Assault With Intent to Kill While Armed and Assault with Intent to Murder While Armed, with mandatory minimum terms of five years on each. For Possession of a Firearm During a Crime of Violence Johnson could have been sentenced to up to 15 years with a five year mandatory minimum, and he faced an additional five years for Carrying a Pistol Without a License. In short, Johnson was at grave risk of being incarcerated until he died if convicted in this case. Probable cause to convict him had been found, a grand jury later indicted him and he was held in pre-trial detention in the case for almost eight months before ultimately being released on bond in January, 1995.

48.    Not only that, but in June, 1996, while he remained on bond in the double homicide case, Johnson picked up a third case in which he was charged with Carrying a Pistol Without a License, again in D.C. Superior Court. As noted, the charge of Carrying a Pistol Without a License carried an additional possible sentence of five years imprisonment.

49.     In March of 1998, a search warrant was executed by the Stafford County Sheriff's Department CID on the property where Johnson's grandfather lived, including the shed in which Johnson himself was living.  Recovered from the shed were illegal items including drugs and stolen guns.  Larry Greenhow Sr., who was charged with possessing the items, informed police that the drugs came from Johnson and that the stolen guns had been stolen in a burglary and brought to the location for Johnson to buy.  Upon information and belief, arrest and search warrants were also issued for Charles Johnson himself.

50.     On May 15, 1998, the threat of still more criminal charges against him impelled Johnson to reach out to AUSA James Trump for assistance in exchange for his cooperation against Mr. Hager.  Johnson paged "911" to Det. Murphy, asking him to call his grandmother's house.  When Det. Murphy called him, Johnson reported that he had two new charges—one involving a stolen gun and one involving possession of marijuana—and a $26,000 bond.  Det. Murphy wrote in his notes of the conversation:  "Going to go to jail—wants to meet with Jim Trump."  A few hours later that same day, Johnson paged Det. Murphy "911" again, informing him that he was at the warrant desk with his grandmother.

51.     Five days later, on May 20, 1998, Johnson was being interviewed at the United States Attorney's Office in Alexandria by AUSA Trump, Det. Murphy and others, and giving information incriminating Mr. Hager in the murder of Barbara White.  Because no further information regarding Johnson's stolen gun/possession of marijuana case was provided to defense counsel by the government in violation of Mr. Hager's constitutional rights, *see* Claim IV, incorporated by reference as if fully set forth herein, and because defense counsel inexplicably and prejudicially failed to seek production of such information, undersigned counsel are currently unaware of the status of that matter at the time of Johnson's May 20, 1998,

interview, or the full extent of Johnson's sentencing exposure. Counsel will shortly move the Court for permission to discover this information and thereafter seek leave to file an amended motion if necessary. The cases pending against Johnson in the D.C. Superior Court had both been dismissed without prejudice in the interim; however, Johnson was still facing life imprisonment or up to 48 years in his still-pending Malicious Wounding, Breaking and Entering, Use of a Firearm and Possession of a Firearm case in Stafford County Circuit Court.

52.     That Johnson's cooperation with law enforcement against Mr. Hager was indeed motivated by a desire to alleviate his own dire legal predicaments is not merely theoretical; Johnson himself admitted as much. During his December, 1999, testimony against Mr. Hager in an unrelated District of Columbia homicide prosecution, Johnson admitted that he spoke with authorities in an attempt to get a better plea deal in his Stafford County case. He further stated that he was trying to clear his past up because he had a feeling it was coming to haunt him.

53.     On July 23, 1998, Johnson pled guilty in Stafford County Circuit Court to one count of Malicious Wounding. As part of his plea agreement, the charges of Breaking and Entering, Possession of a Firearm by a Convicted Felon and Use of Firearm During a Crime of Violence were *nolle prossed*. Instead of a life sentence, Johnson received a maximum of 10 years, with 8 of those years suspended with credit for time served followed by probation. He was released from prison just over one year later.

54.     On June 1, 1999, and August 5, 1999, Johnson signed the above-described agreements with the United States Attorney's Office for the Eastern District of Virginia and the District of Columbia, respectively. From that point forward, Johnson was obligated to testify against Mr. Hager before whatever tribunal the government instructed him to, and in a manner that the government in its sole discretion adjudged to be truthful, in perpetuity, or else face

prosecution for all of the criminal offenses that he had told the government about during his numerous debriefing sessions, all of the offenses for which he was promised use immunity in his plea agreement with the District of Columbia, as well as the double homicide and Carrying a Pistol Without a License cases that had been previously dismissed without prejudice in the D.C. Superior Court. Not only would he face prosecution in each of these instances, but also his own statements made at any point during his extensive interactions with law enforcement could freely be used by the government as evidence against him. The agreement read:

> If the United States Attorney determines that your client has failed to comply with any provision of this agreement, or has committed any crime during the pendency of this agreement, the Government may, at its sole discretion, be released from its obligations under this agreement in their entirety by notifying your client, through counsel, in writing. Your client understands that, should he breach any provision of this agreement, irrespective of whether the United States Attorney elects to be released from its obligations under this agreement, (a) your client shall be fully subject to criminal prosecution for any and all crimes which he has committed, including perjury and obstruction of justice, and (b) the Government will have the right to use against him at any civil or criminal proceeding, any of the information or materials provided by your client pursuant to this agreement and or pursuant to all "off the record" debriefings, without any limitation.

55.     By the time that he testified against Mr. Hager in the instant case on October 15, 2007, Johnson's legal situation was precarious in the extreme. Not only did his freedom and his future depend upon his ability to persuade the government that his testimony was both truthful and complete, but he was also already in violation of the agreement. As noted, by its terms the agreement was violated by the commission of another crime during its pendency, and Johnson had committed two, both in Stafford County. On March 1, 2007, he pled guilty to a charge of Assault, and was given a suspended sentence of 6 months in jail. And on March 15, 2007, Johnson received a similar sentence after pleading guilty to a charge of Obstruction of Justice with Threats and Force. The government was therefore completely within its rights to throw out

the agreement and prosecute Johnson on every available charge, and Johnson was entirely at the government's mercy and dependent upon its grace and favor.

56. Complete information regarding the crimes to which Johnson admitted involvement during his numerous debriefing sessions with the government, and for which he was therefore subject to prosecution should the government opt to rescind the agreement, was withheld by the government in violation of Mr. Hager's constitutional rights. *See* Claim IV, incorporated by reference as if fully set forth herein. Defense counsel inexplicably and prejudicially failed to seek production of such information. Undersigned counsel are therefore currently unable to determine the full extent of Johnson's sentencing exposure at the time of his testimony against Mr. Hager. Counsel will shortly move the Court for permission to discover this information and thereafter seek leave to file an amended motion if necessary. It is nevertheless clear from information that is available that, contrary to the government's intimations at trial, Johnson was far from blameless in, at a minimum, the double homicide for which he was previously charged in the Superior Court for the District of Columbia in F-5055-94, and the non-fatal shooting on the 2900 block of Nelson Place, S.E.

57. With respect to the double homicide case in D.C. Superior Court in F-5055-94, Johnson could readily have been prosecuted on all charges. The events that gave rise to those charges were as follows: On May 24, 1994, at around 10:30 p.m., Timothy Dorsey, Willmon Poole, Michael Robinson, and one other man were driving in an Acura Legend in the area of Minnesota Avenue and Randall Circle, S.E. A red car containing four young black males pulled up alongside and the three passengers opened fire on the Acura Legend. Dorsey, Poole, and Robinson were all hit. Dorsey was pronounced dead at Prince George's County Community

Hospital. Poole was flown to the Med Star Unit and died of his injuries a week later. Robinson suffered gunshot wounds to the head and hands but he survived.

58. Shortly after the shooting, Charles Johnson went to the D.C. General Hospital with a fresh gunshot wound to his chest. He was accompanied by Larry Greenhow who had a fresh gunshot hole in his hat. Greenhow told police that they had just been in a red car that was shot at by individuals in a nice car, possibly an Acura. He denied that anyone in the red car fired at the other car.

59. The eyewitness, Michael Robinson, told police that he saw everyone in the red car except for the driver shooting at the Acura that he was riding in. Larry Greenhow told police that Johnson was seated in the front passenger seat, and that the driver was an unidentified third man. He also claimed that no one in the car shot any kind of weapon at the Acura. Johnson made the implausible statement that he saw nothing because he was looking out the window at a girl, and that he then just heard shots and felt that he was hit.

60. The eyewitness further told police that one of the decedents, Timothy Dorsey, was believed to have been the person who shot and killed Dwayne Gaskins on the 3900 block of Minnesota Avenue, N.E., two days previously. Gaskins was Johnson's god-brother, and they were very close. Police developed evidence that the shooting committed by Greenhow and Johnson was a deliberate act in retaliation for the murder of Gaskins. Based on these facts and others, police found sufficient evidence to believe that Johnson and Greenhow knowingly participated in shooting the three occupants of the Acura Legend and arrested both men for two counts of homicide and related charges. Both men spent the following eight months in preventive detention, and Larry Greenhow ultimately pled guilty to two counts of Manslaughter

for his role in the shootings.[1]  Trial counsel failed to cross examine Charles Johnson regarding any of this information; indeed, counsel failed to even elicit that the case involved homicide charges against Johnson.

61.     With respect to the non-fatal shooting on the 2900 block of Nelson Place, S.E. with Spider, contrary to the testimony that the government elicited at trial, *see* Claim IV, incorporated by reference as if fully set forth herein, Johnson told law enforcement that he did indeed shoot the individual himself.  Upon information and belief, the victims of this shooting were a man known as "Greg," and a man known as "Gary."  Greg was a drug dealer who lived and sold drugs on the 2900 block of Nelson Place, S.E.  Johnson sold drugs for Greg for a period before going out on his own.  At the time of the shooting, Randolph Moses was driving Johnson's Acura and Johnson and Spider were passengers.  Johnson and Spider chased Greg Gary and Johnson shot Greg in the buttocks.  Gary was also shot and survived.

62.     Johnson additionally provided law enforcement with extensive information regarding his own drug trafficking activities, both in Washington, D.C. and in Virginia.  That information included, but was not limited to: that in the early 1990's Johnson was selling 31 or 62 grams of crack cocaine two to three times per week on Nelson Place, S.E., and on some occasions received as much as 125 grams which he then sold on; on one occasion in 1996, Johnson was supplied with 13 ounces of crack by a cousin which he proceeded to distribute; Johnson continued selling crack in Washington, D.C. after he moved to Alexandria, Virginia, in 1992 or so, and was still purchasing 31, 61 or 125 grams of crack at a time during that period; that in 1993 Johnson made his biggest purchase of crack cocaine ever, paying $7,000 for nine ounces from a dealer known as Hooks; after he got out of jail in 1995, Johnson resumed drug

---

[1]     Greenhow was allowed to plead guilty to the reduced charges of Manslaughter in return for his cooperation with law enforcement against a number of individuals, including Mr. Hager.  The reduced charges therefore in no way cast doubt upon Johnson's culpability on First Degree Murder and Assault With Intent to Kill charges.

trafficking, beginning with eight grams and moving back up to 62 grams; Johnson sold crack approximately once a month in the area of Fredericksburg, Virginia, beginning when he was 16 or 17 years old, and when he moved to that area in late 1995/early 1996 he began selling eight grams a week there, all of which was transported into Virginia from Washington, D.C.; and on one occasion in 1997, after he had begun providing information to law enforcement, he sold a quarter pound of marijuana to Mr. Hager. Upon the violation of his plea agreement Johnson was subject to being prosecuted for these offenses also and, as a result, would have been facing sentences that combined amounted to decades or more of imprisonment.

63.     In addition to his staggering criminal liability in unrelated matters, Johnson also knew that he could be prosecuted, at a minimum, as an accessory after the fact to the murder of Ms. White based upon evidence that he took part in disposing of the clothes worn by the participants in the murder following their return to Washington, D.C. On March 31, 1999, Shenita King told AUSA Trump, Agt. Garrett and Det. Murphy that Johnson had walked out into the woods behind her apartment in Maryland with Mr. Hager to dispose of the clothes. On April 7, 2004, Shenita again told Agt. Garrett and Det. Murphy that Johnson and Mr. Hager together got rid of the bloody clothes, gloves and masks after Ms. White was killed, adding that they left them in a creek behind Silver Hill. She further described Johnson as "the keeper." Johnson knew that law enforcement suspected him of complicity in this aspect of the White murder because Agt. Garrett, Det. Murphy and AUSA Mellin specifically questioned him about it on June 10, 2004. Johnson denied that he had had anything to do with disposing of the clothing.

64.     It is also the case that at the time of Mr. Hager's trial in 2007, eight years had elapsed since Johnson he had agreed to plead guilty to Conspiracy to Commit Murder in the

Calvin Spriggs case and no plea had yet been entered. Indeed, no plea has been entered to date, 16 years after the agreement was signed. The jury would likely have assessed Johnson's credibility differently had it known that his obligation to plead guilty to Conspiracy was an illusion and that the government had decided to reward Johnson for his cooperation by absolving him of all of the consequences of his prior criminal conduct.

65. In sum, unbeknownst to Mr. Hager's jury, Johnson had multiple compelling motives to testify against Mr. Hager in an attempt to save himself that cast serious doubt upon his veracity and credibility. Trial counsel's deficient and prejudicial failure to elicit evidence regarding any of these motives amounted to constitutionally ineffective assistance.

66. **Failure to Cross Examine Johnson Regarding His Prior Inconsistent Statements.** Trial counsel also neglected to bring to the jury's attention that Johnson had given significantly divergent accounts of his alleged conversations with Mr. Hager over the course of his multiple interviews with law enforcement, including but not limited to:

67. On the witness stand at Mr. Hager's trial, Johnson claimed that on the day of Ms. White's murder he and Mr. Hager "discussed" that Mr. Hager was going to use a knife instead of a gun to kill her because a gun would be too loud, on account of the fact that she lived across the street from the multiplex.[2] When he was interviewed by AUSA Trump, Det. Murphy, and others on May 20, 1998, however, Johnson made no mention of any such discussion. Then on January 7, 1999, he told AUSA Trump, Agt. Garrett, and Det. Murphy that he found out after the fact that knives were used in killing Ms. White because of the number of police officers that are typically in the neighborhoods around multiplex theaters. When he was first interviewed by Det.

---

[2]    This claim was false. The only reason that knives were finally used in Ms. White's murder was at Arlington Johnson's suggestion after Mr. Hager's gun broke and attempts to electrocute Ms. White failed. *See* Claim II, incorporated by reference as if fully set forth herein. Additionally, as noted below, Ms. White's apartment was over two miles away from the nearest multiplex movie theater.

Murphy on June 3, 1997, Johnson claimed that Mr. Hager told him *after* the murder that they had used knives "because they were afraid to carry a gun in Virginia."  On August 20, 2007, he told AUSA Trump and Det. Murphy that *he* had told Mr. Hager not to use a gun "because the Virginia Police would catch him."  He also stated before the grand jury in the Eastern District of Virginia, on August 5, 1999, that Mr. Hager said he was going to shoot Ms. White and that he, Johnson, said he was crazy and talked him out of it because of the police that would supposedly be across the street at the multiplex.  And Det. Murphy recounted yet another version of the purported conversation when he testified before the grand jury that Johnson told him that he had advised Mr. Hager not to go into Virginia with guns because it makes too much noise, there is too much of a penalty for this, there are too many police and Ms. White lived near a police station.[3]

68.     When he was interviewed on May 20, 1998, Johnson stated that he could not recall who else was present when he had his purported conversation with Mr. Hager after the White murder had occurred.  By June 22, 1999, however, he claimed to remember that Lonnie Barnett, Arlington Johnson and an individual named Frank Moses were all there while he was talking to Mr. Hager and that he was sure that Frank Moses had heard their conversation.  By the time he testified at Mr. Hager's trial in 2007, Johnson had dropped Frank Moses from the picture and claimed instead that it was just Barnett and Arlington Johnson who were there.

69.     **Failure to Cross Examine Johnson Regarding Inconsistencies Between His Statements and Other Evidence**.  Trial counsel also neglected to bring to the jury's attention that important details of Charles Johnson's shifting accounts of his alleged conversations with Mr. Hager were inconsistent with other reliable witnesses and evidence, including but not limited to:

---

[3]     Ms. White's apartment was over two miles from the nearest police station.

70.     As noted, Johnson claimed at times that he had discussed with or advised Mr. Hager not to shoot Ms. White because she lived across the street from a multiplex movie theater, there would be police at the movie theater and the police would hear the gun.   Counsel unreasonably and prejudicially failed to elicit the fact that the nearest movie theater to Ms. White's apartment at that time was the Mount Vernon Multiplex at 7940 Richmond Highway, almost two miles away and well out of hearing range of a gunshot.

71.     Although the government elected not to elicit the fact at trial, Johnson had informed them on multiple occasions that his cousin, Arlington Johnson, had talked to him about Ms. White's murder several different times and provided him with details regarding what happened.   Arlington Johnson, however, was adamant throughout his interviews by law enforcement, and testified in front of the jury, that he never told anyone what had occurred, including Charles Johnson.

72.     Johnson testified that Wee Wee, the father of Ms. White's child, was the "shooter guy" or "hit man" for Chris Fletcher and Rick Pearson.   In fact, Wee Wee, whose real name is William Seals, had no such relationship with Fletcher or Pearson and would have so testified had defense counsel inquired.   *See* paragraphs 26-28, incorporated by reference as if fully set forth herein.

73.     **Failure to Object to Inadmissible and Highly Prejudicial Hearsay Testimony.** Johnson's testimony that Wee Wee was Chris Fletcher and Rick Person's "hit man" was highly prejudicial, for it lent credence to the government's theory that Ms. White was killed because Mr. Hager feared that Wee Wee would violently retaliate against him for the shooting of Fletcher and Pearson.   This testimony was also inadmissible, for it was hearsay.   Johnson admitted on the stand that he had no personal knowledge of Wee Wee's status as a "hit man," and that it was

instead something he had "heard." Had counsel made the appropriate objection, the Court would have been required to exclude Johnson's inflammatory claim.

74.     In sum, by failing to use information that they had in their possession to attack the credibility of Charles Johnson, Mr. Hager's counsel rendered constitutionally ineffective assistance. Counsel's performance was additionally deficient and prejudicial due to their failure to obtain from the government substantial additional impeaching information regarding Johnson to which they were entitled, and their failure to object to prejudicial hearsay testimony elicited by the government regarding William Seals. Separately, and cumulatively with all the other instances of ineffective assistance, counsel's failures with respect to the testimony of Charles Johnson violated Mr. Hager's constitutional rights.

75.     **Failure to Adequately Cross-Examine Stanley Currie and Object to Questions Posed on Direct Examination.** Stanley Currie was one of the first witnesses to testify for the government about Mr. Hager. Currie was an important government witness who testified about, among other subjects, Mr. Hager's distribution of crack, the shooting of Fletcher and another guy he claimed not to know, and statements allegedly made by Mr. Hager about the stabbing of Ms. White. At the time of his testimony, Currie was serving a sentence of 70 years to life for a double murder he committed at the age of 16. Trial counsel failed to adequately cross-examine Currie and failed to object to improper questions on direct examination. Mr. Hager was prejudiced by that failure. Counsel's failures with regard to this witness include, but are not limited to:

76.     In 1993, Currie was 13 years old. At the time of his testimony, he was 27. There were substantial reasons to doubt his testimony about the shooting of Fletcher and Pearson, which he claimed to have witnessed. Currie testified at trial that "some guys" from "up the

street" got into it with Eric (Moses), and "had guns drawn on him." Trial Tr. Vol. 8 156:5-8. He says he "went around and got Tommy and Neldy Windsor" and "[w]e drove back around there." *Id.* at 156:8-13. Currie testified about a discussion among Fletcher, Pearson, and Mr. Hager, followed by Mr. Hager shooting them. *Id.* at 156:16-157:2. Currie testified that he and Mr. Hager took bullet proof vests and a gun out of Fletcher's car and then Mr. Hager, Windsor, and Currie left in Mr. Hager's car. *Id.* at 157:24-158:21. He testified that one of the guys that got shot was Chris Fletcher, but he did not know the other one.

77.     Reasonably competent counsel would have impeached Currie with his prior inconsistent statements to the government. When he was interviewed by AUSA Trump, Detective Murphy and Agent Garrett on November 11, 1999, and then again on March 2, 2000, Currie told them that the other person who was shot was an individual known as "Porky." However, Porky was Chris Fletcher's brother, not Ric Pearson, and he had nothing to do with the shooting.

78.     Arlington Johnson, Jr., also testified about the shooting. He and Currie gave contradictory testimony—Johnson did not put Currie at the scene, and Currie did not put Johnson at the scene. In his cross-examination of Currie, trial counsel should have highlighted this contradiction through questions that emphasized the absence of Johnson in Currie's version of events. Trial counsel did not do so.

79.     Trial counsel also did not object to the prosecutor asking Currie: "Do you know what the shooting was about originally?" *Id.* at 157:8. There was no foundation for this question, and none was ever provided. Currie responded by relating a story about the alleged cause of the dispute with Fletcher and Porky: the theft of "one of our guns"—a .357—by a crack user, who

later sold it to one of the dealers on Ely Place. *Id.* at 157:9-14. Trial counsel should have objected to this testimony, which appeared to be hearsay.

80. Trial counsel also embarked on a line of cross-examination that was designed to elicit information that was harmful, not helpful, to rebutting the government's nexus theories.

> Q: Mr. Currie, you described the shooting near Randall Circle of the man you knew as Chris and his friend; correct?
>
> A. Yes.
>
> . . .
>
> Q. You knew him from Ely Street?
>
> A. Ely and 34th Street
>
> Q. They were part of a crew up there?
>
> A. I don't know those guys that well, but I know they were from the area. I'm not going to say they were part of a crew. I don't know them well.
>
> Q. You didn't know they were working for Wee-Wee?
>
> A. I don't know who they work for.
>
> Q. Did you know that Wee-Wee ran the Ely crew?
>
> A. No, I didn't know who ran that crew up there.

*Id.* at 166:14-167:5. This line of cross-examination served to enhance the government's rival drug gang theory rather than refute it.

81. Trial counsel also failed to cross-examine Currie about his bias against Mr. Hager for killing Ms. White. Currie was asked: "How did you know Barbara White?" *Id.* at 160:7. He responded:

> When I was younger, she used to mess with Kendrick Brown [Currie's brother]. And she used to come over to my mother's house a lot. She always used to beg my mother—I was probably seven years old or something. She used to beg my mother to let me go with her to the store.

> You know, she was like a big sister. She used to always come over and
> bring me little sweets from the store or something like that.

*Id.* at160:8-14. These anecdotes, if admissible at all, should have caused trial counsel to elicit

Currie's bias against Hager, whom he believed killed someone who was "like a big sister" to

him.

82.     The anecdotes about Ms. White, however, should never have been admitted into

evidence. Trial counsel should have objected to them as inadmissible character testimony

intended to bolster the reputation of the victim, who was visiting Currie's home at the time she

was dealing crack, a fact that the government successfully prevented trial counsel form eliciting

on cross-examination of Currie.

83.     Trial counsel's failure to adequately cross-examine Currie and make objections to

improper questions on direct examination was unreasonable and prejudicial to Mr. Hager.

84.     **Failure to Adequately Cross-Examine Arlington Johnson, Jr.** Arlington

Johnson, Jr., an accomplice and cooperator, was a critical witness for the government. He

testified about, among other things, the shooting of Pearson and Fletcher and the killing of

Barbara White. Johnson was indicted with Mr. Hager for the killing of Ms. White and entered

into a plea and cooperation agreement with the government. Prior to Mr. Hager's trial, Johnson

pled guilty to the charged violation of 21 U.S.C. § 848 and received a sentence of life

imprisonment. Following Mr. Hager's conviction and death sentence, Johnson was rewarded

with a reduction in his sentence to twenty-five years. Although trial counsel asked some

questions on cross-examination about Johnson's deal with the government, there was much more

that trial counsel could and should have done, but did not do, on cross-examination. Trial

counsel failed to adequately cross-examine Johnson and Mr. Hager was prejudiced by that

failure. Examples of the deficient cross-examination are set forth below.

85.    More than a year and a half before Mr. Hager's trial, Johnson entered his guilty plea, and trial counsel for Mr. Hager learned that he done so not long thereafter.  However, trial counsel did not obtain the transcript of Johnson's change of plea hearing.  Had they done so, they would have learned that Johnson made a significant admission at the hearing.  Although Johnson signed a statement of facts scripted by the government, the Court asked Johnson directly a series of questions about the factual basis for the guilty plea as part of the Rule 11 colloquy.  The Court inquired: "was that [the killing] done in connection with the conspiracy to distribute crack cocaine that you and Mr. Hager were engaged in," and Johnson replied, "No, it wasn't."  Hr'g Tr. 28:4-10, Jan. 26, 2006.  Johnson's moment of candor could have been, and should have been, used by trial counsel on cross-examination of Johnson and to argue the weakness of the evidence on the essential element of a nexus between the charged conspiracy and the killing of Ms. White. Counsel could not undertake that cross-examination because he had unreasonably failed to obtain the transcript of the change of plea hearing.[4]

86.    Trial counsel also failed to impeach Johnson with prior inconsistent statements he had made about the killing of Ms. White.  For example, at trial, in response to questions from AUSA James Mellin, Johnson provided graphic testimony about the stabbing of Ms. White, including testimony that Mr. Hager repeatedly stabbed her.  In prior interviews, however, Johnson stated, first, that he did not remember whether Mr. Hager stabbed Ms. White and, second, stated that "he never actually saw Hager stab White."  Johnson made the first statement in a taped, July 5, 2005, post-arrest interview with the lead law enforcement investigators. Johnson, accompanied by his counsel, made the second one in a September 2005 interview by

---

[4]    Alternatively, the government should have produced the transcript of the plea hearing to trial counsel as *Jencks*, *Brady*, and *Giglio* material. *See* Claim IV.

the same agents and AUSA Mellin. Trial counsel unreasonably failed to use these statements to impeach Johnson's account of multiple stab wounds inflicted by Mr. Hager.

87.     An important element of the government's nexus theory was that Mr. Hager had used the killing of Ms. White as a bonding experience for Johnson and Barnett to tie them closer to the conspiracy to distribute crack. From other witnesses, the government elicited testimony that Mr. Hager had stated that Johnson and Barnett "were soldiers now" and "went hard." Johnson testified before the grand jury that he had never heard Mr. Hager make such statements. Trial counsel should have elicited that testimony from Johnson on cross-examination to rebut other witnesses' testimony.

88.     The presentence report prepared for use in Johnson's initial sentencing stated that in 1993, the year of Ms. White's murder, Johnson was using marijuana daily. In fact, according to Shenita King, Johnson previously had been to Ms. White's apartment to smoke marijuana with her. Trial counsel failed to question Johnson about his daily marijuana use to show that he was under the influence of marijuana during the events to which he testified—both the killing of Ms. White and the shooting of Fletcher and Pearson.

89.     All of the information in the preceding paragraphs was available to trial counsel. Their failure to use that information and additional information derived from it to cross-examine Johnson was unreasonable and prejudicial to Mr. Hager.

90.     **Failure to Adequately Cross-Examine Lonnie Barnett, Jr.** Lonnie Barnett, Jr., like Arlington Johnson, Jr., was an accomplice and cooperator and a critical witness for the government. Barnett was indicted with Mr. Hager for the killing of Ms. White and entered into a plea and cooperation agreement with the government. Prior to Mr. Hager's trial, Barnett pled guilty to the charged violation of 21 U.S.C. § 848 and received a sentence of life imprisonment.

Following Mr. Hager's conviction and death sentence, Barnett was rewarded with a reduction in his sentence to twenty-five years. Trial counsel failed to adequately cross-examine Barnett and Mr. Hager was prejudiced by that failure. Examples of the deficient cross-examination are set forth below.

91. Although the government elicited on direct examination Barnett's deal with the government, trial counsel failed to cross-examine Barnett about his expectations regarding the sentencing reduction he would receive in return for his testimony, the importance of that reduction, and the impact that reduction would have on his testimony. Trial counsel also failed to elicit the fact that Barnett's plea agreement allowed him to avoid state murder charges. The benefits Barnett would receive in return for his testimony were enormous, and trial counsel elicited nothing about them.

92. A year and a half before Mr. Hager's trial, Barnett entered his guilty plea, and trial counsel for Mr. Hager learned that he done so not long thereafter. However, trial counsel did not obtain the transcript of Barnett's change of plea hearing. Had he done so, he would have learned that Barnett made a significant admission at the hearing. Although Barnett signed a statement of facts scripted by the government, the court asked Barnett directly a series of questions about the factual basis for the guilty plea as part of the Rule 11 colloquy. In response to an opened ended question from the court about "what happened with respect to Barbara White?" Barnett gave a narrative about the events of November 29, 1993. In that narrative, he stated that "when we went over there, he—they was talking, and he [Mr. Hager] started asking her questions about what did she tell her baby's father about him." Hr'g Tr. 31:16-22, Nov. 3, 2005. The court followed up on that statement by asking" "Did that have to do with drug trafficking?" Barnett responded: "I'm not completely sure what that had to do with it." *Id.* at

33:11-13. Barnett's response could have been, and should have been, used by trial counsel on cross-examination of Barnett and to argue the weakness of the evidence on the essential element of a nexus between the charged conspiracy and the killing of Ms. White. Counsel could not undertake that cross-examination because he had unreasonably failed to obtain the transcript of the change of plea hearing.[5]

93. Trial counsel also failed to impeach Barnett with prior inconsistent statements about his account of the killing of Ms. White. At trial, Barnett testified that Mr. Hager directed him to get knives from the kitchen and stab Ms. White after the attempt at electrocution failed. Trial Tr. Vol. 9 92:24-93:14. However, in interviews on November 14 and 16, 2005, after his guilty plea, Barnett, accompanied by his counsel, told the lead agents investigating the case that Johnson, not Mr. Hager, suggested that they get knives and stab Ms. White. Barnett made that statement on each day of the interview. Trial counsel unreasonably failed to use those statements in cross-examining Barnett. The prior inconsistent statements would have served as important impeachment of Barnett's portrayal of the stabbing as one directed and controlled by Mr. Hager.

94. All of the information in the preceding paragraphs was available to trial counsel. Their failure to use that information and additional information derived from it to cross-examine Barnett was unreasonable and prejudicial to Mr. Hager.

95. **Failure to Object to Inadmissible Victim Impact Testimony by Paul White.** At the penalty phase of a capital trial the government is permitted to introduce limited testimony regarding the victim and the impact of the murder on the victim's family. However, such evidence has no place in the guilt phase of the trial, where it is likely to move jurors to decide the case based upon sympathy and emotion rather than reasoned judgment.

---

[5]  Alternatively, the government should have produced the transcript of the plea hearing to trial counsel as *Jencks*, *Brady*, and *Giglio* material. *See* Claim IV.

96.     In this case the decedent's father testified at the guilt phase regarding his discovery of the decedent's body in her apartment. He went on to offer inadmissible and highly prejudicial testimony regarding the decedent that was irrelevant to the jury's decision. That testimony included:

97.     That the day of his testimony was the birthday of Barbara White's daughter, Alexis. Trial Tr. Vol. 8 61:3-9.

98.     That after Alexis was born there was a "metamorphosis of sorts" in Barbara's life. "She no longer thought of herself first. She thought of Alexis first." *Id.* at 61:12-22.

99.     That after Barbara applied for her job at the real estate company she "really hounded the guy until ultimately he gave in and gave her a chance. She progressed at the job and was entrusted with large amounts of cash." She worked diligently and enjoyed her work. *Id.* at 61:25-62:3, 62:24-25.

100.     That Barbara wanted to move out on her own and her sister helped her get an apartment in Alexandria. "The entire family pitched in and helped her furnish th[e] apartment." When you went to "visit Barbara, there would be 50 jars of baby food and 100 diapers in the closet and $50 of quarters stashed away. Everything was focused on Lexi. She was just an absolute loving mother." *Id.* at 62:4-10.

101.     That just before Thanksgiving in 1993, she started a refinance on her father's home for him. The day before she died she called him to tell him that she had gotten the loan approved and that they would have the loan closed in 10 days. That was the last time he talked to her. Her father was very proud of her because that was quite an accomplishment. He believed it was the first loan that her boss had given her to assemble all the closing data and do all the

loan financing processing and actually bring it to closure. After she died her father made it a point to go to her employer and finish the process and close that loan. *Id.* at 63:3-17.

102.     Paul White also identified Barbara's graduation photograph, a photograph of Alexis, and a photograph of Barbara with Alexis at Alexis's first birthday party, all of which were then admitted into evidence. *Id.* at 70:17-71:21, 73:22-25.

103.     All of this testimony was received without objection. Trial counsel's failure to object and seek to exclude the inadmissible victim impact testimony was unreasonable and prejudicial, for it enabled the government to focus the jury's attention on the pain and suffering of the White family from the very beginning of the trial. The government's conduct in presenting of this testimony also separately violated Mr. Hager's constitutional rights. *See* Claim IV, incorporated by reference as if fully set forth herein.

## II.     TRIAL COUNSEL RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE WITH RESPECT TO THE GOVERNMENT'S PRESENTATION OF AGGRAVATING EVIDENCE

Mr. Hager's sentence of death was imposed in violation of his constitutional rights to counsel, the effective assistance thereof, a fair and impartial jury, the presumption of innocence, present a defense, confrontation, compulsory process, due process, freedom from cruel and unusual punishment and a fair, reliable and accurate determination of his sentence as guaranteed by the Fifth, Sixth, and Eighth Amendments because his trial counsel's representation during the penalty phase was woefully deficient. Counsel's multiple errors and omissions resulted in overwhelming prejudice to Mr. Hager. Separately, and cumulatively, those deficiencies in the investigation, preparation and presentation of the defense to the government's aggravating circumstances require reversal of Mr. Hager's sentence of death.

In support of this claim, Mr. Hager alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.      Each of the errors and omissions of trial counsel in the guilt phase also contributed to the jury's decision to find the presence of statutory and non-statutory aggravating factors and to vote for a sentence of death.  *See* Claim I, incorporated by reference as if fully set forth herein.

2.      **Failure to Move to Exclude Evidence of the Cornell Coplin Homicide.**  During the penalty selection phase, the government introduced evidence that Mr. Hager allegedly "directed" the murder of Cornell Coplin on February 26, 1996, on a gas station forecourt in Southeast Washington, D.C.  The homicide was alleged as a non-statutory aggravating circumstance and the jury found in the government's favor.  However, the government lacked sufficient competent evidence to prove beyond a reasonable doubt that Mr. Hager "directed" the murder or was otherwise culpable in any way for Coplin's death.  Reasonably competent counsel would accordingly have moved to exclude all reference to the homicide at trial and such a motion would have been required to be granted.  The failure of Mr. Hager's counsel to make such a motion was unreasonable and highly prejudicial, for it permitted the government to argue that Mr. Hager was responsible for yet another homicide and the resulting destruction of yet another family.

3.      The government's evidence purportedly implicating Mr. Hager came from two principal sources:   the testimony of Anthony Fields, Mr. Hager's uncle, and the hearsay testimony of Shenita King, recounted by Detective Murphy.  Both individuals asserted that they had been present when Coplin was killed.  Both individuals stated that it was not Mr. Hager that

shot and killed Coplin, it was Loneldon Windsor, a cousin of Mr. Hager's. Anthony Fields testified that he, Mr. Hager, Loneldon Windsor, Shenita King and Leonard Wood were driving in a van on the way to visit Mr. Hager's mother in Northwest Washington. When they drove by the gas station, he averred, Mr. Hager said to Loneldon, "there go your man right there, Neldie." Loneldon then got out of the van and shot Coplin multiple times. He immediately returned to the van and they drove off. Anthony Fields' credibility was, additionally, subject to blistering attack. *See* Claim II, ¶¶ 7-11, incorporated by reference as if fully set forth herein.

4.      Shenita King's account of events, according to Detective Murphy, was similar. She told Detective Murphy that, as they drove past the gas station, Mr. Hager said "Neldie, Neldie, there's your man. There's your man," and then "there's your man. Go get him." These references to "your man" suggest that the motive for the homicide was Loneldon Windsor's alone, and the alleged exhortation "go get him" is utterly insufficient to establish that Mr. Hager "directed" Loneldon to shoot Coplin or to create criminal liability for Loneldon's actions.

5.      The government attempted to establish that Mr. Hager wanted Coplin killed because they had a dispute about payment for some PCP. Coplin's brother, David Jennifer, testified regarding the circumstances leading up to a dispute, but he was unable to connect that dispute to the death of Coplin at the hands of Loneldon Windsor. The same was true with regard to the testimony of Anthony Fields on this point. Shenita King, according to Detective Murphy, contradicted them both, stating that the dispute was over a gambling debt. And she could not connect that alleged dispute to the homicide by Loneldon, either.

6.      The only evidence purporting to connect Mr. Hager's argument with Coplin to the homicide was the quintuple hearsay testimony of Agent Bradley Garrett regarding the contents of a note he found in the Metropolitan Police Department's file on the case. The note was

written by a sergeant to Detective Gregory who was in charge of the investigation. The sergeant wrote that he had had a conversation with AUSA Patrick Rowan in which Rowan had told him that he had had a conversation with an officer of the United States Park Police who had told him that she had had a conversation with a confidential informant who said he had had a conversation with an individual named Fitzgerald Stoney who told him that Mr. Hager shot Coplin because Mr. Hager had stolen some PCP from Coplin and Coplin had threatened Mr. Hager. This information was obviously erroneous, as Mr. Hager did not shoot Coplin, Loneldon Windsor did, and the purported basis for Stoney's alleged knowledge was unknown. This testimony was therefore so unreliable, prejudicial and lacking in probative value that it should never have been introduced at the penalty phase of a capital trial, and trial counsel's failure to even object to it separately constituted ineffective assistance of counsel. It was additionally wholly inadequate to raise the government's case to the level of proof beyond a reasonable doubt.

7. **Failure to Adequately Cross Examine Anthony Fields.** In addition to their unreasonable and prejudicial failure to move to exclude evidence of the Coplin homicide altogether, counsel also failed to adequately cross examine witness Anthony Fields regarding his significant criminal record and his powerful motive to fabricate in order to save himself from spending the rest of his life in prison.

8. On direct examination of Anthony Fields, the only information regarding his criminal history elicited by the government was that he was currently incarcerated due to a probation violation in connection with a seven-year-old possession charge. Defense counsel asked four questions on cross examination that merely served to clarify the government's case; they made no mention of Fields' criminal history, nor did they expose his significant bias. The jury was therefore left with the impression that Fields was receiving no benefit to himself for his

testimony and, they undoubtedly concluded, if Fields was nevertheless willing to testify against his own nephew, he must be telling the truth.

9.     Reasonably competent counsel would have established before the jury that, if Fields was indeed incarcerated on a probation violation, that was only the tip of the iceberg. Fields had an incredibly lengthy arrest record and at least four impeachable criminal convictions. In 1981 he was convicted in the D.C. Superior Court of Robbery—Force and Violence.  In that same year he was also convicted in D.C. Superior Court of violating the Bail Reform Act, after he was released upon his promise to return to court for the next hearing but subsequently failed to appear.  In 1991, Fields was convicted of Possession with Intent to Distribute Cocaine, also in D.C.  Then in 2006, he was convicted of Identity Fraud in the District Court of Fairfax County, Virginia.

10.     Reasonably competent counsel would also have established that Fields had a powerful motive to fabricate evidence and testify against Mr. Hager in order to avoid spending the rest of his life in prison.  In 1999, Fields was charged in D.C. Superior Court with two counts of Distribution of Cocaine and two counts of Possession with Intent to Distribute Cocaine.  After he was released pending trial, Fields absconded.  He thereafter remained on bench warrant status for eight years, until he was arrested and charged with Simple Assault—Domestic in D.C. Superior Court on August 29, 2007.  Upon his arrest the 1999 bench warrant was discovered and prosecution of Fields on two counts of Distribution of Cocaine and two counts of Possession with Intent to Distribute Cocaine resumed.  He was held without bond in both matters, and so his testimony that he was in jail merely on a probation violation in a seven year old case was false and extremely misleading.

11.     Thus, at the time that he testified against Mr. Hager, Fields was facing up to 125 years and six months of incarceration.  He faced up to 30 years a piece on all four drug charges, and up to six months in jail for the Simple Assault.  Given that he had broken his promise to appear in court in 1999, he was also subject to a felony charge of violating the Bail Reform Act, for which he could receive a sentence of one to five years in prison that was statutorily required to be consecutive to the sentences on the underlying charges.  At age 45, even half of the total number of years he was facing would ensure that he would die in prison.  And in light of his lengthy criminal history, and the fact that he had been on bench warrant status for eight years, Fields could not reasonably have expected to be treated with any leniency.

12.     **Failure to Rebut the Non-Statutory Aggravating Factor that Mr. Hager Committed the Murder of Jerome Robinson.**  The government alleged as a non-statutory aggravating factor that Mr. Hager had committed a prior murder, namely the murder of Jerome Robinson in 1995.  The jury found this aggravating factor to be present and relied on it in part to sentence Mr. Hager to death.  In fact, Mr. Hager is actually innocent of that offense, and trial counsel's failure to fully investigate the incident and present to the jury the evidence that demonstrated his innocence was unreasonable and prejudicial.  That evidence includes but is not limited to:

13.     Mr. Hager was convicted of the Robinson homicide on the government's second attempt.  A previous trial ended in a hung jury with a majority of jurors voting to acquit.  The government dismissed the charges altogether against Mr. Hager's co-defendant, David Parker.

14.     At the first trial the government presented the testimony of Larry Greenhow, an associate of Mr. Hager who claimed that Mr. Hager had made an admission of culpability to him regarding the Robinson homicide.  However, Greenhow also testified that he was certain that Mr.

Hager's brother, Terrell Hager, had been in close proximity when the alleged conversation took place. Mr. Hager's defense counsel proved beyond doubt that Greenhow was not telling the truth on this point, as Terrell Hager had been in jail at the relevant time, and so Greenhow's credibility took a serious hit. The government declined to call Greenhow as a witness at the second trial.

15. The principal new evidence at the second trial was the testimony of Charles Johnson—the same Charles Johnson who testified against Mr. Hager in the guilt phase of this case—that Mr. Hager had made an admission to him. As demonstrated elsewhere in this Motion, *see supra* Claim I, ¶¶ 38-74, incorporated by reference as if fully set forth herein, Charles Johnson was worthy of no belief whatsoever and, had trial counsel been performing as the reasonably competent advocates guaranteed by the Constitution, the jury would also have rejected his testimony regarding the Robinson homicide.

16. The government's remaining evidence against Mr. Hager was merely that upon which the jury at the first trial declined to convict. The two additional elements of the government's case both mysteriously materialized in 1997, after Mr. Hager had become the subject of a law enforcement investigation. One was the extremely belated identification of Mr. Hager by Robinson's girlfriend, Lora Watkins, who had been with Robinson in the apartment when the shooting took place. She testified that two masked men burst into the apartment at night when she and Robinson were in bed asleep. One took Robinson into the living room and demanded money; the other made her lie face down on the floor in the bedroom and stayed in the bedroom with her. Watkins was questioned by police immediately following the shooting and she never said that she recognized the gunman who had stayed in the bedroom. In the weeks following the incident she asked the police to hypnotize her to see if she could remember any

additional details about the assailant, clearly demonstrating that she had no idea who it was. She also told police at that time that the gunman who had remained in the bedroom with her was approximately 5'9" tall, which is five inches taller than Mr. Hager.

17.     By the time of trial, however, Ms. Watkins' account had changed dramatically. She was then 100% certain that the gunman from the bedroom was Mr. Hager, claiming to have become able to identify him based on the color of the skin that showed around the eyeholes of the mask, his voice and his build. She had also adjusted her estimate of the gunman's height down by five inches, so that it now matched Mr. Hager. The government claimed that she had given all of this information, unbidden, to the detective who had begun to reinvestigate the case in 1997.

18.     According to the government, the remaining piece of the case was not discovered by the detective until after Watkins had told him that one of the gunmen was Mr. Hager. Back in 1995, Mr. Hager's fingerprints had been compared to prints found on the clip of a gun that had been left by the assailants inside the apartment, and two of those prints were said to match Mr. Hager's little finger. However, according to the detective, although a report detailing the match was promptly prepared, that report was never given to the investigating officers and never made a part of the file on the case. Miraculously, when the detective went to the fingerprint section to order a fingerprint examination, he was informed that one had been done previously and the results had matched Mr. Hager. There were, however, also fingerprints on the clip that were not Mr. Hager's, or those of his co-defendant, David Parker. Clearly then, the clip had been handled by at least one person who was not a participant in the Robinson homicide, an unsurprising proposition in light of the fact that street hustlers in that neighborhood habitually pooled and shared firearms.

19.     Upon information and belief, the individual who participated in the Robinson homicide with David Parker was not Mr. Hager; it was a friend of Parker's named Paul Lucas. Parker and Lucas went to Robinson's apartment intending to rob him. Parker was the man who stayed in the bedroom with Lora Watkins; he is 5'9" tall, the height that Watkins originally described. Lucas went into the living room with Robinson. He was carrying the Mac 11 semi-automatic weapon that was left on the scene. They got into a struggle over the gun and it fired, hitting Lucas in the arm. Parker then came out of the bedroom shooting, and shot Robinson multiple times as he fled the apartment.

20.     Undersigned counsel will seek permission to compare the unidentified prints on the clip with those of Paul Lucas during the discovery process and will seek leave to amend this Motion to include any relevant results of the examination. Counsel will also seek access to medical records that are expected to show that Paul Lucas was treated for a gunshot wound to the arm immediately following the Robinson shooting together with the report of the autopsy performed on Lucas's body after he died in 1997, which is expected to reveal the presence of a scar left by the gunshot wound.

21.     The failure of Mr. Hager's trial counsel to discover and present evidence demonstrating Mr. Hager's actual innocence of the Robinson homicide was unreasonable and highly prejudicial.

22.     The fact of Mr. Hager's prior conviction for the Robinson homicide was alleged by the government and found by the jury to be a statutory aggravating circumstance. In the event that that conviction is vacated, Mr. Hager will be entitled to a new sentencing proceeding in the instant case.

23.     The jury might have assessed Johnson's credibility differently had it known that his plea agreement was an illusion and that the government had decided to reward Johnson for his cooperation by absolving him of all of the consequences of his prior criminal conduct.

24.     **Failure to Object to the Vague, Baseless, and Unreliable Opinion Testimony of Correctional Officer Bruce Davidson**.  Bruce Davidson, a correctional officer at United States Penitentiary Pollock ("USP Pollock") at the same time that Mr. Hager was incarcerated there, was one of the government's chief witnesses in its future dangerousness case.  During his direct examination, Davidson gave vague, baseless, and unreliable opinion testimony regarding Mr. Hager's conduct at USP Pollock, the conditions at USP Pollock and their effect on correctional officers, and Mr. Hager's future dangerousness.  Trial counsel did not object to any of this outrageous and speculative testimony even though it was so unreliable that its admission violated due process.  Although some of Davidson's testimony was stricken by the Court, its cumulative effect was highly prejudicial to Mr. Hager because it created the impression that Mr. Hager was a violent, dangerous, and uncontrollable monster.  Constitutionally effective counsel would have objected to all of this testimony, moved for a mistrial, and/or moved to strike it and sought appropriate curative instructions.

25.     Regarding Mr. Hager's conduct at USP Pollock, Davidson testified that Mr. Hager "used to carry a lot of weapons around the yard.  He was not a model inmate.  He was a member of a pretty roughly [sic] crowd that I used to keep a close eye on."  Trial Tr. Vol. 12 192:5-7, Oct. 23, 2007.  Davidson described this "crowd," which he called "the DC crew," as "[p]robably one of the worst" groups at USP Pollock.  *Id*. at 192:9-11.  He further described Mr. Hager as "dangerous himself."  *Id*. at 192:18-19.  These statements, , which were completely unsubstantiated and unreliable opinions, created the prejudicial impression that Mr. Hager was

part of a DC "gang" that was one of the more violent and dangerous groups of inmates at USP Pollock.

26.     Davidson gave similarly baseless opinion testimony regarding Mr. Hager's involvement in the June 29, 2004 altercation at USP Pollock between a group of DC inmates and a group of Memphis inmates (hereinafter the "DC-Memphis altercation"). Davidson testified that when he attempted to restrain Mr. Hager during the altercation, Mr. Hager "didn't stop. He was—I mean, he was intent. That guy was dead—if we didn't weren't [sic] so close at the time, those two, they would be dead. They would dead [sic] without a doubt." *Id*. at 195:1-4. Davidson went on to testify that, after he saw that Mr. Hager purportedly had a knife, he told him "'Goddamn it, Hager, I just caught you a week ago, and here you are with another weapon,'" and, in response, that Hager "just laughed. I mean, that's his lifestyle." *Id*. at 196:4-9. Davidson's testimony about what Mr. Hager's intent might have been during the altercation and about his "lifestyle" was pure speculation and highly prejudicial. In addition, the testimony that he caught Mr. Hager with a weapon a week before the DC-Memphis altercation has no basis in fact, is not supported by the incident reports and disciplinary hearing reports in Mr. Hager's BOP records, and the necessary notice that this additional aggravating evidence was going to be introduced was not provided to Mr. Hager's counsel. Nonetheless, trial counsel did not object this testimony.

27.     Regarding the injuries to the Memphis inmate who was stabbed during the DC-Memphis altercation, Nick Starks, Davidson testified that Starks was "literally beat to hell," was "delirious," and was "so beat up he didn't know where he was." *Id*. at 196:13, 16-18. This testimony, however, is inconsistent with the description of Starks' injuries in the Federal Bureau of Prisons ("BOP") incident report regarding the DC-Memphis altercation, dated July 27, 2004

(hereinafter the "DC-Memphis Report"). That report stated that Starks sustained one two-inch and one quarter-inch laceration, and one quarter-inch and one half-inch puncture wound, as well as bruising and swelling to the left mandible area. Davidson's testimony created the misleading impression that Mr. Hager was part of an attack that nearly killed an inmate, which was not supported by the medical evidence.

28. Davidson also testified that he saw Mr. Hager stab Starks several times, *id*. at 194:18-21, and that he took a shank "right out of [Mr. Hager's] hand," *id*. at 196:23, when he secured Mr. Hager during the DC-Memphis altercation. In response to a question about why the final DC-Memphis Report did not state that Mr. Hager stabbed Starks or that Mr. Hager was found with a shank, Davidson said:

> Somebody was looking out for him; not just him personally, but there is a very powerful group on the yard that control a lot of things. And, you know, I mean, it's prison. You can—it's not a perfect world, and you can control behavior a lot by lessening the severity of some of the infractions. You can manipulate the system from within, and it happens. I hate to say it. I hate to even see it happens [sic]. But it happens every day in every single prison.

*Id*. at 197:18-198:1. This shocking testimony—in which Davidson essentially alleged that BOP officials "cover up" serious assaults to help certain inmates—was without any foundation or basis in fact, and had no indicia of reliability. It also gave the government an opening, during its cross-examination of Mark Cunningham and its examination of another BOP correctional officer, Patrick Townsend, to make the point that wardens sometimes conceal serious assaults. Trial Tr. Vol. 14 162:19-24, Oct. 25, 2007; Trial. Tr. Vol. 15 166:18-167:4, Oct. 29, 2007. As a result, trial counsel's failure to object was highly prejudicial to Mr. Hager because it left the jury with the impression that Mr. Hager did stab Starks and was found with a shank, but those events were removed from the final report *only* because someone was looking out for Mr. Hager.

29.     Regarding the safety of prisons generally and the effect that working at a prison has on its correctional officers, Davidson testified that "[a]side from war, [prison is] the most violent environment that you can be in." Trial Tr. Vol. 12 200:16-17. Davidson then told the jury that "I don't own a swimming pool, but I buy bleach from the pool store in five-gallon jugs to keep on my . . . washing machine to bleach the blood out of my clothes." *Id*. at 200:17-19. The Court, recognizing the outrageous and baseless nature of this opinion testimony, sua sponte cut Davidson off, struck the testimony, and instructed the jury to disregard it. *Id*. at 200:20-201:8. But Davidson was not finished. When asked how the conditions in prison affect the guards, Davidson testified that "[a] lot of them quit. . . . [A] lot of them go home and beat their wives, and a lot of them drink." *Id*. at 201:12-13. He then said that correctional officers "absolutely" feared for their safety. *Id*. at 201:14-16. There was no foundation for any of this unreliable opinion testimony. Nor was it relevant to the question of Mr. Hager's future dangerousness. Yet trial counsel did not object to any of it.

30.     Regarding Mr. Hager's future dangerousness, Davidson gave two opinions that were vague, baseless, and unreliable. First, Davidson testified that "the majority" of inmates facing life in prison without parole "refuse the programs" that BOP has set up for inmates, including GED, English as a second language, and financial responsibility. *Id*. at 199:11-12. Davidson described such inmates as "almost uncontrollable," *id*. at 199:17, and that "[t]here is no way to modify their behavior, or there is no incentives [sic] not to get in trouble, not to cause trouble. I mean, you can't do anything to them, literally," *id*. at 199:21-23. In response to the question of whether "lifers" have anything to lose, Davidson said "[a]bsolutely none." *Id*. at 199:24-25. Davidson began to elaborate by discussing "things you might see on TV," but the Court cut him off. Davidson then said, with regard to Mr. Hager specifically, that "there is

nothing you can do to this guy." *Id*. at 200:5-6. This testimony was baseless and entirely speculative, and in fact was contradicted by Mr. Hager's BOP record, which shows that he earned his GED and worked—and received positive evaluations for that work—during his incarceration at USP Pollock. *See* Claim II, ¶¶ 88-92. Trial counsel neither objected nor made the point about Mr. Hager's BOP record on cross-examination.

31.     Second, and even more troubling, Davis gave the following opinion regarding Mr. Hager's future dangerousness:

> Q:      Based on your experience with the Bureau of Prisons, as well as your dealings with the defendant, are you aware of any place where he could be housed—
>
> A:      No.
>
> Q.      —where he would not have contact with guards or with inmates?
>
> A:      No, sir. The system is not even set up that way any more. It's impossible. The worst you could do to his guy is send him to ADX. But I think at the maximum, they will sit on him for five years, and they are going to release him back to another institution. It's not a permanent thing. There is—I think there are even guidelines stating that he can only stay there for a certain amount of time, and he is going to come right back out. There is absolutely no way. ***And I'm telling you, this guy is not done killing. He is going to get back out, and he is going to do it—.***

Trial Tr. Vol. 12 198:4-21 (emphasis added). The Court then cut off Mr. Davidson.

32.     Reasonably competent counsel would have objected to this inflammatory and unfairly prejudicial opinion testimony. There is no conceivable strategic or tactical reason for counsel not to have objected. In fact, at the close of Davidson's testimony, the prosecutor asked for a side bar and requested that the testimony that Mr. Hager was not done killing be stricken. The Court told trial counsel: "You should have moved for that. I don't know why you didn't move for that." *Id*. at 207:24-25. Trial counsel then moved for a mistrial, which the Court overruled, adding "[y]ou should have moved at that time." *Id*. at 208:9-10. Although the Court

instructed the jury to disregard the testimony—and in so doing reiterated Davidson's testimony that Mr. Hager "was not done killing," *id*. at 209:9-10—the jury had already heard from a federal correctional officer that Mr. Hager would kill again.

33.     Davidson's vague, baseless, and unreliable opinion testimony was devastating to Mr. Hager because it bolstered the government's argument that Mr. Hager represented a current and future danger to others in prison. Trial counsel's unreasonable and prejudicial repeated failures to object to Davidson's testimony or immediately move for a mistrial or better curative instructions constituted ineffective assistance of counsel and violated Mr. Hager's constitutional rights.

34.     **Failure to Adequately and Properly Object to Special Investigative Agent John Feeney's Unreliable Opinion Testimony.** Feeney was a special investigative agent at USP Pollock during the time that Mr. Hager was incarcerated there. Feeney testified that he was involved in the investigation of the March 15, 2003 altercation at USP Pollock between a group of DC inmates and a group of Alabama inmates (hereinafter the "DC-Alabama altercation") and the DC-Memphis altercation. *Id*. at 125:15-20, 137:17-19. Toward the end of his direct examination, the prosecutor asked Feeney a series of questions that began with the preface "based on your experience," including "based on your experience, are people that are serving life, or what are called lifers, are they more or less violent?" and "based on your experience, what makes someone more dangerous?" *Id*. at 143:17-19, 144:10-11. Trial counsel objected on the ground that Feeney had not been "offered or identified" by the government as an expert, and the Court sustained the objection. *Id*. at 144:19-145:5, 145:13-14.

35.     Shortly thereafter, Feeney began to offer testimony about the BOP's administrative maximum security facility in Florence, Colorado. Trial counsel again objected on

the ground that Feeney had not been identified as an expert. During an exchange with the Court, the prosecutor indicated that he intended to ask Feeney questions "concerning his dealings with Mr. Hager, and based on those dealings, does he believe that Mr. Hager is likely to be someone who will abide by the rules and regulations of other prison facilities." *Id*. at 148:15-18. Trial counsel objected on the ground that Feeney was not qualified to render an opinion on Mr. Hager's future dangerousness, but provided no explanation as to why Feeney was not qualified to render such an opinion. *Id*. at 148:22-25. Trial counsel also objected on the ground that the government had not provided them with notice of Feeney's expert testimony. *Id*. at 148:25-149:1. The Court found that Feeney's ability to offer an opinion "is not seriously in question," *id*. at 149:2-3, but sustained the objection due to lack of notice while leaving the door open for the government to call Feeney as a rebuttal witness, depending on the defense's penalty phase case, *id*. at 149:5-13.

36. After the Court rendered its decision, trial counsel had an off-the-record conference with the prosecutor. Following that conference, trial counsel informed the Court that, based on the representation from the prosecutor regarding the question that he intended to ask Feeney, the defense conceded the objection. *Id*. at 150:14-17. The prosecutor then asked Feeney: "[b]ased on your experience with Mr. Hager, the fact that he would be, if he were to be in jail for life without parole, would that have an effect on diminishing his violence, based on your experience with him?", to which Feeney replied "no." *Id*. at 151:7-11. In short, Feeney testified that Mr. Hager would not "age out," or become less violent as he aged in prison.

37. Trial counsel unreasonably failed to adequately and properly object to Feeney's opinion testimony on the ground that it was so unreliable that its admission violated due process. Feeney's opinion about Mr. Hager's future dangerousness had no basis in fact and was nothing

more than rank speculation. Feeney was a special investigative agent who was responsible for conducting investigations of incidents that occurred in the prison, to write disciplinary reports, and to serve as the liaison with the FBI and Inspector General's Office. *Id*. at 126:1-7. In this capacity, he did not interact with Mr. Hager on a day-to-day basis; to the contrary, Feeney testified that he had had only "three or four dealings" with Mr. Hager during the two-and-a-half years that Feeney was at USP Pollock. *Id*. at 136:17-18. Moreover, there was no evidence that Feeney had ever reviewed or was otherwise familiar with Mr. Hager's BOP record. Indeed, there was no evidence that Feeney had any familiarity with Mr. Hager beyond a few incidents. Accordingly, Feeney lacked sufficient information about Mr. Hager to reliably offer an opinion as to his future dangerousness. Had trial counsel articulated for the Court the reasons why Feeney should not be permitted to offer opinion testimony about Mr. Hager, that testimony would have been excluded. Counsel's failure to do so constituted ineffective assistance of counsel and violated Mr. Hager's constitutional rights.

38. **Failure to Timely Object to Testimony That Mr. Hager Stabbed Inmate Nick Starks and to Make a Timely Motion for a Mistrial.** Trial counsel unreasonably failed to make a timely objection to, and to move for a mistrial for, testimony from government witnesses John Feeney and Bruce Davidson that was inconsistent with the government's Notice of Intent to Seek a Sentence of Death. During the selection phase, when asked about Mr. Hager's involvement in the DC-Memphis altercation, Feeney testified that "Hager was stabbing Inmate Starks. The motions on the video were very consistent with stabbing." *Id*. at 141:4-5. In response to a similar question, Davidson testified that he saw Hager stabbing Starks "several times." *Id*. at 194:18-21.

39.     The Notice of Intent to Seek a Sentence of Death, filed by the government on May 30, 2006 (the "Notice of Intent"), included a non-statutory aggravating factor relating to Mr. Hager's involvement in the DC-Memphis altercation.   That aggravator states that, on or about June 29, 2004, while incarcerated USP Pollock, Mr. Hager "hit and kicked an inmate in the head and body as part of a targeted attack by the defendant and inmates associated with the defendant against a rival group of other inmates."   Notice of Intent 5-6 (¶14).   Contrary to Feeney's and Davidson's testimony, the Notice did not state that Mr. Hager stabbed anyone during the DC-Memphis altercation.

40.     Trial counsel did not object to Feeney's and Davidson's testimony at the time it was given.   It was not until six days after Feeney and Davidson testified that trial counsel admitted to the Court that "[w]e should have objected" to their testimony, "and we didn't."   Trial Tr. Vol. 19 12:5.   After raising their belated objection, trial counsel moved for a mistrial, or, in the alternative, an instruction that the jury should disregard any evidence that Mr. Hager stabbed Starks.   *Id*. at 12:12-18.   The Court denied the motion for a mistrial and stated it would consider the possibility of an instruction.   *Id*. at 13:5-8.   Trial counsel, however, never sought a curative instruction during the instructions conference.

41.     Had trial counsel made a timely objection and a timely motion for a mistrial— specifically, at the time Feeney, who testified before Davidson, told the jury that "Hager was stabbing Inmate Starks," Trial Tr. Vol. 12 141:4—the Court would have granted a mistrial or, at the very least, stricken Feeney's testimony and forbade any further testimony that was inconsistent with the Notice of Intent.   In light of the circumstances of Ms. White's death, and the testimony regarding a stabbing at Northern Neck Regional Jail ("Northern Neck") in which

Mr. Hager allegedly was involved, testimony that Mr. Hager may have stabbed someone at USP Pollock was highly prejudicial to Mr. Hager.

42.     It also was fundamentally unfair.  Had trial counsel known that the government was going to present evidence that Mr. Hager had stabbed an inmate at USP Pollock, counsel would have pursued a different investigative and trial strategy concerning the DC-Memphis altercation.  Without notice that the government was going to present evidence of that stabbing, trial counsel did not have that opportunity.  Reasonably competent counsel would have objected and moved for a mistrial as soon as Feeney testified about the stabbing.  Trial counsel's failure to do so resulted in prejudice to Mr. Hager, constituted ineffective assistance of counsel, and violated Mr. Hager's constitutional rights.

43.     **Failure to Adequately Cross-Examine John Feeney and Bruce Davidson.** Trial counsel unreasonably failed to adequately cross-examine Feeney regarding the DC-Memphis altercation.   Feeney testified on direct examination that "Hager was stabbing Inmate Starks," that "[t]he motions on the video were very consistent with stabbing," and that Feeney had interviewed individuals who actually saw Mr. Hager stabbing Starks.  *Id*. at 141:4-5, 10-11. Trial counsel cross-examined Feeney on the fact that the DC-Memphis Report did not conclude that Mr. Hager stabbed Starks, but did not challenge Feeney's testimony that he had spoken with individuals who claimed to have seen Mr. Hager stabbing Starks.

44.     The DC-Memphis Report contradicts Feeney's testimony, and trial counsel should have used it to cross-examine him.   The Report contains three pages of inmate interview summaries and three pages of summaries of "pertinent mass interviews."   According to those summaries, not a single inmate told BOP investigators that they saw Mr. Hager stabbing Starks. Reasonably competent counsel would have obtained an admission from Feeney that none of the

inmate interviews in the DC-Memphis Report include a statement that Mr. Hager stabbed Starks. Trial counsel's failure to do so resulted in prejudice to Mr. Hager because it created the impression that, regardless of the Report's final conclusions, there were eyewitnesses who saw Mr. Hager stab Starks.

45. Trial counsel also failed to conduct a reasonably competent cross-examination of Davidson. Davidson testified that he saw Hager stabbing Starks "several times," *id*. at 194:18-21, and that, while detaining Mr. Hager during the altercation, he took a shank "right out of his hand," *id*. at 196:23. Although trial counsel questioned Davidson on the fact that the DC-Memphis Report did not conclude that Mr. Hager stabbed Starks or was caught with a weapon, *id*. at 203:6-12, Davidson denied that, claiming that the Report stated that he found a shank on Mr. Hager, *id*. at 203:13-14. This testimony, coupled with Davidson's outrageous and unreliable opinion testimony that Mr. Hager's true culpability was whitewashed from the Report by someone who was "looking out for him," *see supra* Claim II, ¶ 28, created the impression that Davidson's version of events was more accurate than the Report's.

46. Trial counsel unreasonably failed to cross-examine Davidson on this testimony using his prior inconsistent statement. The DC-Memphis Report indicates that Davidson submitted a memorandum concerning the altercation on the same day it occurred. In his memorandum, Davidson wrote that when he responded to the fight, he observed that "[i]nmates Kerry, Harris, Hagar [sic], and Barton were striking inmate Starks with closed fists and kicks." Certainly, if Davidson had seen Mr. Hager stabbing Starks—conduct that Davidson himself agreed on cross-examination was a "serious offense," Trial Tr. Vol. 12 203:4-5—he would have included it in his memorandum. That he did not strongly suggests that his testimony that he saw

Mr. Hager stabbing Starks was false. Trial counsel should have highlighted that inconsistency for the jury.

47.     Trial counsel also unreasonably failed to cross-examine Davidson using the specific language from the summary and conclusions section of the DC-Memphis Report. The Report concluded that while "[f]our weapons were found on the ground in the area where inmate Hager was restrained by staff . . . no specific weapon could be directly linked" to Mr. Hager. This directly contradicted Davidson's testimony that he took a shank "right out of [Mr. Hager's] hand."

48.     Had trial counsel adequately cross-examined Davidson using his prior inconsistent statement and the specific language of the Report, it would have irreparably damaged his credibility and the jury would have discounted his testimony.

49.     Davidson also testified that "the majority of life sentence inmates refuse" the programs that the federal system offers, including earning a GED and English as a second language. *Id*. at 199:5-20. Mr. Hager earned his GED within several months of arriving at USP Pollock, but trial counsel unreasonably failed to elicit this fact from Davidson.

50.     Feeney and Davidson were two of the government's most important witnesses concerning Mr. Hager's future dangerousness. Much of their testimony concerning Mr. Hager's role in the DC-Memphis altercation was inconsistent with the BOP's official findings and, in Davidson's case, his own memorandum regarding the incident. The unreasonable and prejudicial failure of trial counsel to adequately cross-examine both witnesses using the DC-Memphis Report constituted ineffective assistance of counsel and violated Mr. Hager's constitutional rights.

51.     **Failure to Move to Admit the BOP Incident Reports Regarding the DC-Alabama Altercation and the DC-Memphis Altercation.**  Trial counsel unreasonably failed to move to admit the BOP incident report regarding the DC-Alabama altercation, dated March 19, 2003 (hereinafter the "DC-Alabama Report") and the DC-Memphis Report.  Although trial counsel used these reports during their cross-examinations of Feeney and Davidson, reasonably competent counsel would have moved to admit the reports in their entirety for the jury's consideration, for at least two reasons.  First, the DC-Alabama Report paints a picture of Mr. Hager's relatively minor role in the DC-Alabama altercation that was not captured by witness testimony.  For example, of the 63 still photographs from the videotape evidence of the incident, Hager appears in only four, and the timestamps on the still photographs show that his involvement in an actual physical confrontation lasted just a few seconds.  Second, the DC-Memphis Report not only concludes that Mr. Hager did not stab Starks, it affirmatively identifies the inmate who did the stabbing.  According to the Report, both staff and video surveillance evidence identified Robert Barton as the inmate that was "repeatedly striking inmate Starks with a homemade weapon in the back."

52.     The detailed information in the Reports would have confirmed for the jury what had only been suggested on cross-examination:  that Mr. Hager's role in these fights was not what Feeney or Davidson had told them.  The Reports would have significantly undercut the government's future dangerousness case.  Trial counsel's unreasonable and prejudicial failure to move to admit the Reports constituted ineffective assistance of counsel and violated Mr. Hager's constitutional rights.

53.     **Failure to Present the Testimony of Anthony Holstick and Nick Starks.**  Trial counsel unreasonably failed to present the testimony of Anthony Holstick and Nick Starks.

Holstick was an inmate from Alabama who fought directly with Mr. Hager during the DC-Alabama altercation.  Nick Starks was an inmate from Memphis, Tennessee who Feeney and Davidson testified was stabbed by Mr. Hager during the DC-Memphis altercation.  During the penalty phase, trial counsel informed the Court that they intended to call Holstick and Starks, but the government had raised the concern that their testimony would "open a door to them offering yet unnoticed acts of violence."  Trial Tr. Vol. 15 70:22-23.  Trial counsel sought a ruling from the Court that would prevent the government from presenting evidence of other alleged incidents involving Mr. Hager if Holstick and Starks testified.  The Court declined to limit the government's rebuttal evidence before hearing their testimony.  *Id*. at 73:12-16, 20-22, 76:12-17.  Trial counsel ultimately decided not to call either witness.

54.     Had trial counsel called Holstick, he would have testified that during the altercation he threw a punch at Mr. Hager, that Mr. Hager never struck him, and that everyone from a particular community needed to "clear the bench" if a member of that community became involved in a fight.  *Id*. at 70:1-18.  Holstick also would have refuted the testimony of government witness Jason Shannon.  Shannon, who was a correctional officer at USP Pollock, testified that he saw Mr. Hager fighting with Holstick.  Trial Tr. Vol. 12 120:4-5.  Shannon said that when he went to restrain Mr. Hager, Mr. Hager immediately jumped back up, and Shannon had to apply a considerably greater amount of force to put Mr. Hager on the ground.  *Id*. at 121:6-9.  Holstick would have testified that when the correctional officers came to break up the fight, Mr. Hager went to the ground and was placed in handcuffs, in contrast to Holstick, who resisted cuffing and refused to go to the ground.

55.     Had trial counsel called Starks as a witness, he would have testified that Mr. Hager did not stab him.  Trial Tr. Vol. 15 73:4-8.

56.     Reasonably competent counsel would have called Holstick and Starks as witnesses to corroborate the findings in the DC-Alabama Report and the DC-Memphis Report and to directly contradict the testimony of the government's witnesses.  Hearing from Starks directly that Mr. Hager did not stab him would have resolved any doubts that the jury may have had about Mr. Hager's actual role in that altercation.  It also would have undermined the credibility of Feeney and Davidson, who provided powerful, but baseless and unreliable, testimony regarding Mr. Hager's future dangerousness in prison.  Holstick's testimony that Mr. Hager was not the instigator of the DC-Alabama altercation and was briefly involved in the fight only because it was expected that he would come to the defense of his fellow DC inmates would have provided a convincing counterweight to the government's image of Mr. Hager as an uncontrollable, dangerous, and lethally violent inmate.  Trial counsel's unreasonable and prejudicial failure to call Holstick and Starks as witnesses constituted ineffective assistance of counsel and violated Mr. Hager's constitutional rights.

57.     **Failure to Develop and Present the Testimony of Other Known Inmate Witnesses.**  Trial counsel unreasonably failed to develop and present the testimony of other inmates who were incarcerated at USP Pollock and who witnessed or participated in the DC-Alabama altercation, the DC-Memphis altercation, or both.  These witnesses had information that would have helped undermine and rebut the government's future dangerousness case generally and the testimony of Feeney, Davidson, and other BOP correctional officers specifically.  Trial counsel interviewed several of these inmates before trial and brought them to Virginia from their respective correctional institutions to testify at the selection phase.  None was ever called.  There also were other inmates that were identified in the DC-Alabama Report

and/or the DC-Memphis Report as being significantly or directly involved in the altercations but were never even interviewed by trial counsel, much less called as witnesses at trial.

58.     Had they been called, collectively these witnesses would have given the following testimony about the following subjects:

59.     <u>Mr. Hager Was Not the Instigator in the DC-Alabama Altercation</u>.  Mr. Hager did not start the DC-Alabama altercation but simply got mixed up in it.  The fight that broke out between a group of DC inmates and a group of Alabama inmates on March 15, 2003 arose out of a fight earlier in the day between a DC inmate—not Mr. Hager—and an Alabama inmate.  The earlier fight started because a DC inmate was trying to play an Alabama inmate in basketball to win back money that another inmate had lost gambling.  The Alabama inmate refused to play, and the DC inmate ended up in a fight with the Alabama inmate in the Alabama inmate's unit.  Later, the DC inmate rounded up a group of DC inmates to confront the Alabama inmate again.  When they went into the Alabama inmate's unit, a larger group of Alabama inmates converged on them and a fight broke out.

60.     <u>Mr. Hager Was Not the Instigator in the DC-Memphis Altercation</u>.  Like the DC-Alabama altercation, Mr. Hager did not start the DC-Memphis altercation but simply got mixed up in it.  The fight between the DC and Memphis inmates arose out of a basketball game between the two groups.  Mr. Hager was not playing in the game.  The game was getting aggressive and words were exchanged between an inmate from DC who was playing in the game and a Memphis inmate who was not.  This Memphis inmate passed a knife to another inmate, which further escalated tensions between the groups.  A fight eventually erupted involving a large group of DC inmates.

61.    <u>Mr. Hager Did Not Stab Starks.</u>   Mr. Hager did not stab Starks during the DC-Memphis altercation, and Mr. Hager did not have a knife or other weapon in his possession during the fight.  In addition, Barton stabbed Starks.

62.    <u>Inmates Are Expected to Join in Fights Involving Inmates From Their Group.</u> Although the DC inmates at USP Pollock were not a gang, they generally stuck together.  If a fight broke out involving a DC inmate, there was an unwritten rule that other DC inmates were expected to join in.  If an inmate did not get involved in the fight, there may be repercussions depending on the seriousness of the fight.   This testimony would have corroborated the testimony of correctional officer Randy Ryland, who testified during the penalty phase that if a member of your group was involved in a fight, you were expected to help, and that there were consequences if you did not.   Trial Tr. Vol. 12 184:24-185:4.   It also would have rebutted Feeney's testimony that fights are usually "a one-on-one thing" and that inmates "try to avoid those big groups, two groups getting at it."  *Id*. at 160:8-11.

63.    <u>Most Inmates at USP Pollock Had Shanks and They Were Necessary for Protection.</u>  As part of its future dangerousness case, the government presented evidence that on April 27, 2004, USP Pollock staff found a sharpened instrument, or "shank," behind the toilet in Mr. Hager's cell.  *Id*. at 177:6-15.  Shanks were common at Pollock, and most inmates had them. Inmates needed shanks for protection because they often were used by other inmates during physical confrontations.   This testimony would have corroborated Ryland's testimony that shanks were "very common" at Pollock and that inmates kept them for protection.  *Id*. at 181:11-16.

64.    <u>The Bias of USP Pollock Staff Against DC Inmates</u>.  DC inmates had a stigma that originated with the DC inmates who were housed in the BOP during the 1970s and 1980s.

The reputation of DC inmates from that era was that they were violent. DC inmates in the 2000s were still living in the shadow of that stigma, and it colored the staff's views of them. Because of the stigma, correctional officers at USP Pollock would blow out of proportion incidents involving DC inmates. When a fight broke out involving a group of DC inmates, Pollock staff would assume that the DC inmates started the fight. The staff would round up all DC inmates, including those who were not involved in the fight, simply because they were from DC. In addition, Feeney did not like DC inmates.

65. Reasonably competent counsel would have developed and presented the testimony of these inmate witnesses to rebut the government's future dangerousness case. Their testimony would have undercut the government's argument that Mr. Hager was a violent and uncontrollable inmate who started fights and had weapons for the purpose of attacking and attempting to kill other inmates. Trial counsel's failure to call these inmates as witness during the selection phase resulted in prejudice to Mr. Hager, constituted ineffective assistance of counsel, and violated Mr. Hager's constitutional rights.

66. **Failure to Develop and Present Testimony of Associate Warden Bobby Tyler.** Trial counsel unreasonably failed to develop and present the testimony of Associate Warden Bobby Tyler to rebut Davidson's testimony that "[s]omebody [who] was looking out for [Mr. Hager]," *id*. at 197:18, removed the conclusion that Mr. Hager stabbed Starks and was found with a shank from the DC-Memphis Report. Tyler was the best person for trial counsel to call to rebut this testimony. Tyler was an Associate Warden at USP Pollock during the first half of the 2000s. He was the intended recipient of the DC-Memphis Report—the Report is styled as a "memorandum for" him—and it bears his electronic signature. In addition, Feeney had testified

that "Mr. Tyler" was one of the staff members who had refused to sign the Report if it stated that Mr. Hager had done the stabbing. *Id*. at 163:7-12.

67.     Had trial counsel called Tyler as a witness, he would have testified that he was not aware of an instance during his tenure as an Associate Warden at USP Pollock where an inmate had done something as serious as stab another inmate and the final incident report omitted that fact in order to help the inmate.  He would have testified that if the Report did not conclude that Mr. Hager had stabbed Starks or been found with a shank, as Feeney and Davidson testified, it was because there was not enough evidence to support those conclusions.

68.     Tyler also would have rebutted testimony that gave the impression that Mr. Hager was part of a "gang."  Davidson testified that Mr. Hager belonged to the "DC crew," which Davidson said was "[p]robably one of the worst" groups at USP Pollock.  *Id*. at 192:9-11. Feeney testified that DC inmates had a "ranking . . . inmate" or "shot caller" who provided advice to other DC inmates about how to handle disputes.  *Id*. at 139:19, 22-25, 140:1-16.  This testimony was reinforced by the rebuttal testimony correctional officer Townsend, who testified that inmates from the DC area were part of a "DC gang" and that they were "considered more of the lower level because they're always in assaults, stealing, fighting."  Trial Tr. Vol. 15 164:19-23, 166:12-17.  Had trial counsel called Tyler as a witness, he would have testified that DC inmates at USP Pollock were not an organized gang and did not have leaders or "shot callers."  He also would have testified that DC inmates were no better or worse than inmates from other regions.

69.     Tyler, like the inmate witnesses discussed above, also could have given context to the testimony that a shank was found in Mr. Hager's cell.  Tyler would have testified that it was common for inmates such as Mr. Hager to have shanks, and that many inmates had them for

protection, particularly older or physically smaller inmates like Mr. Hager who might not be able to protect themselves from larger or younger inmates.

70.     The unreasonable failure of trial counsel to develop and present Tyler's testimony left the jury with three misleading and prejudicial impressions: (1) that Mr. Hager had stabbed Starks and was found with a shank but someone in the BOP chain of command scrubbed that from the Report to help him; (2) that Mr. Hager was a member of a gang; and (3) that having a shank was unusual and meant that Mr. Hager intended to use it offensively. Trial counsel's failure to call Tyler to rebut the impressions left by the government's future dangerousness case constituted ineffective assistance of counsel and violated Mr. Hager's constitutional rights.

71.     **Failure to Object to the Baseless and Unreliable Opinion Testimony of Certified Jail Officer Steven Morris.** Steven Morris was a certified jail officer at Northern Neck in 2006. Morris was one of two witnesses that testified during the selection phase regarding an incident that occurred on October 14, 2006, at Northern Neck, in which Mr. Hager allegedly stabbed an inmate by the name of Alphonso Satchell (hereinafter the "Northern Neck incident"). Trial Tr. Vol. 12 219:12-14. Toward the end of his direct examination, Morris volunteered that he had a clear memory of the event because it "could have been me" that Mr. Hager had stabbed, and wondered "what if he had been upset with me[?]" *Id.* at 222:25-223:1.

72.     This opinion testimony had no basis in fact and was unreliable. Morris did not provide any factual basis to support his purported belief that Mr. Hager posed a threat to him. In fact, Morris himself testified that when he arrived on the scene of the incident and ordered Mr. Hager to drop whatever object he was holding in his hand, Mr. Hager complied. *See* Claim II, ¶ 73. Moreover, the government never presented any evidence that Mr. Hager had ever assaulted or attacked any prison staff during his period of incarceration. Morris' testimony, however,

planted the seed in the jury's mind that there was a risk that Hager might assault either Morris personally or prison staff generally, thus advancing the government's future dangerousness case. The unreasonable and prejudicial failure of trial counsel to object to this testimony constituted ineffective assistance of counsel and violated Mr. Hager's constitutional rights.

73. **Failure to Adequately Cross-Examine Officer Morris Regarding Inconsistencies Between His Testimony and His and Other Officers' Incident Reports.** Trial counsel unreasonably failed to adequately cross-examine Morris regarding several inconsistencies between his testimony and the incident reports regarding the Northern Neck incident that he other correctional officers submitted. Morris testified that on October 14, 2006, he was called to respond to an emergency in one of the housing units at Northern Neck. Trial Tr. Vol. 12 219:16-18. While waiting for other officers to arrive, Morris saw one inmate, whom he identified as Mr. Hager, "standing with a blue hard pen in his hand," while another inmate "was trying to get away from him." *Id*. at 220:14-18. Morris testified that he ordered Mr. Hager to drop the pen, which he did. *Id*. at 221:17-18.

74. The report that Morris filed regarding the incident, however, told a different story. According to the incident report, when Morris arrived at the unit, he could not see what Mr. Hager was holding. He told Mr. Hager to drop what he had in his hand, and Mr. Hager complied. Then, after Mr. Hager was handcuffed, Morris found a blue hard pen under the seat "where [inmate] Hager had been seated after being handcuffed." The report does not indicate where Mr. Hager was when he dropped the item in his hand, or that the blue hard pen was ever in his hand, only that it was under the seat where he was seated after he was put in handcuffs. This version of events is inconsistent with Morris' testimony that he observed Mr. Hager carrying the pen when Morris arrived at the unit.

75.     There also were inconsistencies between Morris' testimony regarding the location of the wounds that Mr. Satchell suffered and the location of those wounds according to other officers' incident reports.  Morris testified that Satchell was stabbed "in his arm, and a few times on his chest."  *Id*. at 221:25-222:1.  But officer Barry Sward, who was the officer that escorted Satchell to medical, stated in his incident report that Satchell was looked over for wounds and "appeared to have been stabbed in the arm by what was found later to be a hard pen."  Sward's report did not mention any chest wounds.  Sergeant Richard Baserap's incident report stated that, when Baserap arrived in the unit where the incident had occurred, Satchell "had several cuts on his arm and neck."  Baserap's report also did not mention chest wounds.

76.     Trial counsel should have cross-examined Morris on these inconsistencies, which, coupled with additional evidence that diminishes the credibility of Satchell's testimony, *see infra* Claim II, ¶¶ 77-83, would have raised doubts about the veracity of the government's version of events concerning this incident.  The unreasonable and prejudicial failure to cross-examine Morris on these issues constituted ineffective assistance of counsel.

77.     **Failure to Cross-Examine Alphonso Satchell Regarding the Extent of His Cooperation With the Government and His Expectation of a Rule 35 Motion.**  Trial counsel unreasonably failed to cross-examine Satchell regarding the extent of his cooperation with the government and his expectation that the government would file a Rule 35 motion to reduce his sentence based on that cooperation.  On its direct examination of Satchell, the government elicited that Satchell had entered a plea agreement with the United States Attorney's Office for the Eastern District of Virginia in connection with *United States v. Alphonso Lee Satchell*, No. 3:06-cr-00252-JRS (hereinafter "Satchell's criminal case"), that as part of that agreement Satchell agreed to cooperate with the government, and that in return for his cooperation, Satchell

anticipated the government asking the judge in his case to reduce his sentence. Trial Tr. Vol. 13 17:5-14, Oct. 24, 2007. The plea agreement in Satchell's criminal case was admitted as Exhibit 205. *Id*. at 18:1-9.

78. There was additional information regarding Satchell's cooperation and his expectation of a Rule 35 motion that trial counsel should have, but did not, elicit on cross-examination. In the memorandum in aid of sentencing filed in Satchell's criminal case on January 26, 2007, Satchell stated that he

> expects the government to file for a Rule 35 reduction of sentence sometime after this Court hands down its initial sentence. It is anticipated that the government will give the Court a full report on the extent of the defendant's adherence to the terms of the Plea Agreement; suffice it to say that such co-operation has been extensive.

79. The reduction Satchell eventually received was substantial. On February 2, 2007, Satchell was sentenced to 320 months imprisonment—more than 26 years—to be served concurrent with a state sentence, and 5 years of supervised release. Satchell is now scheduled to be released from BOP custody on November 2, 2015, after serving fewer than ten years.[6] Eliciting from Satchell that he "expects" the government to file a Rule 35 motion based on "extensive" cooperation would have further elucidated Satchell's motivation to fabricate evidence against Mr. Hager beyond what the government had already brought out on direct examination. Trial counsel's unreasonable and prejudicial failure to cross-examine Satchell on these issues constituted ineffective assistance of counsel.

80. **Failure to Cross-Examine Alphonso Satchell Regarding His Mental Health Issues and Drug Abuse.** Trial counsel unreasonably failed to cross-examine Satchell regarding his mental health issues and his abuse of prescription and other drugs. In the memorandum in

---

[6] Based on undersigned counsel's review of the docket and the publicly-available pleadings in Satchell's criminal case, it is unclear the degree to which Satchell's reduction in sentence is due to a Rule 35 motion, a motion for relief under 18 U.S.C. 3582(c)(2), or some other type relief.

aid of sentencing filed in Satchell's criminal case, Satchell spelled out in some detail his various mental health diagnoses, his use of prescription anti-psychotic drugs to manage those issues, and his drug abuse. Satchell stated in his sentencing memorandum that he "has a demonstrated and documented history [of] 'diminished capacity' in the form of mental conditions for which treatment began at an early age." He has been diagnosed with "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, ADD with Hyperactivity, and other cognitive difficulties, as well as 'Clinical Depression' and stress." His treatment for these conditions began as a child and included various types of talk, group, and behavioral therapies. He also has been given a number of prescription psychiatric drugs, including Impermine, Toframil, and Mellaril, a low potency anti-psychotic drug whose generic chemical name is Thioridazine. He was not given Ritalin, Adderall, or Cyleri for his ADD. The sentencing memorandum also stated that, in the year before Satchell's sentencing, he had abused prescription medications, including regular abuse of Xanax, Percocet, and various narcotic cough syrup preparations.

81.     All of this information was available to trial counsel at the time of Satchell's testimony, and none of it was elicited on cross-examination. Had trial counsel elicited this information, it would have raised doubts about the credibility of Satchell's testimony and his version of the Northern Neck incident. Trial counsel's unreasonable and prejudicial failure to cross-examine Satchell on these issues constituted ineffective assistance of counsel.

82.     **Failure to Adequately Cross-Examine Alphonso Satchell Regarding Inconsistencies Between His Testimony and His Prior Statements.**     Trial counsel unreasonably failed to cross-examine Satchell regarding several inconsistencies between his testimony at the penalty phase of Mr. Hager's trial and statements that he made to Sergeant Baserap in the immediate aftermath of the Northern Neck incident. First, Satchell testified that

Mr. Hager stabbed him because he was "cooperating with the government." Trial Tr. Vol. 13 24:25-25:2. According to Baserap's report regarding the Northern Neck incident, however, Satchell told Baserap that he "did not know why they had singled him out." Second, Satchell testified that Mr. Hager and the other inmates who were "holding court" on Satchell wanted him "to come in the cell" to attack him, *id*. at 19:5-6, 11-12, and that he refused to enter the cell, *id*. at 20:15-17. According to Baserap's report, however, Satchell told Baserap that he was inside his cell when he was initially assaulted. Third, Satchell testified that Hager alone stabbed him. *Id*. at 20:15-20. According to Baserap's report, however, Satchell told Baserap that there were three inmates from Washington, DC who were involved—Mr. Hager, Cotey Wynn, and "Woodfork"—and said that "Hager was not alone in this." Satchell also told Baserap that there were two "Richmonders" who "helped him deflect the assault."

83.     These inconsistencies were apparent on the face of Baserap's report, which was available to trial counsel at the time of Satchell's testimony, but none of them were highlighted for the jury on cross-examination. Reasonably competent counsel would have elicited this information, which would have raised doubts about the credibility of Satchell's testimony and his version of events, including who was involved in the incident, Mr. Hager's role, and the reason why Satchell was attacked. Trial counsel's unreasonable and prejudicial failure to cross-examine Satchell on these issues constituted ineffective assistance of counsel.

84.     **Failure to Develop and Present the Testimony of Known Witness Cotey Wynn.** Trial counsel failed to develop and present the testimony of known witness Cotey Wynn, an inmate who was at Northern Neck at the same time as Mr. Hager. Wynn was identified in Sergeant Baserap's report as a participant in the Northern Neck incident. Baserap wrote that "I/m Satchell told me privately, while in medical, that I/m Hager was not alone in this. I/m

Satchell stated that D-118/b, I/m Cotey Wynn, and D-218/b, I/m Woodfork had been with I/m Hager when he was initially assaulted in his cell."

85.     The reference to Wynn in Baserap's report should have been enough to prompt trial counsel to contact Wynn and ascertain his knowledge of the incident.   But even if trial counsel had not acted on their own to contact Wynn, his name and the fact he had information regarding the incident was brought to their attention by the investigator working on Wynn's criminal case at the time Satchell was stabbed.   At Wynn's instruction, his investigator called trial counsel for Mr. Hager to discuss the Northern Neck incident.   On approximately two occasions, Wynn's investigator spoke with trial counsel and told him that she had information regarding the incident at Northern Neck that would be helpful to Mr. Hager.   Trial counsel informed Wynn's investigator that he would call her back to discuss it, but never did.

86.     Had trial counsel called Wynn to testify at trial, he would have testified that he was involved in the Northern Neck incident and that he, not Mr. Hager, stabbed Satchell.   This testimony, in combination with evidence that should have been elicited from Satchell on cross-examination, *see supra* Claim II, ¶¶ 77-83, would have undermined the credibility of Satchell's testimony regarding the Northern Neck incident.   It also would have undermined Morris' testimony that he caught Mr. Hager with a "blue hard pen in his hand." And it would have significantly undermined the government's future dangerousness case, and thus one of its primary justifications for seeking the death penalty against Mr. Hager.

87.     Reasonably competent counsel would have interviewed Wynn and called him as a witness to rebut Satchell's testimony and the government's future dangerousness case.   Trial counsel's failure to develop and present Wynn's testimony resulted in prejudice to Mr. Hager, constituted ineffective assistance of counsel, and violated Mr. Hager's constitutional rights.

88.    **Failure to Develop and Present Evidence of the Positive Features of Mr. Hager's Federal Bureau of Prisons Record.**  Trial counsel unreasonably failed to develop and present any evidence of the positive features of Mr. Hager's BOP record, including his education, his work history and performance evaluations, and the evaluations of his future dangerousness to others conducted by BOP psychologists.  Presenting this evidence would have given the jury a more holistic, and more accurate, picture of Mr. Hager's conduct during his incarceration, as opposed to the one-sided picture of violence painted by the government.

89.    Mr. Hager earned his GED within several months of arriving at USP Pollock.  As discussed above, *see supra* Claim II, ¶ 30, trial counsel missed an opportunity to elicit this fact during the cross-examination of Bruce Davidson, who had testified on direct that lifers refused programs like the GED program or English as a second language.  Eliciting this information from Davidson or presenting it in the defense case would have shown the jury that Mr. Hager was willing to work to improve himself while incarcerated.

90.    Trial counsel also unreasonably failed to elicit on cross-examination or in the defense case evidence regarding Mr. Hager's extensive work history while incarcerated at USP Pollock and his positive work evaluations.  Between July 2001, when he arrived at USP Pollock, and December 2004, when he left, Mr. Hager worked in the penitentiary's dining facility for approximately 8.5 months, in the paint shop for approximately 13 months, as an orderly for approximately 2 months, and in plumbing for approximately 2.5 months.  In total, Mr. Hager had a job for over two years while at USP Pollock.  In addition, BOP records demonstrate that Mr. Hager was a responsible and hard worker.  He received at least satisfactory or average marks on the vast majority of his monthly evaluations, and in many months received good or outstanding marks.  For example, an evaluation for the period from August 20, 2001 through September 19,

2001, when Mr. Hager worked in the dining facility, stated that Mr. Hager "works exceptionally hard every day waists [sic] no time will forego meals to finish job." An evaluation for the period from July 22, 2002 through August 19, 2002, when Mr. Hager worked in the paint shop, stated that he "was very instrumental in getting the corridor and captain's complex in top condition for the senators' tour. He also worked extra hours in food service working on the wall." And an evaluation for the period from September 20 through October 19, 2003, when Mr. Hager had returned to work in the dining facility, stated that he "has helped in many occassions [sic] on the line, in the dining room and dishroom if needed, never complains about any task asked of him."

91. Reasonably competent counsel also would have elicited evidence of the evaluations that were performed by a USP Pollock psychologist during the periods when Mr. Hager was housed in the Special Housing Unit or "SHU". These evaluations were performed on a monthly basis while Mr. Hager was in the SHU. Each evaluation included an assessment of the threat that Mr. Hager posed to others. And in each evaluation – there were a total of nine – the prison psychologist determined that, "[b]ased on the inmate's history, existing conditions, and other information available at the time of the review, the current potential for harm to others is judged to be LOW."

92. These evaluations were performed in the immediate aftermath of both the DC-Alabama altercation and the DC-Memphis altercation, incidents that the government contended demonstrated that Mr. Hager posed a future danger to others. If introduced into evidence, they would have been effective in rebutting testimony from government witnesses such as Feeney that a life sentence for Mr. Hager would not have had an effect on diminishing his violence. Trial Tr. Vol. 12 151:7-11. The unreasonable and prejudicial failure of trial counsel to develop and

present evidence of the positive features of Mr. Hager's BOP record constituted ineffective assistance of counsel.

93. **Failure to Seek the Production of *Brady*, *Giglio*, Jencks, and Other Materials Subject to Discovery.** Trial counsel unreasonably failed to seek the production of *Brady*, *Giglio*, Jencks, and other material subject to discovery relating to the DC-Memphis altercation, the DC-Alabama altercation, and the Northern Neck incident. These materials, and the reasons for their discoverability, are discussed in Claim IV, ¶¶ 11-18, which is incorporated by referenced as if fully set forth herein.

94. **Failure to Assert Contemporaneous Objections to Testimonial Hearsay During the Selection Phase.** Before trial, trial counsel filed a motion seeking to preclude the presentment to the jury during the penalty phase of any testimonial hearsay to prove any aggravating factor, on the ground that such testimony was barred by the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36 (2004). See Defendant's Motion to Preclude Testimonial Hearsay During Sentencing, DE 208. The Court did not decide the motion at the time it was filed. *See* Order, DE 218. When the government announced during the selection phase that it intended to put on the hearsay testimony of former FBI Agent Brad Garrett, the Court revisited the issue. The government represented that Garrett would offer hearsay testimony concerning the facts of the killing of Cornell Coplin. Trial Tr. Vol. 12 101:20-22. The government also represented that another witness, Detective Murphy, would offer similar hearsay testimony. *Id*. at 103:4-7. Neither trial counsel nor the government identified any additional selection phase witnesses that might offer hearsay testimony. The Court ruled that Crawford and the Confrontation Clause did not apply at the selection phase, and allowed Garrett and Murphy to give hearsay testimony. *Id*. at 99:8-11.

95.     Throughout the remainder of the selection phase, trial counsel failed to raise a Confrontation Clause and *Crawford* objection with respect to the testimony of any other government witness, even if they offered hearsay testimony.    Feeney, for example, gave testimony that was clearly hearsay when he claimed that his knowledge of Mr. Hager's role in the DC-Alabama and DC-Memphis altercations came from inmate and staff interviews and his review of video tape.  *Id*. at 128:21-23, 129:24-130:2, 139:6-8, 13-15, 141:10-12.   On appeal, Mr. Hager argued that the district court erred in ruling that the Confrontation Clause and *Crawford* did not apply to testimony about Mr. Hager's purported prison violence.    In its response, the government argued that Mr. Hager did not preserve his *Crawford* objection to that testimony.   The Court of Appeals agreed with the government.   Applying plain error review, the Court held that "even if there is some error on this front," it was "unable to say the district court committed plan error as to this issue."   *United States v. Hager*, 721 F.3d 167, 201 (4th Cir. 2013).

96.     Trial counsel's failure to contemporaneously assert a Confrontation Clause and *Crawford* objection to each selection phase witness that offered hearsay testimony, including but not limited to Feeney and Davidson, was unreasonable and prejudicial to Mr. Hager.    Had counsel asserted contemporaneous objections, the Court would likely have asked the government to identify the hearsay testimony of each witness, and would have ruled on the admissibility of that testimony based on its specific content and the factual basis for it.    Even if the court had overruled each objection, those rulings would not have been subject to plain error review on appeal.    Mr. Hager was prejudiced by that higher level of appellate review, and reasonably competent trial counsel would have properly made and preserved its objections on a witness-by-witness basis.

97.     **Failure to Rebut the "Grave Risk of Death to Another" Statutory Aggravator.**  One of the six statutory aggravating factors that the government asserted were present and rendered Mr. Hager eligible for a sentence of death was that Mr. Hager knowingly created a grave risk of death to a person in addition to Barbara White in the commission of the offense, and in escaping apprehension for the offense.  The government's theory was that Mr. Hager created a grave risk of death to Ms. White's 13-month-old daughter by leaving her alone in the apartment after Ms. White was killed.  In its opening statement at the penalty phase, the government stated that the child could have choked, picked up something dangerous such as one of the knives on the floor, or eaten something.  But its principal argument was that the child was in the bathroom with her mother's body and therefore could have attempted to get into the bath tub and drowned.  In support of this theory, the government presented without objection by defense counsel the testimony of a police officer, Detective Mark Garman, that blood stains on the sleeve of the clothing the child was wearing could only have resulted from the child having put her arm in the bloody water in the tub were her mother's body was.

98.     The government also presented heart-wrenching testimony by the decedent's sister, Paula White-Morales.  Ms. White-Morales had been living with the decedent temporarily in the fall of 1993, and she took custody of the decedent's daughter after she was killed.  She testified that the child's behavior changed after the murder, in that she refused to take baths and refused to get in the bathtub.  This testimony was later amplified when Ms. White-Morales was recalled to the stand during the penalty phase.  She again testified that the child did not want to get into the bathtub after the murder, and added that she screamed and cried as soon as she started running the water to fill the bath tub.  She further testified that she had to get into the tub with the child in order to get her to take a bath.

99.     The government's argument at the conclusion of the penalty phase was

devastating:

> The blood on the sleeves is a baby reaching out for her mother, a one-year-old child reaching out for the comfort of her mother who is dead in a pool of blood; a little baby reaching in to cold, bloody water.  That cold, bloody water is a result of that cold-blooded killer (indicating).  That little baby was trapped in that apartment to live or die.
>
> . . .
>
> And you see all the deadly traps:  the knives on the floor, the knives on the dining room table, the knives in the bathroom, the blood on the floor, the electrical appliances in the bathtub, and the bloody water in the tub.  That child could have died of starvation, died of electrocution, died of drowning.  You have now heard that during the night of the 29th or the morning of the 30th, before Paula White got over to that apartment at around 4:00 o'clock in the afternoon, that Alexis had put her hands into that tub.  She was reaching out into the tub for her mother.  She was reaching out for her lifeline.  And her lifeline lay lifeless in the tub of bloody water.
>
> . . .
>
> Exhibit 225, the blood, the diluted blood, the evidence of that hand, that arm, going into that bathtub.
>
> . . .
>
> And then, of course, there is the bloody water, the bloody tub.  That is where this came from.  It's from when Lexi was trying to reach out to her mother in that tub.
>
> . . .
>
> [A] child walking around in a cesspool, trying to find her mother in a cesspool, a cesspool that has a broken knife tip on the rug, three knives in and around the sink of that bathtub.

Trial Tr. Vol. 11 70:8-15, 71:3-16, 74:1-2, 74:7-10, 74:16-19.

100.     The government returned to this enormously prejudicial theme in its closing

argument at the conclusion of the penalty phase, arguing that leaving the child in the apartment

was even worse than the murder of the decedent:

And as horrible and as senseless as Barbara White—Barbara White's death was, what happened next was just pure evil. He left that little girl, Alexis, 13 months old, to die in that apartment—this man, this man right here (indicating), this man who would like you to spare his life because he is a father. He left a baby to die with her mother in that apartment. How could anyone be so evil? As he drove back to Southeast Washington, DC, as he bragged about killing Barbara, and the performance of his two boys, Lonnie and Arlington, Alexis was leaving a trail of tiny, bloody footprints as she searched for her mother. As this coward gloating [sic], a hungry, lonely, tired and terrified little girl reached into a bathtub for the comfort of her mother.

Trial Tr. Vol. 16 69:18-70:9.

101.    As devastating as this evidence was, it was also untrue. The child could not have put her hand in the bloody water in the tub after the homicide, because the bathroom door was shut and she could not get in there. Had trial counsel been functioning as the reasonably competent counsel guaranteed by the Constitution, they would have moved to exclude the testimony of Detective Garman altogether. Had they done so, the motion would have been granted and the jury would never have heard the false, unreliable and unscientific evidence or the extraordinarily prejudicial arguments that it engendered.

102.    Detective Garman's testimony was inadmissible on grounds of irrelevancy. It was impossible to know whether the child's clothing was in the same condition when he examined it in September of 2007 that it had been in when it was recovered 14 years earlier on December 30, 1993. Counsel unreasonably agreed to stipulate to the chain of custody of the clothing, despite the absence of any evidence or documentation regarding how the item had been stored over the course of the previous 14 years, if it had been moved or handled by any other individuals, whether it had been packaged securely, and whether it had been fully protected from the elements in each place that it had been stored. Moreover, after discovering Barbara White's body, Paul White handed the child to a neighbor, Teresa McPeake. Ms. McPeake retrieved a clean diaper from the child's bedroom and took the child to her apartment where she "cleaned

her" and changed the diaper. Ms. McPeake obviously removed the child's clothing in order to do so, and where it was placed is unknown. Ms. McPeake kept the child in her apartment for two hours, and so there were any number of ways that the condition of the clothing could have been altered. Reasonably competent counsel would accordingly have moved to exclude Detective Garman's testimony as irrelevant.

103.     Reasonably competent counsel would also have challenged Detective Garman's testimony under Federal Rule of Evidence 702 and the Due Process Clause. Pursuant to Rule 702, expert opinion testimony may only be admitted if it is based upon sufficient facts or data and is the product of reliable principles and methods. Had counsel moved to exclude the testimony the Court would have been required to conduct a hearing at which counsel would have established, at a minimum, that the testimony was not supported by sufficient facts and was not the product of reliable principles or methods. It was in fact "junk science," and should have been excluded as such.

104.     In the unlikely event that a motion to preclude Detective Garman's testimony was denied, counsel could, and should, have presented compelling evidence rebutting the government's theory and precluding a finding by the jury that the grave risk of death to another statutory aggravator was present. That evidence includes, but is not limited to:

105.     If only trial counsel had asked, Arlington Johnson would have testified that the bathroom door was closed when they left the apartment. When he testified before the grand jury on December 22, 2005, he stated:

> Q:     When you left the apartment, where was the child?
>
> A:     She was still at the apartment.
>
> Q:     Where was she in the apartment?
>
> A:     The living room.

Q:     Did you guys close the door to the bathroom?

A:     Yes, it was shut.

Johnson Grand Jury Tr. 29:9-17.

106.    The decedent's father, Paul White, was the first person to enter the apartment after the homicide and he, too, would have confirmed that the bathroom door was closed when he went in.  Detective Murphy testified as follows when he recounted what Mr. White had told him to the grand jury on June 8, 2005:

Q:     And upon entering the apartment, what did [Paul White] see?

A:     . . . He began to look through the apartment for Barbara, calling out to her.  He couldn't find her at first.  Went into her bedroom, he noticed that the bedroom was in disarray. There was blood everywhere.  There were bloody footprints, both adult footprints and Alexis's footprints in the blood.  He finally ended up in the bathroom.  The bathroom door was shut.  He opened the bathroom door and that's when he discovered the body of his daughter in the bathtub.

107.    In his notes of an interview of Paul White that he conducted on November 30, 1993, the same day that Mr. White found the body, Detective Murphy wrote:

Looked in Alexis room—now noticed blood on floor—pools of blood baby had walked in—Now—noticed bathroom door shut—light was on.

108.    And in a report that he prepared on June 2, 1994, Detective Murphy wrote about Mr. White's arrival on the scene:

White stated that he then noticed that the bathroom door was shut.  White went into the bathroom, finding the door unlocked and the light on and discovered his daughter lying in the bathtub face down in the water.

109.    In contrast to these unequivocal statements, and the unequivocal testimony in accordance therewith that trial counsel should have presented, not a single witness testified that the bathroom door had been left open.  The government simply did not ask the question of Arlington Johnson or Lonnie Barnett.  Paul White testified that "the door was mostly closed,"

"[t]here was a crack of light around it that you could see," and "he pushed the bathroom door open." Trial Tr. Vol. 8 68:15-24.[7]

110.    In addition to the eyewitness accounts of the door being closed, trial counsel should have argued to the jury that the layout of the decedent's apartment was such that it would have been next to impossible for Mr. White to have walked past the bathroom and not seen the decedent in the bathtub had the door been open.  The apartment was small and the rooms were all very close together.  The bathtub in the small bathroom was situated parallel to the door and it had low sides, so the red colored water would have been immediately visible to anyone walking past had the door been left open.  And yet, as noted, Mr. White went past the bathroom and into the bedroom before doubling back and opening the bathroom door.

111.    Reasonably competent counsel would also have pointed out to the jury that, while the child's bloody footprints appeared in the bedroom and the hallway, the government's photographs of the crime scene revealed that no such footprints were visible on the floor of the bathroom.

112.    Had counsel performed as the reasonably competent advocates guaranteed by the Constitution and presented the above-described evidence, the government would have been foreclosed from making the devastatingly prejudicial arguments that the child put her arm in the bloody water filled tub in which her mother's body lay.  They also would have convinced the jury that it could not find beyond a reasonable doubt that the grave risk of death statutory aggravating circumstance was present in this case.  Certainly the jury could not have found that the child was at risk of death by drowning, or by electrocution, as both presumed that the child had access to the bathroom.  It similarly could not have found that the child was at risk from the

---

[7]    In a follow up question, the government described the bathroom door as "ajar with the light on," a description that Mr. White did not adopt.  The prosecutor's attempt to move Mr. White off of his prior clear, uncontroverted statement that the door was closed in order to enhance the government's penalty case was improper. *See* Claim IV.

knives that were on the bathroom floor, and the child could not have reached the knives that were on the dining room table. There was thus only one knife that the child could potentially have come into contact with and that was a blunt steak knife that was laying on some carpet in the hallway and unlikely to have caused the child fatal injury.

113. It was also, counsel should have argued, highly unlikely that the child would perish from starvation. It was significantly more likely, as indeed in fact happened, that after the decedent failed to show up for work the next morning, one of the decedent's family members would come to the apartment and find the child.

114. Because of the grand jury testimony of Arlington Johnson and Detective Murphy, and Detective Murphy's notes and report, the government knew, or should have known, that the testimony and argument that the child put her arm into the tub with the body was false. By presenting the testimony any way and making the arguments that it did, the prosecution violated Mr. Hager's constitutional rights. *See* Claim IV, incorporated by reference as if fully set forth herein.

115. **Failure to Rebut the "Substantial Planning and Premeditation" Statutory Aggravator.** Another of the six statutory aggravating factors that the government asserted were present and rendered Mr. Hager eligible for a sentence of death was that he committed the homicide of Ms. White after substantial planning and premeditation. Despite available evidence that this was not the case, and that in fact the events that led to Ms. White's death unfolded haphazardly in the moments that they occurred, trial counsel unreasonably and prejudicially failed to challenge the presence of this aggravator. Had they done so, the jury would have been compelled to reject it.

116.    The single most important piece of evidence that supported the government's theory that Mr. Hager planned and premeditated the homicide was the testimony of Charles Johnson, who claimed to have had a conversation with Mr. Hager prior to the offense in which he convinced Mr. Hager that he should not use a gun to kill Ms. White but should use another method instead.   However, Charles Johnson was severely lacking in credibility and if trial counsel had cross-examined him with the available evidence that so demonstrated, the jury would have rejected his testimony in its entirety.   *See* Claim I, ¶¶ 38-74, incorporated by reference as if fully set forth herein.

117.    The truth of the matter was that Mr. Hager had no clear plan for what was to happen at Ms. White's apartment.   Other than Charles Johnson, no one testified that Mr. Hager discussed killing Ms. White ahead of time.   The only conversation during the trip to Virginia that Lonnie Barnett recounted was him asking Mr. Hager where they were going and Mr. Hager replying that they were "going to talk to Barbara."   Trial Tr. Vol. 9 85:14-17.   Arlington Johnson testified that Mr. Hager stated "We're going to take care of some business" while they were in the parking lot outside Ms. White's apartment building, adding that he did not know exactly what Mr. Hager meant by that.   *Id.* at 29:1-4.   Shenita King said only that Mr. Hager said they were "about to get at Barbara" when he picked her up on Minnesota Avenue and nothing more was said on the matter.   Trial Tr. Vol. 8 231:22-23.

118.    Without the unbelievable testimony of Charles Johnson, then, the government had no evidence whatsoever to support its theory that Mr. Hager planned to kill Ms. White, as opposed to simply talk to her or threaten her; much less that he planned to stab her to death.   And the manner in which events allegedly unfolded in the apartment strongly suggests the absence of planning or premeditation.   According to Arlington Johnson and Barnett, at first Mr. Hager hit

Ms. White with a gun. He then had a conversation with her in the bedroom, and it was after that that someone decided that Ms. White should be killed. The impact to the gun when it was used to hit Ms. White caused it to jam, and so shooting her was not an option.

119. The first attempt to take Ms. White's life was an attempt to electrocute her in the bath by putting a plugged-in curling iron into the water with her. It is almost ludicrous to suggest that Mr. Hager planned in advance to commit a murder by electrocution. Next came the stabbing with the knives. Arlington Johnson testified that Mr. Hager told him and Barnett to go to the kitchen and get some knives. Barnett testified that Mr. Hager told him to go to the kitchen and get some knives. But, as reasonably competent counsel would have established, Barnett had told police twice during an interview on November 14, 2005, that it was Arlington Johnson who first said, "Let's use knives," that Mr. Hager agreed with him, and it was Mr. Hager who went to the kitchen to look for some.

120. It is also inconceivable that a person who planned to commit a murder by stabbing would neglect to take a knife with them and leave to chance that there would be suitable implements at hand on the scene. Because there was no such plan, they did end up using what was at hand, and it was a set of cheap, flimsy steak knives that bent and broke and made it extremely difficult to inflict anything other than very superficial wounds. Only two of the 82 wounds inflicted were life threatening, only one of the others reached a depth of 2½ inches, none of the others was more than 1½ inches deep and many failed to penetrate further than the skin. Unquestionably a horrible result, but equally one that speaks to disorganization, impulsive split-second decision-making and an overall lack of planning or premeditation that is highly consistent with Mr. Hager's neuropsychological deficits. *See* Claims III and V, incorporated by reference as if fully sent forth herein.

121.    **Failure to Challenge Statutory Aggravating Factor No. 5:  Distribution of Crack to a Juvenile.**  Another of the six statutory aggravating factors that the government asserted were present and rendered Mr. Hager eligible for a sentence of death was that Mr. Hager distributed crack cocaine to juveniles, specifically Lonnie Barnett and Arlington Johnson. Specifically the government alleged, and the jury found:

> 5.    The defendant, THOMAS MORROCO HAGER, distributed a controlled substance, namely, crack cocaine, to a juvenile, in violation of Title 21, United States Code, Section 859.  Title 21, United States Code, Section 848(n)(11).

122.    The murder of Barbara White took place on November 29, 1993.  Mr. Hager's trial did not occur until 2007.  In between the two events, in 1994, Congress passed the Federal Death Penalty Act.  This legislation altered the Federal death sentencing scheme in both procedural and substantive ways.  This Court ruled that this case was governed by the substantive death penalty sentencing provisions of 21 U.S.C. § 848 that had been in place at the time of the crime and by the procedural aspects of the Federal Death Penalty Act.  Specifically, the Court ruled that the former statutory provision enumerating permissible statutory aggravating factors, 21 U.S.C. § 848(n), applied to Mr. Hager and not the newer provision supplied by the Federal Death Penalty Act, 18 U.S.C. § 3592.  Further, the government proposed, and the Court agreed "that where any disparity appeared between the ADAA and the FDPA, the provision more favorable to the defendant should be applied."

123.    21 U.S.C. § 848(n)(11), the statutory provision cited by the government as the basis for its proposed Selling Crack to Juveniles aggravating factor, provided that, "[t]he violation of this subchapter [*i.e.*, Subchapter I of the Controlled Substances Act] in relation to which the conduct described in subsection (e) of this section occurred was a violation of section 859 of this title."  21 U.S.C. § 859 provided (in relevant part) an enhanced penalty for violations

of 21 U.S.C. § 841(a)(1) "by distributing a controlled substance to a person under twenty-one years of age." Thus, the aggravating factor in § 848(n)(11) required that the "conduct described in subsection (e)"—*i.e.*, the killing while engaging in a continuing criminal enterprise or an offense punishable under 21 U.S.C. § 841(b)(1)(A)—must be "in relation to" the distribution of drugs to a minor in violation of 21 U.S.C. § 859. In other words, the aggravating factor does not apply to a killing that is unrelated to a particular violation of § 859, *even if* the overall conduct comprising an alleged continuing criminal enterprise or large scale distribution offense includes distribution of drugs to minors.[8]

124.  The Second Superseding Indictment, in accordance with which Mr. Hager was tried, was legally insufficient to allege an aggravating factor under 21 U.S.C. § 848(n)(11). It did not allege any relationship between the conduct at issue—the killing of Ms. White—and the distribution of drugs to a minor. Inexplicably, however, Mr. Hager's trial counsel failed to challenge the sufficiency of the Indictment with regard to the aggravating factor or its submission to the jury.

125.  Adopting the government's proposed instruction, the Court instructed the jury that it could find the Distribution of Crack to a Juvenile aggravating factor present if it found "that the defendant distributed a controlled substance, namely crack cocaine, to a juvenile, in violation of Title 21 Section 859 of the US Code." Trial Tr. Vol. 11 108:15-17. The instruction failed to require the jury to find any relationship between Mr. Hager's distribution of drugs to a minor and the killing of Ms. White, as required by 21 U.S.C. § 848(n)(11). Not only did Mr. Hager's counsel fail to object to the inadequate instruction, they themselves proposed a version of it that

---

[8]  By contrast, 18 U.S.C. § 3592(c)(13) provides that it is an aggravating factor if "[t]he defendant committed the offense in the course of engaging in a continuing criminal enterprise in violation of section 408(c) of the Controlled Substances Act (21 U.S.C. § 848(c)), and that violation involved the distribution of drugs to persons under the age of 21 in violation of section 418 of that Act (21 U.S.C. 859)," requiring only that the CCE offense include distribution to minors, but limiting the aggravating factor to CCE offenses.

was substantially similar, namely: "Thomas Morocco Hager . . . distributed a controlled substance, namely crack cocaine, to a juvenile." *Id.* at 170:18, 171:14-15.

126.     The government did not argue that it had proved any relationship between a violation of 21 U.S.C. § 859 and the killing of Ms. White at trial.  Nor could it have, for the two were completely unrelated.  Instead, the government argued that it had proved the Distribution of Crack to a Juvenile aggravator because Mr. Hager, "back in 1993, was using two juveniles, Lonnie Barnett and Arlington Johnson, to distribute crack cocaine." *Id.* at 77:7-9.  As noted, this fact alone is wholly insufficient to satisfy 21 U.S.C. § 848(n)(11).  Once again, Mr. Hager's counsel failed to object to the government's argument.  Nor did counsel argue the insufficiency of the proof of this aggravating factor.

127.     Mr. Hager's trial counsel thus permitted the government to try him on, and the jury to find and sentence him to death based in part on, an invalid statutory aggravating factor in violation of Mr. Hager's constitutional right to the effective assistance of counsel.

### III.     TRIAL COUNSEL RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE WITH RESPECT TO THE PRESENTATION OF MITIGATING EVIDENCE

Mr. Hager's sentence of death was imposed in violation of his constitutional rights to counsel, the effective assistance thereof, a fair and impartial jury, the presumption of innocence, present a defense, confrontation, compulsory process, due process, freedom from cruel and unusual punishment and a fair, reliable and accurate determination of his sentence as guaranteed by the Fifth, Sixth, and Eighth Amendments because his trial counsel's representation during the penalty phase was woefully deficient.  Counsel's multiple errors and omissions resulted in overwhelming prejudice to Mr. Hager.  Separately, and cumulatively, those deficiencies in the investigation, preparation and presentation of the mitigation case require reversal of Mr. Hager's sentence of death.

In support of this claim, Mr. Hager alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.      Each of the errors and omissions of trial counsel in the guilt phase and in the penalty phase with respect to the government's aggravating evidence also contributed to the jury's decision to vote for a sentence of death. *See* Claims I and II, incorporated by reference as if fully set forth herein.

2.      **Failure to Adequately Investigate and Present Mitigating Evidence.** Trial counsel unreasonably and prejudicially failed to adequately investigate and present an abundance of readily available mitigating evidence. It is more than reasonably likely that, had counsel performed as the minimally effective advocates guaranteed by the Constitution and presented this evidence, at least one of Mr. Hager's jurors would have voted for a life verdict.

3.      <u>The Mitigation Case that Was Presented.</u> The evidence presented by trial counsel at the penalty phase was limited, often contradictory and ultimately wholly unpersuasive. Trial counsel's mitigation presentation centered on the testimony of a psychologist, Dr. Mark Cunningham, Ph.D. The thrust of Dr. Cunningham's testimony was the intuitively apparent, if not blindingly obvious, proposition that exposure to certain risk factors as a child and adolescent, such as violence in the community, criminal behavior by family members, aggressive behavior as a youngster, lenient family attitudes towards criminal behavior, etc., increase the likelihood that an individual will go on to commit criminal and violent acts. The first questions asked by the government on cross examination were scathing:

> Q:    So, if I may summarize the first half of your testimony, your conclusion is that exposure to risk factors when you are young may have an adverse effect on a person's tendency to commit violence. Is that correct?

A:    Yes, sir.

Q:    How much did you charge to come up with that conclusion?

Trial Tr. Vol. 14 134:20-135:1.

4.    Inexplicably, Dr. Cunningham conducted no evaluation of Mr. Hager's actual psychological functioning.  While he discussed some evidence of some of the difficult circumstances that Mr. Hager faced growing up, he completely failed to explain to the jury the devastating effects that those types of experiences have been scientifically proven to have upon the brain development and functioning of individuals who are exposed to them, and in fact had on Mr. Hager.  Instead, he linked them only to the increased statistical likelihood of becoming a juvenile delinquent and a violent criminal.  The overall effect of his descriptions of problems such as substance abuse, criminal behavior, drug dealing, dropping out of school and unwed parenthood amongst members of Mr. Hager's extended family was to suggest to the jury that Mr. Hager was born into a family of bad people and that is was therefore not surprising that he became a bad person himself.  And even the limited testimony regarding Mr. Hager's traumatic childhood that he did present was readily dismissed by the government as uncorroborated and, in significant part, demonstrably inaccurate.

5.    According to his testimony, Dr. Cunningham relied solely upon interviews with Mr. Hager and a handful of his family members.  Trial counsel unreasonably failed to supply him with records or other independent documentation of Mr. Hager's psychosocial history, and he was appropriately taken to task by the government in closing argument for his obvious failure to critically assess the reliability of his informants' memories or to verify the accuracy of his data.  For example, Dr. Cunningham testified that Mr. Hager's mother, Leavonia Fields, had begun smoking crack cocaine in her early 20's and continued using throughout her pregnancies with Mr. Hager and his siblings.  Given that Ms. Fields was born in 1952, this assertion was plainly

wrong; as the government established in rebuttal, and indeed as a number of other defense witnesses testified, crack cocaine did not appear in Washington, D.C. until the mid-1980s. There was therefore no way that Ms. Fields could have been smoking crack in 1972, or during her pregnancy with Mr. Hager leading up to his birth in May, 1973. Dr. Cunningham also testified that Mr. Hager noticed his mother's drug use when he was eight years old, *i.e.* in 1981, which similarly could not have been true, and during a discussion regarding high crime neighborhoods Dr. Cunningham stated that the onset of crack cocaine occurred in the mid-1970s. The government's cross-examination, rebuttal and closing arguments on this point were devastating to Dr. Cunningham's credibility.

6.      Dr. Cunningham also testified that Mr. Hager's paternal aunt, Pamela Hager, had a history of alcohol and drug abuse and that her son, co-defendant Lonnie Barnett, had abused marijuana. The government called Lonnie Barnett as a rebuttal witness, and he informed the jury that his mother had never abused drugs or alcohol and that he himself had only ever tried smoking marijuana on one occasion.

7.      Dr. Cunningham was also unable to accurately recount where Mr. Hager had lived at different points during his childhood. As the government pointed out during its cross examination of him, this failing reflected particularly poorly on Dr. Cunningham's presentation given that he had placed a great deal of emphasis during his direct examination on the significance of certain aspects of the neighborhood in which a child grows up. When the government suggested on cross examination that Mr. Hager did not grow up in the Southeast section of Washington D.C., and that his family did not move there until he was 14 or 15 years old, Dr. Cunningham was unable to correct him. In fact, Mr. Hager lived at 2936 Knox Place, S.E., continuously from shortly after his birth until 1989, when he was 16 years old. Dr.

Cunningham could not identify which neighborhood Mr. Hager lived in as an adolescent, and testified that the family was "pretty transient" after Mr. Hager turned eight years old. As noted, this was incorrect. Trial Tr. Vol. 14 150:18.

8.     On direct examination, Dr. Cunningham testified that Mr. Hager had been exposed to drugs and alcohol while in utero and started to describe the effects that such exposure can have on the brain of a developing fetus. The government objected, and Dr. Cunningham was forced to admit that no formal assessment of Mr. Hager's brain functioning had been conducted and he therefore had no knowledge of whether Mr. Hager had in fact been adversely affected. The testimony was accordingly excluded. Dr. Cunningham offered no explanation for the lack of such an assessment and so the jury was left to wonder why, if there was truly a possibility of brain damage, trial counsel had declined to discover and present it. This troubling scenario was repeated when Dr. Cunningham sought to testify about the psychological effects of exposure to traumatic events. Once again, he was forced to admit that, for reasons that were never explained, he had conducted no assessment of Mr. Hager to determine whether he suffered from such effects. As a result, that portion of his testimony was excluded. In sum, Dr. Cunningham's testimony was affirmatively damaging to Mr. Hager's case for life and trial counsel's decision to call him as a witness fell below an objective standard of reasonableness and severely prejudiced Mr. Hager.

9.     Trial counsel thereafter called to the stand an assortment of lay witnesses whose testimony also failed to further Mr. Hager's case for avoiding a sentence of death. David Blair, a former neighbor, testified that he had known Mr. Hager since birth. He described the scene at the Hager residence at 10th and C Streets, N.E., where there was constant drinking and partying and the home was filthy and unkempt. He also recounted physical and verbal abuse by Mr.

Hager's father against Mr. Hager's mother and the children and drug use by both parents. However, Mr. Blair's credibility was severely damaged by trial counsel's failure to establish the circumstances under which Mr. Blair saw Mr. Hager as a small child at the house at 10th and C. The facts of the matter were that Hager family members had been living around 10th and C since before Mr. Hager was born, first in apartments at 1000 C Street, N.E., then in a house at the corner of 10th and C Streets, 300 10th Street, N.E. Mr. Hager and his parents and siblings did not move into the house full time until 1989, when Mr. Hager was 16 and they were evicted from their apartment on Knox Place, S.E.; however, they were frequent visitors throughout Mr. Hager's childhood and Mr. Hager spent many weekends staying there with his grandparents. None of this information was elicited by trial counsel, which enabled the government to suggest that Mr. Blair had claimed untruthfully that Mr. Hager and his parents lived in the house when he was a small child, and to argue that his testimony should be disregarded as a result.

10.     Courtney Mitchell was a young woman who had been in middle school with Mr. Hager for a time. Her brief testimony was limited to the fact that Mr. Hager had accompanied her and her family on outings on three or four occasions. Mr. Hager's uncles, Eric Hager and Lorenzo Fields, both testified about drug use by Mr. Hager's parents, domestic violence between them and the filthy state of their apartment. However, the value of this testimony was undermined when both insisted that extended family members pitched in to help Mr. Hager and his siblings. Eric Hager testified that he, his sister, his mother and his father all tried to come through with what they had and, though they were not millionaires, the family tried to look out for Mr. Hager and his siblings. Lorenzo Fields testified that his aunt was the super of the building that Mr. Hager's family lived in and she used to provide food for the children whenever there was none in their home. He also said that the family staged many interventions over the

years and took pains to ensure that Mr. Hager and his siblings had as normal a life as possible. In closing argument, the government pointed to this testimony and argued that Mr. Hager's childhood may not have been as bad as defense counsel suggested it was.

11.     The next witness, Mr. Hager's maternal aunt Jennifer Fields, also described domestic violence by Mr. Hager's father against his mother and drug use by both parents. She testified that the children were frequently without adequate food and often not in school when they should have been. She also reported that she had called social services about the family at some unspecified time, though the results of the call were not elicited. But she, too, said that her mother and other family members took food over to the children when they had none, and that they also bought clothes for them from a variety of stores.

12.     Deborah Williams, a former girlfriend of a friend of Mr. Hager's father, echoed previous testimony regarding the sorry state of the apartment in which Mr. Hager lived in the mid-1980s; she had, however, only set foot in the place on one occasion. Donny Free, who had attended junior high school with Mr. Hager, provided testimony regarding physical and verbal abuse inflicted upon Mr. Hager and Mr. Hager's mother by his father, the parents' drug use and, once again, the unclean state of their home. He also said that Mr. Hager and his brother Terrell used to borrow clothes from him because their own clothes were dirty. On cross examination, however, the government established that Donny Free was three years younger than Mr. Hager and so the time period that he was describing was when Mr. Hager was 15 to 17 years old. By that age, it was undisputed, Mr. Hager was involved in drug dealing and making his own money and so it was highly unlikely that he was borrowing clothes from Donny Free.

13.     Counsel elected to present only extremely brief, frankly dehumanizing testimony by Mr. Hager's parents in which they admitted they used drugs and acceded to parenting failures

such as not taking Mr. Hager to the park or helping him with his homework. Thomas Hager also admitted to hitting Leavonia and Mr. Hager when he was a child. Leavonia contradicted him on the latter point, claiming no memory of Thomas Hager hitting the children, and she was of course impeached by the statements attributed to her by Dr. Cunningham regarding her use of crack in the 1970s. Thomas Hager was also impeached with Dr. Cunningham's notes, which stated that he had said during an interview that he had in fact taken Mr. Hager places and played catch with him, and that he had denied hitting his son.

14. The remainder of the defense case consisted of testimony by an attorney regarding the poor conditions at two juvenile facilities in which Mr. Hager had been placed as a teenager and the exceedingly brief and uninformative testimony of Mr. Hager's two daughters regarding their relationship with him. Overall, then, counsel's mitigation presentation was extremely weak and all too easily assailed by the government. It need not and should not have been thus; there was a mountain of compelling mitigating evidence that trial counsel should have found and presented. Their unreasonable and prejudicial failure to do so amounted to constitutionally ineffective assistance of counsel.

15. <u>The Mitigation Case that Should have been Presented.</u> The evidence that trial counsel presented, even where it was not affirmatively harmful to Mr. Hager, pales in comparison to the abundance of compelling evidence that was available to them and that they had a constitutional duty to uncover and present. Counsel could have presented, through credible witnesses with personal knowledge, corroborated by government and other records that long predate Mr. Hager's trial, evidence of a multigenerational history of psychological trauma and mental impairments perpetuated and passed down over many decades, along with specific,

compelling expert testimony regarding the devastating effects of this history on Mr. Hager's own mental functioning and well-being, which includes but is not limited to:

16.     Tommy Hager was born in 1973 in the District of Columbia.  His mother, Leavonia Fields, was 21 years old and his father, Thomas Hager Jr., was 19.  They were not married and neither was employed.  Tommy was the first child for both of them.  They had first met four years earlier, when Thomas Jr. was 15 and Leavonia was 17.  At the time of Tommy's birth, Leavonia was still living with her mother, Nancy Lee Fields, at 1012 C Street, N.E., in Washington, D.C., and Thomas Jr. was staying with his cousin, John Winston Hager, in an apartment across the street.  Approximately seven months after she gave birth to Tommy, Leavonia became pregnant again.  She continued to live in her mother's house until shortly after Tommy's brother, Terrell, was born in 1974.  In February of 1975, while Terrell was still in a bassinet, Leavonia and Thomas Jr. got an apartment together at 2936 Knox Place, S.E.  By then, Leavonia was receiving welfare checks for herself and the boys.  Her aunt, Mary Fields, was the superintendent of the building on Knox Place and she helped to arrange for Leavonia to rent the apartment.  With the money from the welfare checks Leavonia paid for the apartment at market rent.

17.     Because Leavonia was receiving welfare payments based upon her single status, in May of 1977 the District of Columbia Department of Human Resources filed a complaint for child support against Tommy's father, Thomas Jr., in the Superior Court of the District of Columbia Family Division, seeking support for Tommy and Terrell.  Thomas Jr. had signed an Affidavit of Support on July 15, 1976, in which he acknowledged paternity of Tommy and Terrell.  Because he was believed to be living in Maryland, the action was transferred to Prince

George's County Circuit Court.  It was ultimately dismissed the following year due to the Sheriff Department's inability to find and serve process on Thomas Jr.

18.     The failure to locate Thomas Jr. is understandable in those days before the widespread use of computers.  But in fact he was hiding in plain sight - Thomas Jr. was in jail. He was arrested on September 30, 1977, in Prince George's County and charged with Burglary, Resisting Arrest and Malicious Destruction of Property.  His cousin, John Winston Hager, was arrested along with him and he was charged with Breaking and Entering, Resisting Arrest and Vandalism.  The young men were arrested in their old high school, Frederick Douglass High School in Upper Marlboro.  Thomas Jr., his brother Tyrone, John Winston and his brother Michael were drinking and driving around in Maryland that night when they decided to break into the high school as a lark.  They did not intend to steal anything; they were just running up and down the halls and acting silly.  When the police showed up they all tried to run.  Tyrone and Michael got away, but Thomas Jr. and John Winston were arrested and charged with multiple felonies.  Thomas Jr. went to prison on June 28, 1978, and was released on April 25, 1979.  He spent time in the jails in Upper Marlboro and Baltimore and after sentencing he went to the state prison in Jessup.

19.     Tommy was almost five years old when his father went to prison.  His first memory of his father is of talking to him on the telephone.  Both his mother and Thomas Jr. lied to Tommy and told him that his father was away flying airplanes.  Tommy believed them for years until a family member finally told him the truth.  He clearly remembers being given a silver-colored toy airplane as a gift one year, but he has no memory of ever actually playing with it or getting it to work.

20.     After Thomas Jr. was released he was on parole for two or three years.  At his parole officer's urging, Thomas Jr. finally got a job; he started working for a moving company, Allied Van Lines, in D.C.  His brothers also worked for the same company.  Tommy soon realized that his father and uncles were also stealing from the company.  Odd items started appearing in the home in crates.  Tommy remembers a bow and arrows appearing one day, and recalls being mystified as to why they would need a bow and arrows in the city.  Even though Thomas Jr. had begun working, he also began a downhill slide into serious drug addiction.  He would take Tommy's mother, Leavonia, down with him.

21.     Thomas Jr. had been an alcoholic since adolescence.  With his new-found income from the moving company, he began using drugs as well.  At first he snorted cocaine, a drug that was becoming ever more popular and ever more available on the streets of D.C.  It was expensive, but not so expensive that it was out of reach of Thomas Jr.—at least if his income was dedicated to the pursuit of the high and not used for household expenses.  Leavonia, who had also been a heavy drinker since she was a teenager, began using cocaine also.  She also continued to drink heavily, and to smoke marijuana.  She drank and used drugs throughout all of her pregnancies, including her first pregnancy with Tommy.

22.     The Knox Place apartment became a party venue, a place that people wanting to drink, get high and hang out gravitated towards and congregated regularly.  On weekends there was always a party, with people coming in and out at all hours.  They played cards, Bid Wiz and spades, and they drank. Mutt and Leavonia drank a lot.  A favorite was "The Bull," which was malt liquor that came in a blue can. They also liked vodka and Bacardi.  Friends and relatives of Thomas Jr. used to come down from Croom, Maryland, or elsewhere and get too drunk to drive

home so they would just end up sleeping wherever they laid in the apartment. The parties frequently ended in fights, and the police were called on many occasions.

23.     Leavonia's aunt Mary who lived upstairs was well aware of what was going on in her niece's apartment and she did not approve. She used to be furious about the parties and the fighting. She used to bang on the door when things were getting out of hand and tell Lavonia and Thomas Jr. to stop making her look bad before they all got put out. Once she came in, saw the kitchen table covered with alcohol, and turned the whole thing over. She said Leavonia was headed for "the muck and mire."

24.     On one occasion Thomas Jr. and his brothers, Eric and Tyrone, found a large amount of marijuana that someone had grown out in Croom and they took it. They practically had a whole car full. There was so much that they did not know what to do with it all. Thomas Jr. stored a large amount in a closet in the Knox Place apartment for a while, but it began to smell throughout the whole building so he had to get rid of it.

25.     Leavonia had three more children with Thomas Jr. during the early to mid-1980s. In 1980, Tommy's sister, Tiffany, was born. She was followed by Tesha, born in 1981, and then by Tommy's youngest brother, Tywon, who was born in 1985. Thomas Jr. was, however, cheating on Leavonia throughout this period with a number of women. Although Eric was too young to drive legally, Thomas Jr. taught his youngest brother how to drive his car and had Eric drive around town while he had sex with women in the back seat. Later on, he used to take Tommy with him as cover when he went to another woman's house to have sex. One of those women was Shirley Berry. Thomas Jr. fathered three children with Ms. Berry during the same period that he was fathering Tommy's siblings. His son, Jermaine Berry, was born in 1981. His older daughter, Kimberley Berry, was born in 1986 and she was followed by another daughter,

Rochelle Berry, in 1987. Tommy recalls playing in the living room of Ms. Berry's house while she and his father went off into the bedroom together.

26.     From the beginning of their relationship until they finally separated around 1999, Thomas Jr. terrorized the family. He was severely and violently abusive towards Leavonia. He had no compunction against beating her in front of Tommy and his siblings, or against abusing her in public. The first incident that Tommy remembers was when they were all in the car driving on the highway. His parents were having a loud argument when Thomas Jr. suddenly leaned over, pushed open the passenger side door, grabbed Leavonia by the throat and tried to shove her out of the car while it was still moving. Tommy recalls his mother screaming and crying.

27.     When he beat her in the home, Thomas Jr. punched, kicked and slapped Leavonia and threw her to the floor. She tried to fight back and kick him away but she was much smaller than Thomas Jr. and so she never stood a chance. Despite the enormous size differential— Thomas Jr. was 5'11" and strong, Leavonia was 5'2" and weighed less than 100 pounds—he beat her like he would another man. She frequently had visible bruises, black eyes and split lips. He was particularly likely to beat Leavonia after they had been up all night using drugs and there were no more drugs in the house. Tommy has vivid memories of crying and screaming at the top of his lungs for his father to stop, and of the terrible helplessness he felt when his screams had no effect and there was nothing else he could do to stop his father from hurting his mother.

28.     On one occasion after a beating from Thomas Jr., Leavonia had a seizure. She was walking out of the apartment with Tommy's sister Tesha when she collapsed on the steps of the Knox Place apartment building. She had been carrying a carton of eggs which smashed when she fell and dripped all over the steps as she lay there seizing. On another occasion, also

when they were still living on Knox Place, Thomas Jr. dragged Leavonia down the concrete steps leading up to the building and then dragged her up and down the street outside, all in view of the children and everyone else in the neighborhood. As usual, nobody stepped in or tried to help Leavonia; the neighbors simply averted their eyes.

29.     On another occasion, Thomas Jr. was visiting Levonia's sister Jennifer and another friend when a car pulled up and Leavonia got out. It was at a time when she was thinking about trying to get away from Thomas Jr. He immediately assumed that she had been with another man and he grabbed her and was choking her against a fence. Someone did intervene this time, and chased Thomas Jr. away.

30.     In addition to beating her, Thomas Jr. tortured Leavonia with cruel gestures such as threatening to put his cigarette out on her face. He also pulled his gun on her and threatened to kill her on many occasions. Sometimes when he left the house after beating Leavonia, Thomas Jr. took Tommy's youngest brother, Tywon, with him and they spent the night sleeping on the seats in the Greyhound bus station.

31.     He also treated her horribly even when he was not hitting her. He yelled at her and talked to her like she was a child. He used to say things to her like "shut the fuck up" and "go stand over there in the corner," and "you better listen to me." Or, if he needed something, he would yell "goddamn you, go to the store, I'm paying for this shit." Virtually every sentence he spoke was laced with profanity. He ordered her to do things for him like fix him some food or run his bathwater. He could be sitting on the couch so close to his beer that he could reach one, but rather than getting it himself he demanded that Leavonia get up and hand one to him. If she did not react immediately, he would yell at her to get him his goddamn beer. Leavonia learned to quietly do as he asked.

32.     As the battering continued, Leavonia became increasingly sad and depressed and her competence as a parent, never very high, declined still further.  The only time she appeared to be at ease was when she was drinking alcohol with her girlfriends.  She received no treatment for her depression until many years later, in 1998, when the social worker in the D.C. Family Court neglect case involving Tommy's sister, Tesha, referred Leavonia to Washington Hospital Center Outpatient Psychiatry for depression and substance dependence.

33.     When Tommy was around seven or eight years old, he was playing tug o'war with a girl outside over a stick when the girl suddenly let go of her end.  The stick flew back into Tommy's face and caused a deep gash in his upper lip, the scar from which is still clearly visible today.  The gash immediately began to bleed profusely.  Tommy ran into the apartment, where his mother was sitting on the couch and talking on the telephone.  Instead of running to her for help, Tommy ran past her and into the kitchen and put his head into the freezer, believing that the cold would stem the flow of blood.  His mother called to him, wondering what he was doing, and he reluctantly went back to the living room with his hand covering his mouth.  Leavonia made him move his hand and when she saw the wound she screamed and immediately called 911.  Tommy was taken to the hospital where he received many stitches.  It was not safe for Tommy to seek out his mother for comfort or help when he was in distress.

34.     As they got older and bigger, Tommy and Terrell started to intervene whenever they could and physically pull their father off Leavonia.  When they got older still, in their late teen years, Tommy and Terrell spent a good deal of their time away from their mother's home, which by then was at 67 K Street, N.W., in the Sursum Corda projects.  But Leavonia and their younger siblings always knew that, if Thomas Jr. started beating on Leavonia, they could page "911" to Tommy and he and Terrell would go straight there.  Tommy did not even stop to call

back; when he saw the "911" together with is mother's number he knew exactly what was going on. Tommy and Terrell teamed up and dragged their father off their mother, and often gave him a beating in a vain effort to discourage him from continuing to abuse their mother. On one occasion after this happened, and after Thomas Jr. left the area, Tommy and Terrell stayed with their mother for a while in case Thomas Jr. returned and started beating her again. He did return, but he did not come alone. He brought his brothers, Eric and Tyrone, and he was carrying a 12 gauge shotgun. After railing at Tommy and Terrell and threatening to kill them, Thomas Jr. suddenly raised the shotgun and fired at the house, directly into the window to the younger children's room upstairs. Fortunately the window was double-paned and while one pane was shattered the second stopped the shot. Though uninjured, the younger children were terrified, as well as shocked and confused that their father would choose to aim directly into their room rather than anywhere else. After the shot was fired, Thomas Jr. and his brothers immediately took off to escape the police that they knew would be arriving shortly.

35.    On another occasion, this time inside 67 K Street, Thomas Jr. pulled a gun on Tommy and Leavonia and pinned them to the ground like hostages, threatening to shoot and kill them if they tried to move. Once again this terrifying scene played out in full view of the younger children.

36.    A friend of Tommy's recalls another time when Tommy tried to stop his father from beating his mother and Thomas Jr. pulled a gun on him. The friend was 12 or 13 years old at the time. Thomas Jr. was beating Leavonia in the bathroom and when Tommy went in to try to stop him, Thomas Jr. pulled out a shotgun and pointed it directly at him. Tommy had a handgun himself and he pulled it out, but he dared not fire it because his sister Tiffany was standing behind him and he knew that if he fired, his father would fire the shotgun and his sister

would likely get hit.  Tommy loved his baby sister; she was his heart.  So, instead of shooting Tommy grabbed his mother and pulled her away from Thomas Jr. and out of the bathroom.

37.     It was frustrating and confusing to Tommy and Terrell that, no matter how many times they rescued their mother from Thomas Jr., she always went back to him.  Tommy used to say, Ma, just leave him alone.  Leavonia might keep Thomas Jr. away for a while, but eventually she always allowed him back into her house.  Even after the incident where Thomas Jr. threatened the family with a shotgun and shot at the window to the children's room, Leavonia took him back.  He showed up a while later with some drugs for the two of them and she allowed him back into the family's life.  She was terrified of him, and afraid of what he might do to her and the children if she ended the relationship.

38.     It took Thomas Jr. putting her in the hospital before Leavonia finally mustered the courage to leave him.  He hit her so hard that he broke her jaw, and she had to go to the hospital and have it wired shut.  For months she could not talk or eat except through a straw.  She had to have a steel plate put in her jaw which is still there today and she permanently lost feeling in parts of her lower face.

39.     Thomas Jr. not only abused Tommy's mother, he abused Tommy and his siblings, also.  He beat Tommy and Terrell regularly with a belt, often leaving visible marks on their bodies.  He also used a switch.  He used to grab Tommy by one arm and beat him with the other as Tommy cried and screamed and struggled to get away.  When a rock that Tommy threw accidentally broke the windshield of a neighbor's car, Thomas Jr. beat not only Tommy but also Terrell and a little cousin who happened to have been with them.  Thomas Jr. did not care whether there were kids around when he was beating on Leavonia, whether it be his own or other people's.  When he went on a rampage, if Tommy or Terrell spoke up he would slap them.  A

friend of Tommy's recalls being in the house when this happened and praying that Thomas Jr. would not hurt him. Tommy's friend used to grab the dog and set it in front of him on his lap so that it would growl if Thomas Jr. came near him and keep him away.

40.     Thomas Jr. also cussed at Tommy and Terrell and berated them, even when they were little boys. He used to tell them to shut the fuck up, what did I tell you, why in the fuck are you doing that. He also used to threaten them, telling them to shut the fuck up or else he would kill their asses. The boys were visibly afraid of their father when they were small.

41.     After beating Leavonia at 67 K Street another time Thomas Jr. left for a while, only to return shortly afterwards. Leavonia and the children had made sure to lock all of the doors and windows to the house in the meantime, and Thomas Jr. started banging on the door and yelling to be let in. The house had a mail slot in the front door that opened directly onto the living room. Thomas Jr. opened the slot and saw Tommy's sister Tesha sitting terrified on the couch; she in turn saw his angry face in the slot. He then began a profanity-laced rant directed at her, demanding that she open the door right now and let him in. Tesha did not open the door; she was far too scared of her father for that, and eventually he went away. He stayed away for several hours and Tesha, believing that the coast was finally clear, went outside and began playing jump rope with the other neighborhood kids. All of a sudden, Thomas Jr. appeared out of nowhere and attacked her. He snuck up on her before she even had time to try to run away. He grabbed her by the neck and started choking her, causing scratches and abrasions all the way down her neck. The police were called and Thomas Jr. was arrested and charged with Simple Assault and ordered to stay away from Tesha—an order that, to Tesha's intense distress, he repeatedly violated.

42.     Thomas Jr. threatened the children starting when they were very small.  He was fond of saying "I brought you into this world and I will take you out of it."  He regularly called the girls bitches.  The children grew up wondering what on earth they had done to this man, their father, to make him say such terrible things to them.

43.     The origins of Thomas Jr.'s extraordinarily violent and abusive behavior likely lie in his own childhood experiences and those of the generations that preceded him.  He grew up in an extremely abusive home himself.  He was physically abused by both his father and his mother and he watched his father beat his mother throughout his whole childhood and beyond.  Thomas Jr. is the second child of Hilda Hager; his mother had a child when she was very young that she gave up for adoption.

44.     Thomas Jr. grew up in a rural community in Prince George's County, Maryland, known as Croom.  The community was rife with racism and could be a dangerous and threatening place for a person of color.  Thomas Jr.'s cousin Mike, who grew up with him, remembers them as children, walking along the side of the road gathering cans to turn in to make a little money and having white kids drive by in cars throwing cans at them and calling them N-------s.  White kids also used to shoot at stop signs as they walked by them.  One particular night when they were teenagers Mike and Thomas Jr. were driving together when they took a wrong turn and ended up on a single lane dirt road way back in the woods.  They could not turn around because the lane was too narrow and so they had to keep going deeper into the woods.  Suddenly there was a commotion, and when Mike looked out of the car he saw a bunch of white men with flashlights all pointing pump action shotguns at them.  The men called them N------s and told them to get out of there before they killed us all.  They were terrified and have never forgotten it. There was also a restaurant in town that had a sign out front saying:  N-----s go round the back.

45.     Although she took his last name, Thomas Jr.'s mother Hilda never married his father, Thomas Sr.  Neé Watson, she had been married in 1950, at the age of 20, to Leander Brooks, aged 22.  Leander Brooks had a sister, Eleanor, who was seeing Thomas Hager Sr. and eventually had a daughter with him named Gloria who was born in 1952.  Thomas Sr. was simultaneously seeing a woman named Elizabeth Hamilton, with whom he had a son, William, who was also born in 1952.  According to the pleadings and testimony taken in connection with their subsequent divorce, Hilda Brooks left Leander after less than a year of marriage and went to live with Thomas Hager Sr. in Croom.  Hilda quickly became pregnant and had a child whom she gave up for adoption.  Not long thereafter, she came pregnant again with Tommy's father, Thomas Jr., and he was born in 1953.  By the time of his birth, Hilda was living in Washington, D.C.  She filed Thomas Jr.'s birth certificate under her maiden name of Hilda Watson, and no father was listed.  The birth certificate did not include Thomas Jr.'s name either, until it was supplemented in 1969.

46.     Hilda Watson had been born into a family of tobacco farmers in Brandywine, Maryland, in 1930.  Her father was J. Marbury Watson and her mother was Lillian Watson. Lillian and J. Marbury were first cousins; Lillian's last name was Watson even before she married J. Marbury. Their fathers, Charles and Joshua Watson, were brothers.  Hilda had two sisters named Gwendolyn and Audrey.  All three sisters were African American but they had extremely light complexions, almost white.  Their parents' shared grandfather was a white man. There was a tradition amongst some very light skinned African American communities in Prince George's County, Maryland, of intermarrying within the community, sometimes resulting in a particular pattern of genetic abnormalities in children born into such families.  J. Marbury was a heavy drinker.  He once fell asleep in front of a wood stove after drinking too much. His clothes

were soaked with diesel fuel from working on a tractor and a spark caught fire, burning him all over his torso.

47.     Hilda's son, Thomas Jr., was followed by a sister, Valerie, who was born in 1955. Hilda did not raise Valerie.  Instead, she grew up in the home of Juanita Dotson, a local woman who made extra income by caring for the elderly.  Hilda originally dropped off both Valerie and Thomas Jr. with Ms. Dotson.  She came back for Thomas Jr. before too long, but left Valerie behind.  Valerie had no idea that she had living parents and siblings until Ms. Dotson finally told her when she was 10.  She did not come to live with the Hager family until her teen years.  Hilda and Thomas Sr. did raise their next four children, starting with Pamela Hager, born in 1956, then Loneldon "Tyrone" Hager, born in 1958, Sheldon "Eric" Hager, born in 1960, and finally Felicia Hager, who arrived in 1963.  The family was extremely poor.  They lived in a series of small rented wooden houses, most of which had no electricity, no running water, no bathroom and no heat except for a wood stove.

48.     Thomas Sr. was an alcoholic who compulsively gambled and chased other women and worked only temporary jobs in construction or farming.  He was in and out of jail regularly for things like fighting, illegal gambling, shootings and drunk and disorderly conduct.  He loved to play cards and dice, and his drink of choice was bourbon.  He used to go to houses in the area where people gambled and sold liquor and come home drunk as a skunk.  There were many times that he got so drunk that someone would have to drag him back to his house.  When Tommy's father was young, Thomas Sr. used to send him and his friends to the liquor store on a Saturday morning with a note.  They were instructed to give the note to the man in the store and bring back the half of bourbon they were given to Thomas Sr.  The store owner just put it on

Thomas Sr.'s account, which he paid at the end of the month. Once he had paid what he owed his money was just about gone, and he just started running up an account again.

49. Thomas Sr. also viciously abused Tommy's grandmother, Hilda. Every weekend he came home drunk and hit her. As Thomas Jr. got older he was often in the middle, trying to get his father off his mother. Thomas Sr. always carried a knife and always had a gun, and he frequently pulled one or the other out and threatened to kill Hilda and Thomas Jr. It was nothing for him to pull out a gun and threaten to shoot someone, and it fell to Thomas Jr. to try to get the gun away from him before he injured anyone. He also kept a shotgun behind the front door. The beatings typically ended with Thomas Sr. throwing Hilda and the children out of the house. They used to hide out in the woods and then when he finally passed out they knew it was safe to come home. Sometimes, after he had beaten on her for a while, Thomas Sr. abruptly turned around and directed Hilda to their bedroom. The next day they just went on as if nothing had happened.

50. On one occasion Thomas Sr. was laying into Hilda and when he swung back to hit her again, his fist collided the head of his youngest daughter, Felicia, and knocked her unconscious. It was wintertime, and her cousins carried her outside to put snow on her face to bring her round.

51. Thomas Sr. was arrested for assaulting Hilda at least once, in January of 1972, but the case was dismissed after Hilda failed to come to court to testify against him. Hilda always told her children that she would leave Thomas Sr. after they were grown, but she never did. On one occasion when they lived in Capitol Heights Thomas Jr.'s sister Pam came home from her job as a waitress at Bob's Big Boy and saw all the dressers tipped over and clothes on the floor.

She asked her father where her mother was and he said she had left.  But she came right back the next day.

52.     Thomas Sr. was also jealous and controlling towards Hilda.  The insurance man could make a sales call and Thomas Sr. would suspect her of cheating on him and beat her.  The children began to realize that he often got suspicious if he saw tire tracks in the dirt road up to the house, so they started sweeping the road with a broom before he came home to try to save their mother from a beating.  He got angry any time another man wanted to talk to Hilda.  On one occasion a friend drove Thomas Sr. home from the country store and said he would like to come up to the house and say hello to Hilda.  Thomas Sr. ordered him to stop the car, got out, ran to the house and came back out with his shotgun.  The man ran to a neighbor's house and called the police, and Thomas Sr. was taken away in handcuffs to spend another night in jail.

53.     Thomas Sr.'s frequent accusations that Hilda was cheating on him were ironic given that he regularly cheated on her, including with his old girlfriend, Eleanor Brooks.  He used to take the children with him to Eleanor's house, ostensibly to see Gloria.  In fact, he was going to see Eleanor.  The children were left in the living room while Thomas Sr. and Eleanor went upstairs to the bedroom, hand in hand.  Thomas Jr.'s brother, Eric, used to go out collecting bottles so that he could get the deposit money for them.  He recalls standing by the side of the road waiting for a ride and getting hopeful when he saw his father's car coming.  But instead of stopping when he saw Eric, Thomas Sr. hit the gas and sped away, though not before Eric noticed that he had a woman in the passenger seat who was definitely not Hilda.

54.     On one occasion when Thomas Sr. was hitting Hilda she managed to pick up a pot of half smokes that was boiling on the stove and threw it down Thomas Sr.'s neck.  The hot water took all the skin off his neck and he was in the hospital for a long time.  He stayed furious

with Hilda for even longer.  At first she had to go and stay with her father until Thomas Sr. cooled off.  Even after she went back home, Thomas Sr. used to bring up what happened every time he got drunk and started fighting her.  On another occasion after Thomas Sr. slapped her Hilda went and got the shotgun herself.  She sat at the foot of the stairs, which looked straight into the kitchen where Thomas Sr. was standing.  She told him to sit his ass down in a chair and not get up.  He cussed at her good but he sat down and did not get up.  And that was the end of the beating that day.

55.     Although he regularly beat Hilda up, Thomas Sr. went into a fury when he heard that his daughter Gloria's husband had beaten her and given her a black eye.  He went looking for the man and finally spotted him going into a liquor store, followed him and hit him in the head with his gun.  Thomas Jr. and his cousin Greg saw what happened, and Greg managed to wrestle the gun away from Thomas Sr. before he shot the man.  When Thomas Jr. asked his father afterwards how it was that he objected so violently to someone beating his daughter when he beat on Hilda all the time, Thomas Sr. had no answer.

56.     Thomas Sr.'s abusive behavior was not directed solely towards his family.  Around the time he started getting involved with Hilda, he was at a dice game and he believed that someone had cheated.  Thomas Sr. hit the man in the head with something like a tire iron, then left the game.  He knew the man's friends would be after him so he kept his shotgun in the back of the car for the next few days as he drove around.  He stopped to get gas one day and the man's friends were right there at the store in the pumping station.  Hilda saw them first, as Thomas Sr. was winding the pump.  She yelled for him to duck just as one of them threw a brick at Thomas Sr.  He ducked and it missed him.  He immediately grabbed his gun, and let them have it with both barrels. Then he ran from Maryland to D.C., fearing he was about to get locked

up.  The landowner that he worked for, Mr. Duval, offered to fix the situation if Thomas Sr. would come back and work.  He did so, and Thomas Sr. got away with a $10 fine.

57.    Some years later, Thomas Sr. went after a white police officer who called him names.  He hit the officer over the head and rolled his car.  Thomas Sr. used to joke that he shot four n-----s and got a $10 fine, but when he put his hands on a white police officer, they were coming for him across the field with torches.  When Thomas Jr.'s brother Eric was 12 or 13, he stopped by his friend Margaret Pinkney's house.  The two of them were playing in her back yard when her father saw Eric and said, "Is that one of them Hager boys I see?"  Thomas Jr. and his family were already getting a reputation for being violent troublemakers.  Mr. Pinkney told Eric to get off his property and told his daughter to stay away from him.  When Eric told his father what happened, Thomas Sr.'s response was to drive him right back to the Pinkneys' house where he threatened to hurt Mr. Pinkney if he ever disrespected Eric again.

58.    In 1978, after they had left Croom and were living in a house on 10th and C Streets, N.E., in Washington, D.C., Thomas Sr. shot up a laundromat.  He had been working there, or at least washing people's clothes for them in return for some change.  One day he was drunk and said something inappropriate to a neighbor's sister.  The neighbor then came to the house, kicked the door in and punched Thomas Sr. in the face before leaving.  Thomas Sr. was furious.  He took his gun, went back to the laundromat and shot the place up trying to hit the neighbor.  Fortunately, the neighbor escaped without injury.  Thomas Sr. called Tommy's father.  Thomas Jr. hurried over to the laundromat and saw bullet holes everywhere.  There was a hole in the glass that was right above a woman's head.  Thomas Jr. took his father's gun and hid it upstairs at a cousin's house nearby, and the police never did find it.  Thomas Sr. was arrested and charged, but ultimately was found not guilty by a jury.

59.     Thomas Jr. has had to jump in between his father's gun and people he was trying to shoot on several occasions.  After they moved to 10th and C Streets, Thomas Jr. got phone calls multiple times from people in Maryland telling him to come out there because Thomas Sr. was going off and threatening to shoot someone.  One time he had his gun right up in his son's face as Thomas Jr. was begging him not to please not shoot a boy.  Thomas Sr. was a very frightening person to be around.

60.     As a child, Thomas Jr. was physically abused by both his parents, and also by his uncle, John Hager, and his wife Doris, who lived with the family off and on and were frequent visitors even when they were staying elsewhere.  Both men used to kick Thomas Jr., his brothers and his cousins hard in the butt as punishment.  Thomas Jr.'s uncle, who was a heavy drinker, gambler and philanderer just like his brother, also knocked the boys' heads together real hard. Other times they smacked them in the face or beat them with a belt.  Thomas Jr.'s mother, Hilda, and his aunt Doris had their own methods of mistreating their sons.  They both believed in making the children put their heads between their legs and beating their naked butts with an electrical cord or a broomstick.  They also used to grab the boys' ears and twist them hard, or twist one arm behind their backs to cause pain.  If one of the boys used a curse word they would get their mouth washed out with soap and sometimes bleach.  Aunt Doris also forced the boys' hands on the hot stove, burning them.  She herself had been raised by a violently abusive mother, and she met John after she had been placed in the girls' reform school that was located in Croom.

61.     Growing up this way did not just affect Tommy's father; it profoundly damaged Thomas Jr.'s brothers, Tyrone and Eric, also.  Tyrone became a severe alcoholic.  He drank all day every day, starting as soon as he woke up.  He drank beer and hard liquor, whatever was to hand.  He was arrested on DUI charges on at least seven occasions, both in Maryland and in the

District of Columbia. Tyrone had a lengthy history of arrests for other charges, too, including car theft (1979), unauthorized use of a vehicle (1979), unlawful entry, carrying a dangerous weapon – rifle and unregistered firearm (1980), theft of hubcaps (1983), assault with a deadly weapon – gun, possession of a prohibited weapon and simple assault (1985), kidnapping the child of an ex-girlfriend (1994), and destruction of property (1995).

62.     Tyrone fathered children with at least three different women. The mother of his first child, Loneldon Windsor, was Audrey Windsor. He physically abused her so badly that she spent most of Loneldon's early years hiding from him. He had hurt her badly, including breaking her nose on multiple occasions, and he once set her mother's house on fire when he found out she was staying there. Another time he tried to force his way into the house and broke Audrey's finger in the door. Tyrone also had children with girlfriends Janice Smith and Renee, and he abused both women.

63.     In the late 1980's, Tyrone was living in an apartment on Holbrook Terrace, N.E., out of which he ran a profitable business as a bootlegger. He bought liquor by the case from a crooked employee of a local liquor store, who sold it to him after hours at a discounted price. Sometimes he took Tommy with him on his late night trips to the liquor store. It was not uncommon for there to be boxes and boxes of liquor stacked up in the apartment. Because Tyrone had money and there was always liquor available, the apartment became a magnet for women who wanted to drink or get high and were willing to have sex in exchange. Tyrone used to get them high and drunk and when they wanted more, he told them they had to do something, like have sex with one of the guys. Starting when Tommy was 11 or 12 years old, his uncle pushed him into having sex with these women.

64.     Even though he slept with large numbers of women including known drug users and prostitutes, Tyron refused to ever wear a condom.  He eventually contracted AIDS and died of the disease in 2002 at the age of 43.

65.     Thomas Jr.'s brother Eric lived with a girlfriend, Barbara Farmer, off and on for many years.  Barbara is the sister of Audrey Windsor.  She was also physically abused.  For a time, Tyrone lived across the street from Eric on the 2900 block of Nelson Place, S.E.  Eric stopped off at Tyrone's apartment to drink with him almost daily on his way home from work.  He came home drunk one evening after hanging out with Tyrone when Barbara was cooking dinner.  When he came in the kitchen, Barbara told him immediately not to put his hands in the water in the sink because she had broken a glass in there while washing dishes.  Not long afterwards he did exactly that, and the broken glass gashed his hand.  Eric flew into a rage and started slapping Barbara while her young daughters watched.  Fortunately, Tommy's teenage cousin Loneldon happened to be there visiting, and he jumped and pulled Eric off Barbara.  Eric cussed him out and told him to get out of the house, but stopped hitting Barbara.  Loneldon instructed Barbara's daughters to come and get him if Eric started beating on their mother again and he turned to leave, but before he reached the door Eric came up behind him and kicked him, hard, in the rear, just as he had been kicked as a child by his father and his uncle.  Loneldon wheeled around and they began to fight as Barbara screamed and tried to break them up.  Rather than throwing Eric out of the house, Barbara told Loneldon to leave.

66.     About four months later, Loneldon and Tommy and their friends were outside on Nelson Place when Eric came over to them.  Eric got in Loneldon's face, deliberately trying to provoke him until Loneldon finally hit him and they started fighting.  Barbara broke them up and it appeared to be over as quickly as it started.  Then Eric suddenly said "look, police!" Loneldon

instinctively turned to look and when he did so, Eric punched him in his face.  Barbara begged Loneldon to just leave, and he and Tommy drove off.  When they returned to the neighborhood later that night, they were flagged down by Terrell right before they turned onto the block. Terrell told them not to go onto Nelson Place because Eric was drunk, had a gun and was looking for Loneldon.  Loneldon was afraid that his uncle was going to get himself arrested and lose his job, so he went looking for him.  When he found him, Loneldon fired his own gun into the air one time, hoping to scare Eric into going home.  It did not work.  Eric started shooting directly at Loneldon, and continued shooting at him, and chasing him, as he ran away.

67.     Women and girls frequently react differently to exposure to traumatic events than men and boys do.  They are less likely to engage in aggressive or violent behavior, and more likely instead to have consequences such as difficulty with interpersonal relationships and revictimization as adults.  Thomas Jr.'s sister Valerie was beaten by her first husband.  Her mother told her when she got married that marriage meant accepting a lot of things you would not normally accept.  So when her husband beat her the first time, Valerie left him for a short while but then went right back.  She finally plucked up the courage to leave him after he beat her while they were living in St. Louis, Missouri, where he was stationed in the service.  She managed to get someone to help her get the bus all the way back to D.C. with her son.  When she saw her parents, her father said she looked like she had been eating hot water soup. She had stopped eating from the stress of getting beaten and threatened.  Even then, her mother, Hilda, tried to convince her to go back to her husband.

68.     The cycle of abuse into which Tommy was born did not start with his grandfather, Thomas Sr., for Thomas Sr. had himself been raised in an abusive family.  His father, John Benjamin Hager, was a veteran of the First World War who served in one of only two African

American regiments that were deployed into combat in France towards the end of the war. John Benjamin fought in the Battle of Meuse-Argonne, the last battle to be fought and still the bloodiest battle in American military history. 26,277 American lives were lost in the battle, more than twice as many as the closest contender, the fighting in Okinawa in 1945 during the Second World War.

69. John Benjamin, known as Bennie, and his wife, Hannah, also had very light complexions and are described in early census records as "mulatto." Bennie was an alcoholic. He also cheated on his wife, and had at least one child by another woman, a daughter named Myrtle Tolson. In 1952 he was arrested for hitting Leander Brooks in the head with a bottle. Leander Brooks was the husband of Hilda Watson, who had left him to be with Tommy's grandfather and Bennie's son, Thomas Sr. Bennie was also physically abusive to his children and later on to his grandchildren, including Tommy's father, Thomas Jr. Even after he was virtually blind from glaucoma he could still grab them and beat them with a belt.

70. Thomas Sr. was not the only child in his family who grew up to perpetuate the violence and assaultive behavior they had been exposed to as children. For example, his brother, William Hager, went to prison for 10 years for beating and choking to death his fiancé, Rose Clark, in Washington, D.C. on March 13, 1944. He was initially charged with First Degree Murder and was sentenced to 5-15 years after he pled guilty to Manslaughter pursuant to a plea agreement. He had been violent towards Ms. Clark before. On October 28, 1943, she was granted a protective order against him by a Prince George's County Justice of the Peace, after informing the court that she was afraid that William Hager would kill her or do her bodily harm. Two days earlier, William Hager was charged in the Circuit Court of Prince George's County with assaulting Ms. Clark by choking her with his hands, and with creating a disturbance and

using lewd, profane and obscene language, in the home of James Forbes in Upper Marlboro. That case was set for trial in April, 1944; by then, however, Ms. Clark was dead.

71. Thomas Sr.'s older brother, John Hager, was the closest to Thomas Sr. As noted, he too was an alcoholic, a gambler and a womanizer, and he too physically abused his wife, Doris. John Benjamin and Thomas Sr. spent a lot of time in the rough bars and clubs near Croom. These were places where strippers and prostitutes were plentiful and fights and shoot-outs frequently ended the night. There was no police department for miles, and even when they did come, the small, tight knit community was reluctant to cooperate, so the bars operated largely unchecked.

72. John and his wife Doris argued and fought constantly, and they spent more of their marriage separated than they did together. Doris did finally leave John, but for many years she stayed with him because she knew he would never let her take their children and she did not want to leave them behind. So she stayed while John beat her and ran around with other women, frequently staying out all night.

73. Tommy's paternal family thus had a history of violence spanning multiple generations. The violence and psychological trauma that Tommy's father and grandfather were exposed to explain both their behavior and their attempts at self-medicating the aftermath with alcohol and drugs.

74. There were plenty of serious problems on Tommy's mother's side of the family, also.

75. Leavonia was born in Charlottesville, Virginia on February 6, 1952. Her mother was Nancy Lee Fields, aged 18. No father is identified on Leavonia's birth certificate, but Nancy told Leavonia that he was Charles William Seay of Charlottesville. William Seay had a

number of children with a number of different women.  He served in the Navy during World War II but after that he never worked and was always broke.  He was a serious alcoholic.  Even in high school his nickname was Melrose, which was the name of a cheap wine that was popular at the time.  After Leavonia, Nancy went on to have a second daughter, Debra, in Charlottesville in September, 1954.  Debra's father was a married man named Mannis Wesley.  Neither Leavonia nor Debra ever met their fathers.

76.     When she was 16 years old, Nancy was seriously injured in a near-fatal car accident.  The accident occurred on April 4, 1949, on Route 29 in Albemarle County, Virginia, about 10 miles away from her home in Charlottesville.  She was injured so badly that her father sued the driver for compensation for her medical expenses and won.  Nancy was left with a large scar on the back of her head and permanent tinnitus.  She was also absolutely terrified of getting in cars for the rest of her life.  If she ever had to be driven anywhere, she made the driver go so slowly that people honked at them.

77.     When Leavonia and Debra were still small, Nancy moved to Washington, D.C.  They lived first with Nancy's parents, Walker and Mollie Fields, who had moved to Washington, D.C. some years earlier.  Walker and Mollie lived at 61 New York Avenue, N.E.  Then in 1960 Nancy and her children moved into a house at 1012 C Street, N.E., which was rented by her mother's brother, Uncle Peck.  She stayed there for the next 27 years.

78.     Nancy went on to have five more children.  After Leavonia and Debra came their sister, Jennifer, in 1957, followed by their brothers Tyrone, in 1959, Anthony, in 1962, Lorenzo, in 1965 and finally Harold, in 1966.  The father of Jennifer and Anthony was a man named Joseph McLaughlin.  McLaughlin was a singer in several rock and roll bands that played in clubs all over D.C., Maryland, Virginia, and the rest of the country at times.  He was an inveterate

womanizer, and in addition to Jennifer and Anthony he has 11 other sons and eight other daughters, for a total of 21 children. Tyrone's father is believed to be a club owner by the name of Johnny Somerville. Harold Gaither was the father of Lorenzo and Harold. The only one of the children's fathers that ever lived with Nancy was Harold Gaither, and he only stayed for a short time.

79.     Nancy and her mother's brother, Elmer Johnson, known in the family as Uncle Peck, paid the rent between them. She received public assistance and Uncle Peck made his living by running an illegal gambling operation. He used to run card parties in the house and there was often a lot of noise at night from people coming in and out, drinking and partying and sometimes fighting. He himself was a heavy drinker. He also had a criminal record, including a conviction for possession of liquor in violation of the Prohibition Act and a felony conviction from 1938 for which he was sentenced to two years in the Virginia State Penitentiary. His codefendant in the Prohibition Act case who was driving the car was also charged with driving under the influence. In their teenage years, Leavonia and Debra were afraid to be alone with Uncle Peck because he leered at them and tried to get them to come close to him.

80.     Nancy's brother, Walker Fields Jr., known by his nickname Solid, lived in the basement. Solid was a man with serious problems. In 1940, when he was 14, he was charged in juvenile court in Charlottesville, Virginia, with trespassing on the property of Miss Daniels and larceny of chairs. He was placed on probation and thrashed. The following year he was thrashed again and put on probation, this time for being incorrigible, running away from home, associating with disreputable persons and assault. The year after that he received his third term of probation for vagrancy and trespassing on Southern Railroad property. Later that same year he was turned over to the State Department of Public Welfare and sent to Reform School after

committing larceny of five sweaters, a tie, a belt and a slack suit from Newman's, Inc. A subsequent charge of disorderly conduct was dismissed. At the age of 17 he was charged with attempting to rape and carnally know a 13 year-old girl named Christine Johnson, together with assault upon Ann Johnson and cursing and abusing Ann Johnson and Katie Ross. That case resulted in a conviction for simple assault and six months in jail. He was fined in 1945 for profanity and shortly thereafter he joined the Army. He came back to Virginia in June, 1947, and the following year he was fined for being drunk and sentenced to 30 days in jail for assaulting a police officer. In January of 1949, he was charged with Robbery of a man named John Woody, for which he received five years in the Virginia State Penitentiary.

81.     After he was released from the Penitentiary, Solid moved to D.C., joining several members of his family, including his twin brothers, Albert and Alfred Fields. The twins had problems, also. They were both alcoholics and they both had lengthy criminal records. Between the years 1949 and 1974, Albert was arrested on at least 26 separate occasions, mostly for intoxication but also for illegal gambling, pan-handling and disorderly conduct. For his part, Alfred was arrested on at least 19 separate occasions between 1954 and 1965. He was arrested for similar offenses as his bother; mostly intoxication but also gambling, disorderly conduct, vagrancy and unlawful use of a motor vehicle. Solid was a severe alcoholic also; he drank all day, every day. He also used drugs, including powder cocaine. Nancy's children used to see him having sex with women in the basement. Solid and Peck used to swap women back and forth between them before Solid died in 1981.

82.     Nancy believed that Uncle Peck was buying the C Street house and that the money she gave him each month was going to pay off the mortgage. In fact, the house was rented, which Nancy only found out when Uncle Peck passed away in 1987. Without his

contribution she could no longer afford the rent and had to move to a house at 1140 Neal Street, N.E., in the Trinidad neighborhood. She remained there until her death in 2014.

83.     Like her father, Walker Fields, before her and many other members of her family, Nancy was an alcoholic. She liked to party, and frequently left the children home alone to go out dancing. Her sister, Mary, visited her frequently and they used to close the dining room door and drink by themselves for hours. She also had regular drinking parties on the weekends. The adults hung out in the basement, drinking, and the older children were charged with keeping the younger ones upstairs and out of the way. Sometimes Nancy gave Leavonia some money to take the younger kids to the movies to get them out of the way. There used to be a movie theater at 8th and H that they went to. After the parties were over, Nancy gave the children 50 cents or a dollar to clean up all the beer cans and the other mess.

84.     Though she liked to have a good time, Nancy was also a stern, unhappy woman with a sharp tongue who was extremely guarded and mistrustful. She drank until she got drunk all the time. Her children recall watching her drinking and crying by herself. She was not warm or affectionate towards her children and they were acutely aware that she paid them little attention and doubted her love for them. She physically disciplined her children with a switch that she used to make them select themselves from the yard, and with a belt that she kept specifically for that purpose. Debra also recalls her mother slapping her in the face with a ruler. Nancy was very distressed when Harold Gaither left her. After him there were a string of male friends that came though her life and quickly left. Nancy's drinking became heavier and the household became noisier and more chaotic. Nancy stayed up late into the night drinking and frequently arguing with whatever man friend was around at the time.

85.     Despite the chaos in her own life, Nancy continued to be hard on her children. For example, when she got to high school, Leavonia discovered boys and liked to go out and have a good time. When Nancy caught her sneaking back in at night she used to beat the hell out of her, usually with a switch, to the point where Leavonia's sister used to put her hand over her ears, squeeze her eyes tightly shut and pray that Nancy did not kill Leavonia. Nancy was furious with Leavonia when she became pregnant with Tommy.

86.     Nancy's children have struggled to live happy, productive lives. For example, Leavonia's brother, Harold Fields, has been charged with multiple sex offenses. On January 11, 1989, he was charged with Rape While Armed in D.C. Superior Court. He was charged with raping Teresa Apple inside her home on December 28, 1987. Ms. Apple informed police that, as she was leaving her apartment at approximately 8:30 a.m., a man wearing a black ski mask and holding a gun grabbed her and pushed her up against the door. The man told her not to make any noise or he would blow her fucking head off. He forced her to open the door, pushed her into the apartment and put her on the bed. As she struggled, Ms. Apple was severely beaten about the head and body. She was then vaginally raped. Afterwards, the man ransacked her home and then left. On March 31, 1988, a witness informed police that Harold Fields had admitted to raping a woman in November or December of 1987 and beating her up real bad. Fields also informed the witness that he only does this to white women. Phenotyping revealed that the semen recovered from the sex kit was consistent with that of Harold Fields; only 1 in 50 black males would have the same serology characteristics. Charges were later dismissed, presumably due to the lack of an eyewitness identification.

87.     Eight months later, on September 2, 1989, Harold Fields was charged with Enticing a Minor Child, Taking Liberties with a Minor Child, Assault with Intent to Commit

Carnal Knowledge and Assault with Intent to Commit Rape in D.C. Superior Court. He was alleged to have approached the complainant, Lakechia Jackson, 15, on the corner of West Virginia Avenue and Neal Street, N.E. and told her that his sister wanted to speak with her. Ms. Jackson went with him to 1140 Neal Street, N.E., where Fields was living with his mother. Once inside the house, Fields locked the iron gate over the front door with a key. When Ms. Jackson attempted to holler and flee, Fields put his hand over her mouth and forced her down on the couch. He then put his hand under her skirt and rubbed her upper legs. He tried to kiss her and then forced her into the kitchen and attempted to take her down to the basement. Ms. Jackson grabbed Fields' penis and tried to pull it off. He then let go of her. She grabbed a large kitchen knife and told him she would stab him if he didn't let her go. A witness saw Ms. Jackson running away from the house, being chased by Fields holding a knife. Ms. Jackson subsequently identified Fields in a photographic line up. He plead guilty to one count of Simple Assault pursuant to a plea agreement and was sentenced to one year in jail, all but 30 days suspended, followed by probation.

88. On June 8, 1999, Fields was charged with First Degree Sexual Abuse While Armed in D.C. Superior Court. He is alleged to have assaulted the complainant, P.P., inside her home on May 30, 1999. He accosted her at her front door at about 12:30 a.m. as she was coming home and asked to use her telephone. She let him in her home where he used the phone and the bathroom and then asked for a drink of water. He then asked her for money and when she said no he refused to let her out of the kitchen. He produced a large kitchen knife and put it to the complainant's neck, dragged her to an upstairs bedroom and raped her vaginally. Afterwards, he said that if she contacted police he would have a hit man kill her daughter. He then began to stab her in the throat before fleeing. The complainant subsequently identified Fields from a

photographic lineup. Fields pled guilty to Second Degree Burglary, Third Degree Sexual Abuse and Assault with a Dangerous Weapon and was sentenced to terms of imprisonment of 5-15 years, 40 months to 10 years and 40 months to 10 years, all three sentences to run consecutive. He told the presentence report writer that he attempted his first rape in junior high school.

89.     Harold Fields lived with his mother, Tommy's grandmother, for his entire adult life prior to his incarceration in the Federal Bureau of Prisons. He engaged in other sexually inappropriate behavior that did not result in criminal prosecution. For example, he used to spy on his niece and great niece when they were in the bathroom and repeatedly tried to get them alone in the basement. As a child, he was referred for a psychological evaluation by his pediatrician because of his feelings of insecurity, fear of making mistakes and concern that people do not think well of him. His language skills were found to be impaired, which was thought to be due to his environment. His mother reported that she considered Harold to be a little nervous, and that she thought he was a mama's boy for wanting help with his homework.

90.     Leavonia's brother, Anthony, also has an extensive criminal history and a long history of drug addiction. In school in the fourth grade he was referred for a psychological evaluation due to academic underachievement and poor classroom adjustment in that he did not get along with other children. Projective testing revealed that he was suffering from anxiety and was a boy who did not feel good about himself and felt rejected by his peers. He was struggling with feelings of guilt about his need for attention and was afraid that he would not be able to control it. He was also preoccupied with violence. At the age of 15 he was described by a teacher as extremely aggressive, rude, disrespectful, a chronic liar who cuts class at will, uses profanity profusely and is often accused of threatening smaller boys. An evaluation was conducted that year with Nancy Fields present for part of the procedure. The evaluator noted

that, while his mother was present, Anthony was shy, said nothing and merely nodded occasionally. When she left, however, he became warm, enthusiastic and cooperative. Testing suggested insecurity and feeling always on the brink of a catastrophe or disaster. Anthony had an external locus of control and cycled through feelings of guilt and remorse for letting his mother down.

91.     As an adolescent and adult, Anthony developed serious problems with substance abuse. At different times he has been addicted to crack, heroin, and PCP. He began to be involved in the criminal justice system as an adult in the District of Columbia in 1978, when he was arrested for Petit Larceny. He was arrested for the same offense in 1979 and again in 1980. Also in 1980 he was arrested for Attempted Second Degree Burglary and Simple Assault in one case and for Robbery—Force and Violence and Violating the Bail Reform Act in another. He was sentenced to prison for the latter. After he was released, in 1985 he was arrested for Attempted Unlawful Entry in November and the First Degree Burglary and Theft in December. In 1993, he was arrested for Possession with Intent to Distribute Cocaine and Attempted Possession of Cocaine. In 1994 he was arrested in Prince George's County, Maryland, for Battery and Threatening Arson and then Malicious Destruction of Property, both in Maryland, and then for Possession with Intent to Distribute Cocaine in D.C. in 1994 and again in 1995. Back in Maryland he was arrested for Malicious Destruction of Property (1996) and Indecent Exposure (1998).

92.     In D.C., in 1999, Anthony was arrested once for Assault with a Dangerous Weapon—Shod Foot and then again for Distribution of Cocaine. He was arrested six times in Fairfax County, Virginia, between 2000 and 2006. He was accused of Indecent Exposure (2000), Stalking, two counts of Indecent Exposure and Obstructing Justice (2001), Taking

Indecent Liberties with a Child and three counts of Indecent Exposure (2001), Indecent Exposure (2002), Indecent Exposure (2003) and Identity Fraud (2006). In 2007 he was arrested in D.C. for Simple Assault—Domestic. Following that arrest, an outstanding warrant for failing to appear in court on a 1999 Distribution of Cocaine charge was discovered and he was eventually sentenced to prison in that case where he remained until 2015.

93.     Leavonia's brother, Tyrone, has been a serious alcoholic for many years and was addicted to crack like Leavonia for a period of time. Her sister, Jennifer, is withdrawn and spends most of her time inside the house. She had never been employed. Their brother, Lorenzo, is almost completely estranged from the family.

94.     These are the origins of the two lives that came together and gave life to Tommy Hager and his siblings. Because of their own pain and trauma, their alcohol and drug use and Thomas Jr.'s battering of Leavonia, neither was able to be a parent to Tommy or his brothers and sisters. As bad as things were, however, they were about to get exponentially worse. In 1986, crack began to appear on the streets of Washington, D.C., and it changed everything. Tommy was about to become a victim of the worst drug epidemic in American history in a city that was one of the hardest hit by the crisis.

95.     Crack, or cocaine hydrochloride, is a form of cocaine that is significantly cheaper than cocaine in powder form and is also extremely addictive. For an addict, the absence of the drug does not produce physical withdrawal symptoms in the way that a drug such as heroin does. But it does result in an overpowering need to obtain more, whatever the cost. The user becomes obsessed, unable to focus on anything other than the drug and how to get it. Tommy's mother and father both rapidly developed serious addictions to the drug, and Tommy and his siblings became invisible to them as a result.

96.     Tommy was 13 years old in 1986.  He and Terrell, 12, soon noticed that their parents and the people who came over to party at their apartment were spending a great deal of time shut away in the bedroom.  Whereas before, his parents and their friends and neighbors used to sit outside and drink together on warm weekend nights and even play games with the children, now they were always inside behind closed doors and ignoring the youngsters.  Tommy was curious about what was happening and one night he went outside and peeked through the bedroom window.  There he saw his parents and friends obviously doing drugs, and he finally understood.

97.     Although it is cheaper than cocaine powder, the intensity of the euphoria that crack produces and the brevity of the high drives its users to smoke more and more and more and so the habit quickly absorbs all of the user's income and more.  Tommy watched as the fragments of the family's previous life were taken away by the drug, piece by piece.  Where he and his siblings had previously had new clothes for school when they needed them, none were being purchased for them anymore.  No one even cared whether they went to school or not.  There was no longer a reliable food supply in the house and the refrigerator stayed empty.  Birthdays, Christmas and other holidays were ignored, and while other kids in the neighborhood were given exciting toys and new bikes and other treats, the Hager children got nothing.  The house was filthy and cluttered.  Their parents started getting behind on the bills, so there were frequent periods when the gas or the electricity were cut off.  When their father got paid every Friday he sometimes gave the children some money, only to come into their room late at night and demand it back so that he could buy more drugs.  They tried telling him that they had spent it already, but he got so mad at them that they quickly abandoned that tactic.

98.     Tommy, Terrell and their younger siblings were literally in danger of starving. They rarely attended school because they had no clean clothes, no money to get their hair done, no bus fare and no lunch money.  With their parents effectively absent, it fell to Tommy and Terrell to try to keep the family afloat.  They became substitute parents, helping the younger siblings get back and forth to school, doing their hair, attending their graduations and other significant events and buying groceries and Christmas presents.  At their young ages, the only way they saw to make the money that they and their siblings desperately needed was the drug trade.

99.     Knox Place, S.E. had always been a neighborhood in which drug sales occurred, but the explosion of crack onto the scene ratcheted up the scale of the business considerably.  In order to protect themselves and their business from law enforcement efforts, the street hustlers turned to neighborhood kids to help them.  They recruited the youngsters to act as lookouts, alerting them whenever a police car entered the area.  They also had children hold their stashes of drugs for them, reasoning that, in the event that they were arrested, the children would receive significantly less punishment in the juvenile justice system than they would as adults.  They even paid children to run errands for them, such as going to the store for food, soda and cigarettes so that the hustlers could stay out on the corner all day and make the maximum amount of money possible.

100.    Out of necessity, Tommy and Terrell became two of those children.  They were paid little bits of money by the hustlers for performing these services, and they used it to buy food and other necessities for themselves and their siblings.  As they got a little older, the hustlers would sometimes give them crack on consignment to sell for them, for which they received a little more money.  Neither boy wanted to be selling drugs in the streets.  It was not

glamorous or exciting; it was tedious work for long hours, out in the heat of the summer and the bitter cold of the winter, and it was dangerous. Shootings were not uncommon in the area, nor were robberies and stick-ups of drug dealers. Women sold their bodies for crack and could frequently be seen turning tricks in cars parked in the alleyways. Painfully thin crack addicts shuffled through the streets like zombies. There was desperation in the air and neither Tommy nor Terrell was under any illusion that this was a route to easy money. But at their age, no one would hire them for a proper job even if any were available and they felt they had no choice but to work in the streets unless they were to watch their younger siblings starve. The money they made helped to keep the family fed and clothed, but it was not enough. Their parents quit paying the rent and they were ultimately evicted from their apartment in April of 1989. Tommy was 15 and Terrell was 14.

101.    With no place else to go, Tommy's family was forced to move into the home of Tommy's paternal grandparents, Thomas Sr. and Hilda, at 300 10th Street, N.E. The house was big, though not big enough for all of the people who lived there. In addition to Thomas Sr. and Hilda, there was also Tommy's uncle Eric, his girlfriend Barbara and her children, Hilda's sister, Gwendolyn, and any number of people who stayed there for short periods of time, or simply passed out drunk and ended up spending the night. And there were plenty of those, because Thomas Sr. and his buddies spent their days drinking and gambling, in the yard when the weather was warm enough or inside the house when it was not, all day every day.

102.    The house was also in a terrible state of disrepair. There were holes in the walls and the floor of the filthy kitchen was starting to give way. Nobody cleaned and nobody attempted any type of home improvements. The house was infested with roaches and also had a horrifying rat population that terrified Tommy's younger siblings. His sister Tesha recalls

wetting the bed rather than going to the bathroom at night and confronting the rats that would almost certainly be in there.

103.    It was while living at 10th and C Streets that Tommy and Terrell became involved with Henry "Little Man" James, a drug dealer who lived around the corner.  They had known him for a while, from visiting their grandparents' home, but it was after they moved that they became involved in his crack business.  Their parents' crack additions raged unabated, and so the well-being of themselves and their siblings continued to fall on Tommy and Terrell's shoulders. They each began hustling for Little Man full time.

104.    During this period, Tommy was robbed at gunpoint.  In order to sell crack, Tommy used to ride his bicycle around six or seven different blocks where crackheads came to score.  He went alone, and always late at night.  One night when he was out he was approached by a man in his 30s wearing a trench coat.  Before Tommy knew what was happening, the man pulled out a gun and demanded everything from Tommy's pockets.  Tommy immediately handed over the drugs and money that he was carrying.  His vulnerability to such an attack terrified him.

105.    Before long, both Tommy and Terrell became enmeshed in the juvenile justice system.  Tommy was arrested for selling drugs in the area of 10th and C Streets, N.E on five separate occasions during 1990 and 1991.  Terrell was also arrested on five occasions during that period, also for selling drugs in that area.  Tommy was held at the juvenile detention centers Cedar Knoll and Oak Hill for lengthy periods.  Both facilities were essentially nothing but warehouses for the children.  No counseling was offered, nor was any attempt made to alter the trajectory that their lives had taken.  Once the period of incarceration was over, the child was simply sent back into the same environment which had led to his becoming involved in the juvenile justice system in the first place.  By the time he was released for the last time, Tommy's

parents and grandparents had been evicted from 300 10th Street, N.E. for not paying the rent and Henry James was incarcerated, never to be released. Terrell had begun selling drugs on the 2900 block of Nelson Place, S.E., where his uncle Eric Hager was living, and Tommy soon followed suit.

106.    After they were evicted from 300 10th Street, N.E., Tommy's parents rented an apartment in District Heights, Maryland, by placing it in Eric Hager's name. They had no furniture, having thrown away what little they had left when they were evicted from Knox Place, and they and Tommy's younger siblings arrived with only bags of clothes. They were there for only two months before, once again, they were evicted for spending their money on crack rather than paying the rent. From there, Thomas Jr. went to stay with his parents in their apartment in Cheverley, Maryland, and Leavonia and the three youngest children went to her mother's house at 1140 Neal Street, N.E. The rocky relationship between Leavonia and her mother made living there so unbearable, however, that on April 21, 1991, Leavonia applied to the District of Columbia Housing Authority for emergency housing. She, along with Tiffany, 10, Tesha, 9, and Tywon, 5, was placed in the Budget Motor Inn on New York Avenue, N.E., a former motel that the District had converted into a homeless shelter for families.

107.    Tommy, by then 17 years old, and Terrell, 16, fended for themselves. They slept here and there, occasionally at uncle Eric's apartment, sometimes with another family member or at the houses of girlfriends or people they came to know in the Nelson Place neighborhood. As they gradually became known to the drug users in the neighborhood, they learned who would let them spend the night in their apartment in exchange for some crack, and where they could spend the night on the couch while the apartment occupants smoked crack in the bedroom, coming out every so often to buy more drugs from them and allowing them to sleep in between. Even

people who were not drug users got to know them, because they were out in the neighborhood hustling every day, and some of those also would let them into their homes. To them, Tommy and Terrell were just neighborhood kids.

108. The relentless pressure to earn money to support the family was as acute as ever, if not more so. The Budget Inn was a miserable place. Leavonia and the three children were confined to one standard room. The place was chaotic, populated as it was by those who had lost their homes for one reason or another; many were drug addicts, and many were battered women. Leavonia continued to be both. Though men were not allowed on the premises, Thomas Jr. regularly snuck in. He and Leavonia smoked crack together there, and he continued to physically abuse her. In an attempt to brighten their siblings' lives a little, Tommy and Terrell made sure that they had nice clothes and things that they wanted. They continued to be the sole source for the family's basic needs. They brought groceries to Leavonia and the children and gave them money when they needed it. The family stayed at the Budget Inn for over a year until finally, on July 10, 1992, Leavonia was given a place in the Sursum Corda housing projects, 67 K Street, N.W.

109. By this time, the crack epidemic had turned the streets of Washington, D.C. into a war zone. Disputes over drug markets led to murders, shootings and stabbings becoming an every night occurrence in some areas. Gangs from New York and Jamaica had arrived in the late 1980's with an arsenal of semi-automatic weapons. As the dangers and economics of the drug trade increased, the use of deadly firepower grew along with it. While the entire city was reeling from the dramatic increase in violence that crack had wrought, the fact of the matter was that most of the damage was occurring in a small number of Black neighborhoods. Of the city's all-time high of 489 murders in 1991, up from 148 in 1985, only 18 victims were white. While for

whites, the probability of dying before the age of 30 was well under one percent, for black males, it had risen to 12 or 13 percent. The streets were literal death traps for street hustlers like Tommy. The police had lost control of the city and the only way a young black man involved in the drug trade could remain safe was to protect himself. Bodies lay uncovered in the streets for hours. Crime reporters joked that the medical examiner's office had run out of sheets. The new mayor wished out loud that she could call in the National Guard.

110. Tommy was around people who kidnapped, tortured, robbed, and killed other drug dealers and so he knew only too well what could happen. You could come home and find that there were people there waiting for you to kidnap you. There were plenty of people who did not sell drugs themselves, and instead they made money by kidnapping dealers, torturing them and threatening to kill them unless the dealer revealed the location of his drugs and money. They torture the dealer perhaps by cutting him until he gives up where his safe is and the code to open it. They would hold him there while someone checks to see if he is telling the truth and then they kill him anyway. Tommy was told early on by the older guys he worked for that if that ever happened to him he was not to give up the drugs or money because he was going to get killed anyway so there was no reason to. Tommy has seen people scaling up balconies to the 5th floor of an apartment building to break in and rob people who were inside asleep.

111. On one occasion, Tommy and his cousin Loneldon saw a man crash through the glass of a second floor apartment window and hit the ground as they pulled up in a car. The man was badly hurt, and when he tried to stand up he immediately collapsed in front of them, bleeding from cuts inflicted by the glass. They found out that the man had been in an argument over drugs with another man in the apartment and when the other man pulled a butcher knife, he was so terrified that he jumped out of the window.

112. During the years when Tommy was hustling on Nelson Place, there were several attempts made to take his life. On one occasion a group of men ambushed him when he was in his car on Nelson Place. They were next to the car and on the roof, firing into it with Uzi's. Somehow Tommy managed to get out of the car and slide underneath it. He then ran to an apartment on Nelson Place and began desperately scratching and banging on the door for someone to let him in. His fingernails were all broken and bloody he was trying to get in so bad. His car was covered in bullet holes all over the top and sides. There were also several drive-bys on Nelson Place where people came into the neighborhood spraying bullets and trying to kill Tommy.

113. Tommy and his fellow street hustlers also had to be vigilant to avoid the police. If the police caught them with drugs or money they often staged a "fake arrest," taking them into custody and then dropping them off elsewhere after confiscating the money and drugs for their own benefit. Police beating up civilians on the street was a common sight. If someone tried to run from the police and got caught, a beating was virtually guaranteed.

114. Because he was constantly in fear for his life, Tommy became paranoid and constantly on the lookout for potential danger. When he parked his car on Nelson Place he used to park it in a spot at the top of the hill where there were no streetlights and it was completely dark so his enemies did not know that he was on the block. He was constantly questioning people's motives for doing things and trying to figure out whether they meant him harm. He was constantly under threat and never knew when the next attack would come or from whom, and so he had to stay alert and focused at all times.

115. When Tommy and his companions needed to drive somewhere, they always took care to plan the precise route they would take in advance, cutting through alleyways, gas stations

and parking lots where necessary. They avoided having to stop at red lights or stop signs wherever possible, because of the danger that someone who wanted to hurt them might pull up alongside them as they waited and open fire. If they were ever forced to stop, they made sure to be in the left lane in case they had to make a quick getaway. They never stopped too close to the car in front for the same reason; they always made sure to leave enough space to pull out and take off in an emergency. And everyone in the car monitored the rear view and side mirrors constantly for signs of trouble.

116.    There was a public telephone at the end of the 2900 block of Nelson Place that everybody knew not to use after dark because the way it was positioned allowed the user to be seen by others before he could see them, and thus rendered him vulnerable to attack. In his excitement, Arlington Johnson forgot this precaution one night when he received a page containing the number "69," which meant it was from a woman. He ran up to the telephone and was about to dial the number when someone opened fire on him, hitting him in the shoulder. He had been set up and he had fallen into the trap.

117.    Tommy and Terrell and their friends were only too aware of the danger they faced every single day. Tommy knew that his time selling drugs was limited; that it would end in one of two ways, death or incarceration; and that either one could happen any day. But there was no realistic way out. With his family depending on him and no other way to make enough money to support them, Tommy was stuck.

118.    Tommy continued to take care of his family during the years that they lived on K Street. He and Terrell both went by Sursum Corda every few days or so to check on them, and if they needed anything between visits they knew they could call Tommy or Terrell and between them they would make sure that the need was met. Tommy bought things for his mother,

including a complete set of living room furniture, for she had virtually nothing of her own. He continued to ensure that there was always food in the house and that his siblings had everything that they needed. He and Terrell also gave their mother money that they knew she was going to spend on drugs. They recognized that she was seriously addicted and that she was going to get access to crack one way or another, and they wanted to ensure that she was never reduced to stealing or turning tricks to buy it like so many of the pathetic women they saw every day in the streets. Knowing that they would give her money for drugs also ensured that, when they gave her money to buy school clothes for Tiffany and Tesha or to pay to get their hair done, Leavonia would actually do it rather than spending money intended for her daughters on drugs. At least so long as they did not give her the money too far in advance. If the girls or Tywon needed clothes for school in Monday, Tommy and Terrell learned to give their mother the money on Sunday and send her out right away to buy them. Expecting her to have the money for any length of time and then go shopping with it was futile.

119. Tommy and his friends sometimes stayed the night at his mother's house. When they did so they bought everyone breakfast the next day. They might go to the store for eggs, cereal, juice and so forth and they would cook breakfast, something that Leavonia was never in a position to do. Or they might make a run to McDonalds and bring back food for everybody.

120. Tommy stayed on top of Leavonia to make sure she paid the bills and kept the utilities on. One memorable Christmas, Tommy bought Tywon a motorized go kart as a gift. Tywon absolutely loved that go kart and rode it as often as he could. He used to hit up Tommy, Terrell and their friends for gas money and as soon as he got some off he went, for as long as the gas lasted.

121.     Tommy was simultaneously providing for uncles and aunts that needed money, and for his grandparents on both sides of the family.  By this time, his grandfather, Thomas Sr., spent his days sitting in a lawn chair outside of his apartment building at 4902 East Capital Street, S.E. and drinking steadily throughout the day with his brother, Uncle Button, and his sons and grandsons.  Thomas Sr. drank hard liquor; he used to have a glass of liquor in one hand and a can of soda in the other, and his habit was to take a drink of the liquor followed by a sip of soda.  Tommy regularly bought liquor for his grandfather and other relatives.  He also made sure to purchase Christmas gifts for his grandparents and his cousins.

122.     Tommy was also generous towards non-relatives.  He spent so much time on Nelson Place that he knew virtually everyone, and he helped out people who were short on their rent one month, or needed a little extra cash to cover their gas bill.  With crack users especially, their business was always known by everyone in the streets and if Tommy heard that someone's lights had been cut off, for example, he would go to them and help them out.  He had a particularly soft heart when it came to the children of crack users.  He knew from bitter experience how they suffered, and he tried to help them where he could.  He used to buy them small Christmas gifts, knowing that their parents were smoking crack all day and had not bought their children anything.  If he saw someone on the street whose kid was hungry he would always give them money for food, or give them crack for free so that they would spend their money on food.

123.     There was a young man from the Nelson Place area who had been sent there to live with an aunt and uncle after both his parents died.  The aunt and uncle mistreated him, however, and stole his social security money from him.  He ended up sleeping in a broom closet

in one of the apartment buildings on the block until Tommy and his friends took him under their wing and let him stay with them.

124.     No one in authority ever tried to rescue Tommy or Terrell when they were small. Child Protective Services did eventually step in to try to protect the youngest children, Tesha and Tywon, though the adequacy of their intervention may be seriously questioned.  In August of 1993, Tommy's paternal aunt Valerie Kinard called in an abuse/neglect report to the D.C. Department of Human Services regarding Tiffany, Tesha and Tywon.  She reported that Tesha, then 11, was refusing to go home to her mother's house and had threatened to kill herself if she was made to return there due to her mother's alcohol and drug abuse. The allegations were investigated and the case was referred to family court, which opened a neglect proceeding on behalf of Tesha.  Tesha told a social worker that her mother used her public assistance check and food stamps to buy drugs, and that she drank to the point that she was too intoxicated to care for Tesha or herself.  She reported that a Ms. Harmon who works for the Mayor's Empowerment Center has seen her mother buying several quarts of beer at a time and has seen her with bloodshot eyes and her hair and clothing in disarray early in the morning on several occasions. Tesha also reported that her parents fought constantly.  The social worker noted that during the previous school year it was discovered that Tesha needed eye glasses.  The school gave Leavonia a voucher with which to purchase them, but she never went to go and buy them for Tesha. Tesha's school, Walker Jones Elementary, had also scheduled several appointments with Leavonia to discuss Tesha's problems in school, but Leavonia cancelled all of them.  Tesha was taken into protective custody by the D.C. Department of Human Services pending action by the Family Court.

125.     During a subsequent psychiatric evaluation, Tesha reported that she went to live with her aunt Valerie when the gas was cut off at her mother's home and her mother allowed a woman to live with them which meant that Tesha had to share her bedroom with her brother and sister.  She had only the microwave with which to prepare food for herself there because the gas was cut off.  She also reported that her father tried to choke her.  A home visit to Leavonia's apartment confirmed that there was no gas service.  The family court placed Tesha in the custody of her aunt Valerie.  Leavonia was ordered to undergo weekly drug testing, but on numerous occasions she failed to report for the test and when she did report she tested positive for cocaine use.  Tesha was eventually returned to her custody in June, 1995, despite the fact that Leavonia continued to fail to appear for court-ordered drug testing and was, in fact, still using heavily.

126.     Terrell was locked up in 1995, followed by Tommy in 1997.  Faced with losing the family's primary sources of income, Tesha began to be involved in the drug trade.  She had become aware that her mother was going outside and buying something there that took precedence over everything else and that her father's paycheck was basically going out the back door every Friday.  One day she went out to one of the boys that she saw her mother dealing with and told him that she wanted some of the stuff that her mother gets from him so that she could sell it.  If she was the one selling to her mother, she figured, then at least some of the money her mother spent would be available to help take care of herself, Tiffany and Tywon.  She told her mother to meet her outside and started selling her crack from then on.  The two did not tell Thomas Jr., as they knew that he would beat Leavonia for buying from Tesha.  Most Fridays, Tesha sat in the house waiting for her mother to go out back to buy drugs.  When she did, Tesha immediately left out of the front door, went around to meet her mother and sold her the crack.

127.    On September 9, 1997, Tommy's youngest brother, Tywon, 12, was brought in to Child Protective Services by the Metropolitan Police Department after being found in an alley with a cousin who was a known drug dealer under police surveillance.  The police believed that Tywon was being used by his older cousin to hold drugs.  Another neglect case was opened in the D.C. Family Court and Tywon was placed in the custody of his maternal grandmother, Nancy Fields.  He stayed there until 1999, when she sent him to live with his father, Thomas Jr., and grandfather, Thomas Sr., in their apartment at 4902 East Capitol Street, S.E.

128.    Reasonably    competent    counsel    would    have    secured    a    thorough neuropsychological evaluation of Mr. Hager.  Such an evaluation would have shown, and expert testimony would have been presented, that Tommy suffers from neuropsychological deficits that include, but are not limited to:

129.    Tommy's overall intellectual functioning is significantly impaired.  As measured on the Wechsler Adult Intelligence Scale—IV (WAIS-IV), his overall IQ is 75.  The WAIS-IV was released in 2008 and so the norms of the test are at least 7 years old.  The necessary correction of a score obtained in 2015 to account for the Flynn Effect results in an IQ score that is properly understood to be approximately 73, which is in the range of intellectual disability. His overall score on the Halstead-Reitan Impairment Index is .29, which is in the range of mild impairment.  It is important to note that the term "mild impairment" may misleadingly suggest that the deficit is not significant.  That is not the case; impairment in the range that is designated "mild" means that an individual is functioning at a level that is at least one standard deviation below the mean for the general population and so it is most certainly significant.

130.    Tommy's language functioning is particularly impaired.  His score on the Verbal Comprehension Index of the WAIS-IV is 70, which is in the 2nd percentile of the population as a

whole.  His oral vocabulary score on the Woodcock Johnson Tests of Cognitive abilities—IV is in the borderline range and yields an age-equivalency score of 12-0.  His scores on the oral comprehension and picture vocabulary subtests are both in the borderline range and yield age equivalency scores of 10-2 and 11-10, respectively.  On the Neurological Assessment Battery his auditory comprehension is mildly impaired and his naming ability is mild to moderately impaired.  These results suggest that Tommy has difficulty comprehending verbal information.

131.    Tommy's memory functioning is also significantly impaired in some domains.  His score on the Working Memory Index of the WAIS-IV was 71, which is in the 3rd percentile of the population.  Working memory is the ability to hold different pieces of information in mind temporarily and to manipulate them.  It is an important part of the processes of comprehension, reasoning, learning and memory updating.  Tommy's score on the Symbol Span subtest of the Wechsler Memory Scale—IV (WMS-IV), which is in the borderline range, also demonstrates impairment in working memory.  Tommy's scores on the Logical Memory subtests of the WMS-IV were all in the borderline range.  On the Rey Complex Figure Test, which is also a measure of planning ability and impulsivity, Tommy's scores on the Immediate Recall scale are mild to moderately impaired and on the Delayed Recall scale are moderately to severely impaired.

132.    The test results reveal that Tommy has impaired executive functioning that is likely centered in the frontal lobe of the left hemisphere of the brain.  Executive functions are abilities such as planning, weighing options against each other, generating ideas, predicting consequences, inhibiting impulses and thinking abstractly.  Tommy's results are consistent with an individual who is impulsive, who has a significantly impaired ability to plan and to organize complex information, particularly complex verbal and visual information, and to think abstractly.

He lacks the cognitive resources to competently think through a set of options and to weigh them against each other.

133.    As noted above, the very impaired scores that Tommy has on the Rey Complex Figure Test suggest greatly impaired planning ability and impulsivity.  His score on the Neuropsychological Assessment Battery is also consistent with frontal lobe impairment, as is his score on the Booklet Category Test, which is in the mildly impaired range.  He scores in the borderline range on the repetition errors scale of the Verbal Fluency subtest of the Delis-Kaplan Executive Functioning System and in the extremely low range on the mover accuracy scale of the Tower subtest of the same instrument.  On the Tactual Performance Test, Tommy shows mild impairment with his left hand and moderately impaired localization.  His approach to this test showed significantly impaired planning ability.  He utilized an unsophisticated trial and error approach instead of any type of coherent strategy.

134.    The test results are consistent with a history of untreated childhood Attention Deficit Hyperactivity Disorder.  Impulsivity is a prominent feature of this disorder, and Tommy also demonstrates variable attention.  On a symptom checklist for the disorder as a child, Tommy endorsed a number of additional signs and symptoms.

135.    Tommy's test results are also consistent with in utero exposure to alcohol. ADHD symptoms such as Tommy describes are common amongst children who have a Fetal Alcohol Spectrum Disorder, as are language difficulties and decreased intellectual functioning.

136.    Tommy's scores on all tests of effort were normal, indicating that he gave his best effort during the neuropsychological evaluation and the results summarized above are reliable and accurate reflections of his neuropsychological functioning.

137.    In November of 1993, Tommy was aged 20 years and 6 months.  At that age, the frontal lobes of the brain that are critical to, amongst other things, judgment, planning and impulsivity, are still developing and will not reach full maturity until the mid-20s.  ADHD will often further delay that maturation process, meaning that a young man with the disorder may be behind his age peers in frontal lobe development which results in even more impaired functioning.  It is likely that there is a genetic component to Tommy's cognitive impairments, and a shared exposure to neurotoxins in utero, for both of his brothers, Terrell and Twyon, and his sister Tesha also have deficits, as do other family members, including but not limited to three of his maternal uncles.  Terrell and Tesha each have been diagnosed as suffering from intellectual disability in the past.  In December, 1990, when he was 16, Terrell was placed at St. Elizabeth's Hospital for an inpatient psychiatric evaluation after he threatened to commit suicide during a hearing in juvenile court.  Following an evaluation, a report was filed which ultimately diagnosed Terrell as suffering from Mild Mental Retardation and Conduct Disorder, group type, rule out organic brain impairment.  The report writer recommended that Terrell undergo further outpatient evaluation to rule out organic brain impairment and that he be placed in a school setting that could address his learning disabilities and provide him with vocational training.

138.    Terrell's adjustment to the hospital was problematic.  He was unable to engage in a significant way in the group and attempted to run away shortly after he got there.  He challenged adult authority on the unit and showed no interest in programmed activity.  His family showed little interest in him and his mother failed to keep an appointment with the social worker.  He had no visitors at all during his month-long stay in the hospital.  Terrell gave a history of a very chaotic and crowded home life.

139.     The report noted that Terrell's school records showed that he was a successful student in elementary school according to a CTBS achievement test that he took in 3rd grade.  A psychiatric evaluation showed that Terrell's affect was appropriate but constricted with a mood that parallels the thoughts he expressed.  His responses were minimal and concrete and he had apparent deficiencies in communication.  He expressed anxiety about being returned to Cedar Knoll which he found depressing and intolerable.  His memory of recent and past events was markedly impaired.  He had difficulties with calculation and sequencing of events, low frustration tolerance and poorly controlled impulses.  His limited intelligence rendered his judgment poor.  The report noted that Terrell tends to act out or run away from stressful situations.  Under stress he readily acts out without much thought about consequences.  Indicators of organic brain impairment were predominant both on psychiatric and psychological evaluations.

140.     Psychological testing conducted during Terrell's stay revealed significant deficits in a multitude of areas.  On an abbreviated administration of the Wechsler Intelligence Scale for Children-Revised, Terrell obtained an estimated Full Scale IQ of 65, which placed him in the mildly retarded range of intelligence.  He showed several indicators of organicity, including concreteness, perseveration, extremely poor visual abstraction and poor spatial relations ability.  His visual motor integration was measured at the level of a 7 year old child.  Together with his history of poor judgment and impulsivity, these results pointed to a high probability of organic impairment, and a complete neurological evaluation including an MRI was recommended. A neurological consultation performed at D.C. General Hospital revealed an abnormal EEG showing parotysmal activity, mild right-sided weakness with hyper reflexia and profound memory deficits.

141.    Terrell was administered the Slosson Oral Reading Test and the Brigance Diagnostic Inventory which indicated that he reads and calculates at the third and fourth grade level.

142.    A speech and language evaluation showed that Terrell has severe language deficits which appear secondary to severe language learning disability and behavioral problems. He showed impulsivity, reduced attention span, reduced ability to sustain effort and perseveration on some tasks.  Auditory processing and verbal expression were severely reduced for his age.  He had difficulty with auditory memory and comprehension.  His knowledge of rote language-based concepts was reduced and his verbal formulation and word retrieval were poor. His speech was mildly dysfluent in oral reading and in production of polysyllabic words.

143.    In February of 1998, Tommy's sister Tesha, 16, was evaluated at the Child Guidance Clinic of the D.C. Superior Court in connection with her Family Court neglect case. The evaluator noted that Tesha had been retained in the eighth grade at Terrell Junior High but was too old for middle school.  She tested positive for marijuana in July, 1997.  On the Wechsler Intelligence Scale for Children-III, Tesha's Full Scale IQ was measured at 75.  Her Verbal IQ was 79 and her Performance IQ was 74.  The Clinic interpreted Tesha's score on the WISC-III as placing her in the Borderline range of intellectual functioning although, properly understood, the score placed her in the range of mild mental retardation.  Significant deficits in diffuse areas of language and nonverbal abstract reasoning were noted.   On the Woodcock-Johnson Psychoeducational Battery—Revised, her scores were:  Word Recognition - .1 percentile, 2.0 grade equivalent; Calculation—8th percentile, 5.0 grade equivalent; and Dictation—.1 percentile, 2.2 grade equivalent.  Her scores on both Trails A and Trails B were in the impaired range, and on the Rey Complex Figure Test she displayed adequate copy but impaired recall.

Her scores on these two tests indicated impaired ability to shift attention, to perform simultaneous processing, speed of processing, recall of detailed visual information and managing complex stimuli. On the Bender-Gestalt she made 5 errors, which is equivalent to the expected performance of a seven and half to eight year old and is consistent with significant developmental delay.

144.     Tesha's language scores were found to be so weak that they could be consistent with a hearing impairment, although testing revealed that her hearing was intact. She appeared to manifest significant pathognomonic signs of aphasia, including anomia, spelling dyspraxia, dyslexia, auditory/verbal agnosia and dyscalculia. While her calculation score was slightly higher, she was totally dependent in counting on her fingers. Tesha demonstrated a relative strength in nonverbal, practical skills such as picking out missing parts of a familiar object, solving some practical problems and assembling puzzles. This suggested to the evaluator that she might be able to master a vocational skill such as cosmetology, hotel service, culinary skills or flower arranging. She has deficits in nonverbal, abstract meaning, tends to think in concrete terms and has difficulty interpreting symbols. She clearly has some visual-perceptual deficits as well as linguistic ones. She cannot match designs, especially if they are similar except for right/left orientation.

145.     In terms of her academic scores, the clinic concluded that Tesha would have tremendous difficulty functioning in a junior high school with functional scores that fall into elementary levels. She could not manage the complexity of a rotating schedule, multiple teachers, a complex environment and complex academic tasks, especially in light of the emotional and physical symptoms that plague her daily.

146.     Tywon, the youngest child, was retained in the fifth grade in 1996 and in one of the earlier grades due to academic underachievement.  When he was promoted to sixth grade he was placed in remedial classes in Mathematics on Mondays through Thursdays and Mathematics and Reading on Saturdays.  A social worker involved in his neglect case noted her suspicion that Tywon's exposure to negative influences and lack of structure in the family home may have distracted him and contributed somewhat to his short attention span.  The following year, it was determined that he needed speech and language therapy.  According to an evaluation by Carol Kamara, Ph.D. on February 24, 1999, Tywon's profile is consistent with a diagnosis of Abnormal Auditory Perception, Unspecified, Receptive Dysphasia, *i.e.* difficulty processing and using oral symbolic language due to neurobiological factors and Dyslexia, *i.e.* difficulty understanding and producing written symbolic language due to neurobiological factors.  By the ninth grade Tywon was failing in all subjects and regularly cutting school.  His father believed that Tywon was embarrassed about being a special education student.

147.     The family recognized early on that Leavonia's brother, Tyrone Fields, was "slow."  Tyrone was placed in special education classes in elementary school because he could not read or write.  He received social promotions throughout his school years before finally dropping out for good shortly after entering high school.  He only began to learn to read and write as an adult.

148.     Another of Leavonia's brothers, Anthony Fields, was administered the Metropolitan Readiness Test in kindergarten and received scores that were characterized as "low."  He repeated 1st grade.  In 4th grade he was referred for an evaluation due to academic underachievement. His IQ was determined to be in the lowest 10% of the population and he was functioning at the level of a 2nd grader.  Anthony failed the sixth grade and was promoted to

seventh grade simply because of his age.  At the age of 15 years and nine months he was still in seventh grade, even though he had been out in special classes.  He was referred for an evaluation to identify a more suitable placement for him and testing revealed that his IQ was measured at 84, in the low average range.  By the end of the seventh grade he was receiving grades that were mostly Ds and Fs and he dropped out altogether in the middle of his eighth grade year.

149.    Leavonia's brother Harold Fields also has serious cognitive deficits.   In the second grade, his IQ was measured at 72, which is in the range of intellectual disability.   He repeated first grade and was only promoted from second to third grades because of his age.  He then received Fs in all areas and had to repeat third grade.  In fifth grade he was referred for special education because he was performing at a level that was three years below his grade level.  He was still working at a second grade level in math despite having spent the year working with a remedial math teacher and receiving daily services from the school based special education teacher.  He was then placed in the Learning Center at Stuart Junior High School.

150.    After presenting the evidence summarized above, reasonably competent counsel would have presented the testimony of a mental health professional with particular expertise in the psychological and neurobiological effects of exposure to traumatic events.  Such an expert would have explained to the jury that Tommy's history of repeated, chronic exposure to traumatic events, including exposure at critical points in his development, severely compromised his ability to become a healthy and productive adult.  The expert's testimony would have included, but not been limited to, the following:

151.    Tommy endured an unrelenting series of traumatic experiences throughout his childhood and adolescence.  He suffered the loss of his father at a very young age when his father went to prison.  When his father returned, Tommy witnessed him batter his mother over

and over again. He watched as his mother became increasingly sad and depressed as she was repeatedly victimized, leaving him with no parental nurturance at all. He himself was beaten by his father, as was his brother, Terrell. Two objects that he remembers his father using are a belt and a switch. He witnessed his father and uncles having sex with multiple women and was pushed into having sex himself with a woman in her twenties when he was 11 years old. When his parents became addicted to crack, Tommy was utterly and completely neglected by his parents. He turned to the streets to ensure his and his siblings' survival, and there he was robbed at gunpoint as a teenager. He witnessed shooting, stabbings and other violence on a regular basis. He lost friends to murder and suffered multiple attempts on his own life. On at least two occasions his father held him at gunpoint and threatened to kill him. Stressor upon stressor was piled upon Tommy beginning at his birth, continuing until he was pushed into the streets by his parents' abject neglect of him and his siblings, and thereafter until he was incarcerated. He received no support from his parents, the school system or the justice system to help him learn to cope with these traumatic stressors at any stage of his life.

152. All children have the potential to be adversely psychologically affected by exposure to traumatic events or to grow healthily with the benefit of proper care, provision of safety and encouragement. Whether a child is able to survive trauma without developing symptoms of Posttraumatic Stress Disorder (PTSD) depends on the confluence of many factors, including the child's cognitive resources, his education, his genetic predisposition for mental illness, the efficacy of his principal caretaker, the sources of support available to him, the severity of the trauma, the ages at which the events occurred and the number of traumatic events that he is exposed to and other factors. Additional factors that may influence the outcome for a child include the quality and quantity of his sleep and a history of mental illness in the family.

153.    These and other factors influence the outcome for a child exposed to trauma because they impact how the child processes the memories of the traumatic events and hence how they affect his schooling, his capacity to form relationships and the ability to manage stress. Memories of these events are encoded and stored.  If a child can make sense of what happened and can put that understanding into words, he can encode the memory as a narrative, such as "I saw my father hit my Mom; he should not have done it but she and I both survived."  When he later retrieves that memory, he will be able to cope with the remembrance and maintain the belief that, while bad things do happen sometimes, the world is generally a safe place.  In order to be able to accomplish this, the child must be old enough to be able to verbalize thoughts.  They must have both the cognitive resources and the education necessary to have developed a sufficient vocabulary.  And, especially with young children, they must have someone – whether it be a parent, a caretaker, a teacher, a therapist or some other individual who is involved in their lives – who can help them process what happened and help them to understand and make sense of it.  Tommy had no one to play that role for him, for most of the adults around him were abusing substances and ignoring any problems.

154.    In the absence of the necessary resources, what will be encoded in memory will be principally the emotion that the child experienced when the event was occurring, such as intense fear, along with disjointed and incomplete images of what happened.  When a memory is encoded this way, when retrieved, voluntarily or involuntarily, it reappears in the same form.  So when the memory is retrieved, the child experiences the same feeling of terror over again. Retrieval of such memories can be unwanted and it can be frequent.  Retrieval may be triggered by a cue that the child recognizes as a reminder of the trauma, such as a television news report recounting what happened or the sound of someone being punched that the child recognizes as

similar to the sound that they heard when their father punched their mother. Retrieval can also be triggered unconsciously. The memory may include a sensory impression of the event such as a neutral object that happened to be present, perhaps a particular model of car, or the smell of something that was cooking when the traumatic event happened. When the child is exposed to such an unconscious cue they also experience the intense fear that was encoded in memory along with it, and may have no idea what is happening to them.

155. The experience of intense fear triggers the fight or flight response system. Powerful stress hormones such as cortisol are released that cause the body to prepare to defend itself or flee by processes such as increasing heart rate, increasing respiration and shutting down functions that are non-essential at that moment such as digestion. The fight or flight response is adaptive, in that it enables the quickest possible reaction to danger and the best chance of survival. However, it is designed for use only in occasional emergencies. When released chronically, as in a child that is experiencing ongoing stress, cortisol is known to be neurotoxic and to adversely affect cells in the brain, and if a child's system is constantly flooded with it the consequences can be severe. One of those consequences is the development of PTSD which, if left untreated, can become a chronic condition and can have lifelong consequences for an individual's ability to function.

156. PTSD in children is characterized by particular categories of signs and symptoms. Children develop what are known as intrusion symptoms, such as dissociative reactions; recurrent, involuntary and intrusive thoughts of the traumatic event; nightmares; and intense psychological distress when faced with reminders of the event. There are also avoidance symptoms, such as persistent, effortful avoidance of distressing trauma-related thoughts and stimuli. Children with PTSD also suffer negative alterations in mood or cognition. They may

develop persistent, negative and often distorted views about the world and about themselves and their future; they may experience feelings of alienation or disconnection from others; they may develop distorted blame of themselves or others for causing the traumatic events; and they may have persistent negative emotions. The disorder also results in alterations in arousal and reactivity; hyper vigilance; irritable or aggressive behavior; an exaggerated startle response; self-destructive or reckless behavior; impaired concentration; marked loss of interest in significant activities; and sleep disturbance.

157. Not surprisingly, these symptoms of PTSD can have a markedly adverse effect on the child's development and functioning. Healthy development requires a child to master the ability to relate to others, to express distress and to receive comfort. These skills are the infrastructure of functionality; they are a necessary foundation for success at work or at school, for forming relationships with others and for developing tolerance for distress. Children are not born with them; they have to be learned. If trauma deprives the child of the opportunity for that learning to take place, the child's potential for growing up to become a healthy, productive adult is severely curtailed. Symptoms such as the inability to pay attention, persistent negative emotions and dissociative reactions make it extremely difficult for a child to cope with, and succeed in, a traditional school environment. Feelings of alienation, cognitive distortions, irritable or aggressive behavior and the efforts involved in avoidance can seriously impair the child's ability to interact positively with others and thereby develop appropriate social skills. And symptoms of hyper arousal significantly diminish the child's ability to tolerate stress and to regulate their response to it.

158. Indeed, we now know that exposure to traumatic stressors actually alters the structure and functioning of the child's brain. For example, the area of the brain known as the

hippocampus is heavily involved in memory processing. High levels of cortisol have been shown to be associated with a decrease in the volume of this structure in children that have PTSD as compared to those without. Functional MRI studies have shown marked differences in the reactivity patterns in that area during memory retrieval between the two groups. Similar studies have also shown that children with PTSD have decreased reactivity in areas of the prefrontal cortex, regions of the brain responsible for executive functions such as the inhibition of impulses, weighing consequences and alternatives, abstract thinking, planning, etc.

159. Tommy never had any of the resources that might have allowed him to process and cope with the severe and chronic trauma to which he was exposed. His impaired intellectual functioning and his inability to succeed in an educational environment deprived him of the opportunity to develop the vocabulary and verbal fluency necessary to encode his traumatic memories in a coherent narrative. He also never received any therapeutic intervention that may have helped with this process. The D.C. Public School System in particular failed him in that regard. Despite clear indications that he was struggling, Tommy was never provided with services to help him learn and progress. Nor were his parents a source of any assistance or support to Tommy in achieving academically.

160. Neither did Tommy have a single individual in his life who was able, attentive and involved enough with him to help him understand and make sense of the traumatic events he endured, the single most common finding in resilient children. As often as his father battered his mother, there was never any discussion afterwards. Neither parent ever talked to Tommy about what happened or tried to reassure him that he was safe. The same was true with regard to his father's abuse of him and all of the other traumas he experienced. His resulting inability as a small child to articulate what was happening when his mother got hurt is evidenced by the fact

that he interprets her silence as reasonable because he believes that even if she had tried to help him understand he would not have been able to. He never received counseling or therapy from any source, not even after he became involved in the juvenile justice system.

161. Deep sleep (stages 3 and 4; delta wave sleep) has been associated as protective against the development of PTSD. Stage 5 (REM) is the stage of sleep in which most dreaming occurs. Deep sleep and dreaming are important for processing the events of the day, including traumatic events. When children live in an environment of violence, their sleep tends to be light because of their state of hyper vigilance. Of note, the stress hormone cortisol is also elevated in children with PTSD symptoms at night. Tommy reports almost never dreaming, which indicates that his experience of REM sleep is diminished and that he lacked essential deep sleep. His ability to sleep overall was also adversely impacted by his parents drinking and partying in the home late into the night.

162. Tommy was subjected to such a relentless barrage of trauma that, even if he otherwise had the resources necessary to process what was happening, he could not have managed it because there was not enough time between one incident and the next. His experience was analogous to that of Australians living in areas hit by repeated bush fires. Before they have the opportunity to clean up and rebuild after one devastating blaze, there is another one which compounds the damage.

163. There is an extensive history of mental illness among Tommy's biological family that likely rendered him genetically predisposed to developing Posttraumatic Stress Disorder and further compounded the effects of his lack of resources that could lead to resilience. Substance dependence is itself a mental illness, and it can also manifest as an attempt to self-medicate to avoid the distressing symptoms of other conditions such as Anxiety, Depression, Posttraumatic

Stress Disorder, Bipolar Disorder and others. Known substance abusers in Tommy's family include all four of his siblings, both of his parents, his maternal grandmother, his maternal grandfather, his paternal grandfather, his paternal paternal great grandfather, his paternal maternal great grandfather, two paternal paternal great uncles, three maternal maternal great uncles, at least three maternal uncles, two paternal uncles and a whole host of first and other cousins.

164. Other disorders are present in the family, including depression, anxiety and schizophrenia. His mother suffers from Depression and his maternal grandmother showed the signs and symptoms of the same disorder. His grandmother, Nancy Fields, may also have suffered from Posttraumatic Stress Disorder or other psychological sequelae of the severe car accident that she was in at the age of 16. Audrey Curtis, the sister of Tommy's paternal grandmother, Hilda Hager, was diagnosed as suffering from Schizophrenia. Bernese Williamson, the niece of his paternal maternal great grandmother, also exhibited signs of a major psychiatric disorder. Tommy's maternal uncle, Anthony Fields, was diagnosed in middle school as suffering from Anxiety. His maternal uncle, Harold Fields, and his paternal grandfather, Thomas Sr., exhibit some of the signs and symptoms of Bipolar Disorder.

165. It is significant that Tommy has a clear memory of receiving a toy airplane as a gift as a small child but no memory of ever playing with it or getting it to work. Play is extremely important for a child's development. Through play, the child practices and improves his motor skills and his cognitive abilities. When he plays with others, he also learns social skills and the ability to relate to and get along with other people. Because of the chaos of his home life and his mother's severely impaired ability to be an attentive and involved parent, Tommy was deprived of those opportunities.

166. As a consequence of his untreated and unresolved trauma, Tommy began to manifest the signs and symptoms of Posttraumatic Stress Disorder as a child. He began to experience dissociation and still manifests such symptoms today. Dissociative symptoms associated with trauma include depersonalization, psychic numbing, disengagement and amnesia for all or part of a traumatic event. Depersonalization may take the form of an "out of body experience." It is the feeling of watching oneself act while feeling that one has no control over what is occurring. The sufferer may feel like the world has become vague, dreamlike and less real. Tommy experienced this phenomenon when he watched his father try to shove his mother out of a moving car. Psychic numbing in response to trauma is the experience of being physically present but going elsewhere in one's mind, operating intellectually but with no emotional connection to what is happening. Tommy experienced numbing frequently as a child and adolescent, including while watching his father batter his mother. When Tommy was not able to fight or flee in the moment and he was overwhelmed by terror for his Mom and himself, he describes going into "a dream state." This experience is commonly seen in traumatized children. He also likely has amnesia for some traumatic events.

167. Tommy also experienced symptoms of avoidance, especially splitting. Splitting is a failure to combine different aspects of a situation or a person into a coherent whole, thereby avoiding the distress that would result from confronting the complete picture. For example, Tommy witnessed the sadness and depression of his mother that followed the battering by his father. His father also took him along when he went to have sex with other women at their apartments or houses. Tommy experienced each set of events as separate from the other; what happened at home was one thing, what happened at the other women's apartments was another. In this way he avoided thoughts of his father's behavior as additional mistreatment of his mother

and additional infliction of pain and distress upon her and himself.  He also made, and continues to make, strong efforts to avoid thinking about his past traumas.

168.    The alterations in mood and cognition that Tommy experienced mimic some of the signs and symptoms of depression and some hallmarks of Attention Deficit Hyperactivity Disorder.  Those conditions are difficult to distinguish and are often confused with PTSD.  They can also coexist; 80% of children diagnosed with PTSD also suffer from depression and/or anxiety, and a child can have both PTSD and Attention Deficit Hyperactivity Disorder.  Tommy suffers from impaired sleep and also nightmares, in which he remembers afterwards a feeling of having tried to wake himself up to escape a frightening situation but does not recall what the situation was or any other details.  He describes difficulties with concentration as a child and as an adult.  He experienced anhedonia, a loss of the ability to experience interest or pleasure in formerly enjoyable activities, particularly as a child.  As a child he was hyperactive, always on the move and finding it very difficult to sit still for any length of time.  He had tremendous difficulty focusing on a particular task.

169.    The tendency towards tangential and disorganized thinking, his impulsivity and the pressured speech he displays as an adult suggest that Tommy suffers from chronic, untreated Attention Deficit Hyperactivity Disorder in addition to posttraumatic symptoms and impaired cognitive functioning.    Additionally, he describes coming up with unusual strategies for accomplishing difficult tasks at school that are common in children with this disorder.  In the 3rd or 4th grade, he recalls frequently being assigned a task that involved reading a story and then writing the answers to questions about what he had read.  Rather than reading the story through first and then turning to the questions, Tommy went first to the questions and then searched the story for words that revealed the answers.  This practice suggests that he lacked the capacity to

concentrate long enough to first read the story and then go to the questions and that he did it in the reverse order to compensate for this inability. This type of behavior, which seems to cut corners in order to accomplish the final goal, is characteristic of children that have ADHD. Tommy never received any treatment for these symptoms or possible condition.

170. Finally, Tommy's traumatic history and childhood Posttraumatic Stress Disorder unquestionably impacted his development and deprived him of the opportunity to achieve competence in all three functional domains. Whether due to trauma or a combination of trauma, depression and Attention Deficit Disorder, Tommy struggled, and ultimately failed to succeed, in school. He never had a legitimate job. He had significant problems, including an inability to trust others, that severely impaired his relationships, both romantic and otherwise. He also experienced lifelong hypervigilance, hyperarousal and a severely impaired ability to tolerate stress and to modulate and regulate his response to it.

171. The signs and symptoms of chronic and severe exposure to trauma have also been documented in Tommy's siblings. For example, in September of 1993, Tommy's sister, Tesha, was evaluated at St. Elizabeth's Hospital after threatening to commit suicide if she was forced to return to her mother's home. On the Children's Depression Inventory she received a score of 21 which indicates that she is experiencing symptoms of clinical depression. Projective drawings indicate anxiety, low self-esteem, unmet dependency needs, helplessness, hopelessness, a sense of being unrelated to others and general impoverishment. She reported watching television in order to be able to fall asleep, and that she then wakes up around 1 a.m. and has a hard time falling back to sleep. Upon discharge she was diagnosed as suffering from Depressive Disorder NOS.

172.     Tesha was evaluated again in November, 1997.  The evaluator noted that her sphere of alertness was dulled by what may have been chronic depression and possible dissociation from previous Posttraumatic Stress Disorder from situational and chronic family circumstances.  Her score on the Beck Depression Inventory was significant for depression.  She endorsed statements regarding hopelessness, futility and psychic numbing, as well as sleep and appetite disturbance, anhedonia and general malaise.  Her Thematic Apperception Test stories involved themes of domestic violence between adults, physical abuse of children and separation from a father.

173.     A report of a psychological evaluation of Tesha, in 1998 when she was 16 noted as follows:  Her scores on the Rorschach suggest that she copes with her environment by narrowing her perspective as much as possible to keep herself from being overwhelmed, a common defense for traumatized children.  If the enormity of their situation entered their conscious awareness, they would be unable to function.  There are indications that Tesha's thinking can be rather fluid, with reversals in her decisions and promises, and her behavior and thinking seems to decompensate under stress.  The female perceptions she provided were in the context of derogation and submission – caring for infants, pregnant, vulnerable, "funny-looking shoes" and passive.  Male figures were chillin', winning, giving each other a high five and dominant.  The Human Figure drawing seemed almost pre-oedipal in that differentiation was by hair type and description. They had the appearance of a distorted infant with large, aggressive teeth and flipper arms.   Tesha also appeared to have significant sexual concerns possibly involving sexual trauma.  In response to one card she states "he has his hand over her face, he is going to kill her."

174. The report continued: Tesha may have concretely and experientially concluded that male figures are more secure and that female characteristics make an individual too vulnerable. To dress like a stereotyped male may confer protection. She seems to have intense feelings about men. Her quasi-delusion that her parents will reunite suggests a developmental delay in transferring her identity to competent women. The kind of stress that Tesha has endured throughout her development places unthinkable roadblocks in the path of normal identification.

175. The anatomy responses indicate that Tesha is attempting to cope with debilitating anxiety, probably at phobic levels, with physical symptoms. She may also be physically ill. When a somatic mode is adopted, the individual may have difficulty accepting psychological explanations for their behavior. Tesha has very limited insight into her behavior. Her profile is so constricted that it is difficult to understand how Tesha processes emotion except by somatic symptoms.

176. On the Trauma Symptom Checklist for Children, Tesha reports flashbacks, phobic avoidance, guilt, anger and sadness. It is possible that dissociative defenses are masking the intense symptoms. The TAT stories contained themes of academic inadequacy, family problems related to too many children and various stereotyped roles, people who are overwhelmed, death when vulnerable, and anger over love and basic needs. In summary, the report concludes that Tesha has a history of multiple risks for adult adjustment problems. Her mother has a long history of substance abuse and Tesha may have had prenatal exposure. She tested positive for tuberculosis present in the central nervous system. She has a high probability of having been abused as well as neglected. She has been hospitalized for suicide threats and has been unable to negotiate important developmental tasks. Personality testing suggests a young woman who makes massive efforts to maintain a façade of control. When stressed she tends to decompensate

but she can relate to a large spectrum of maturity levels depending on situational demands. There is a high probability with her experience of chronic neglect and possibly abuse that she uses dissociative defenses that mask some of her debilitating anxiety. Her presentation with regard to her identity seems to be affected by multiple factors that are well known in the literature in adolescents who have been traumatized and think and behave in concrete terms. She will be very vulnerable to substance abuse, further victimization and the transfer of the intergenerational pain and dysfunction to her children.

177. Tommy's brother, Terrell, who is only 19 months younger has also threatened suicide in the past. In December of 1990, when he had just turned 16, Terrell appeared in the D.C. Juvenile Court for a status hearing. He told his lawyer that he would kill himself if he was not allowed home visits from Cedar Knoll. He underwent psychiatric emergency screening by a child psychiatrist, who noted that Terrell's gaze remained fixated on the psychiatrist during the interview and his expression was somewhat anxious. His verbal responses were marked by a pronounced stammer. When asked who lives at his home he replied "everybody." He did not know what he would like to do when he was finished with school and shook his head when asked about movies, TV shows or participation in sports. He denied having any friends. When asked what he would like if he could have anything at all as a Christmas present he said that he would like a cat. He could not be specific when asked where he would like to live if he could live anywhere or what he would like the court to decide about him. Terrell told the psychiatrist that he had nothing to live for and "they say I am ugly." The juvenile court judge ordered that Terrell be placed at St. Elizabeth's Hospital for a 21-day inpatient evaluation.

178. **Failure to Present the Testimony of Terrell Hager.** Mr. Hager's young brother, Terrell Hager, was just one of the witnesses who could have provided the jury with some

of the compelling mitigating evidence summarized above. Trial counsel's unreasonable failure to call him as a witness was especially prejudicial, however, because counsel promised the jury during their opening statement that they would hear from Terrell and because their expert, Dr. Cunningham, relied heavily upon information he received from Terrell and referred to it frequently throughout his testimony regarding Mr. Hager's background.

179. During opening statement at the penalty phase, trial counsel stated as follows:

> The second child was Terrell, born just about a year [after Tommy]. And the evidence will show you that over the years, people often though that those two children were twins, because what one experienced, the other experienced, as children growing up. They were constantly together.

> . . .

> And the evidence will show you that Tommy's father would go into what his brother, Terrell, described as drinking rages and drug rages. . . And when he came home, as Terrell will tell you—We had to take whatever he was dishing out.

> . . .

> and Terrell will tell you: We stood in the corner and we screamed, 'No, stop fighting," as children.

> . . .

> And Terrell will tell you it was like a war zone.

> . . .

> And Terrell will tell you that Tommy and he were joined at the hip, and what one did, the other did. And what Terrell will tell you is: We would go to our grandmother's house . . .

> . . .

> Terrell will say: Our grandmother had one rule, and that was we had to wash our hands before we ate.

> . . .

> And what Terrell will also tell you is that: I know our mother loved us, but she couldn't show it because of the crack.

> The evidence will show you, Terrell himself is a murderer, and his is in imprison [sic]. But the evidence will show you, when you see him, the man has poetry in his heart. And his ability now, as a man, to look back at that childhood and to interpret through the eyes of an adult what they experienced as children, I think you will find remarkable.

Trial Tr. Vol. 12 34:25-35:4, 42:25-43:8, 43:17-19, 44:12-13, 44:15-19, 44:23-24, 45:5-7, 45:10-16.

180.    Dr. Cunningham also referred to information that Terrell had given him throughout his testimony. After all that, counsel's failure to actually call Terrell to testify for his brother cannot have been overlooked by the jury and would naturally have led them to adverse inferences regarding the credibility of Dr. Cunningham, the mitigation presentation in general and defense counsel in particular.

181.    **Failure to Preclude or Rebut False Evidence Regarding Powder Cocaine.** Apparently realizing that Dr. Cunningham's testimony regarding Mr. Hager's parents' use of crack in the 1970's was patently wrong, trial counsel attempted to clarify the situation with subsequent lay witnesses. Both Mr. Hager's mother, Leavonia Fields, and his father, Thomas Hager Jr., explained that prior to the mid-1980's it was powder cocaine that they used, and not the as-yet unheard of crack cocaine. This testimony was corroborated by Leavonia Fields' sister, Jennifer Fields, and brother, Lorenzo Fields. However, the credibility of all four witnesses was seriously damaged when the government presented in rebuttal the testimony of Detective Anthony Washington of the Metropolitan Police Department as a drug "expert." Det. Washington confirmed what several defense witnesses had already stated, that crack cocaine did not appear in Washington D.C. until the mid-1980s. He then went on to dismiss the idea that Mr. Hager's parents were using powder cocaine prior to that time:

Q: Now, cocaine powder, was that a prevalent street drug in Washington, D.C. in the early and mid-1980's?

A: No, it wasn't. It was considered the rich man's drug. A lot of people couldn't afford powder cocaine. The average back during that time, a kilogram could range anywhere from $50,000 to $60,000 per kilogram.

Q: And once it got to the distribution level, was it much more expensive than what crack eventually was?

A: Powder cocaine?

Q: Yes.

A: Yes, it was very expensive.

. . .

Q: Again, was [freebasing] something you saw in street-level trafficking?

A: No.

Q: Why not?

A: Once again, the cost of cocaine was very expensive. And usually when you found that, it was going to be around individuals who had extreme amounts of money.

Trial Tr. Vol. 15 157:23-158:8, 158:17-23. With this testimony, the government appeared to have established that all four of Mr. Hager's witnesses who had testified regarding the use of powder cocaine were lying. But in fact the testimony was false. The evidence that demonstrates its falsity includes, but is not limited to:

182. As the DEA has written:

By the late 1970s, a flood of cocaine was entering the country in Miami and being transported north to New York City and to cities and towns all along the East Coast. Cocaine, however, was not yet considered a major threat because many believed that its use was confined to the wealthy . . . However, statistics indicated otherwise: by 1974, 5.4 million Americans acknowledged having tried cocaine at least once. By 1979, cocaine use was at its peak. That year, the Household Survey showed that almost 20 percent of Americans had used cocaine in the past year, and 9.3 percent

had used cocaine in the previous month.  By the early 1980s about 22 million Americans admitted to having tried cocaine.

183.     In 1974, Dr. Peter Bourne, drug advisor to Jimmy Carter and Special Assistant for Health Issues, wrote:  "Short-acting . . . not physically addicting, and acutely pleasurable, cocaine has found increasing favor at all socioeconomic levels in the last year."

184.     In 1971, following the arrest of a cocaine dealer after a police chase, Metropolitan Police Department Vice Squad officials told a reporter that cocaine is typically sold on Washington-area streets in 40-60 milligram tinfoil packages.  In June of 1973, MPD officers arrested seven people and seized an estimated $35,000 worth of cocaine after watching through the basement window and observing the individuals sitting around a table spooning cocaine into bags for street sale.  A national study of high school seniors by the National Institute on Drug Abuse showed that 9.8% of the class of 1976 reported having tried cocaine that year.  In 1978, two employees of the Federal Reserve Board were charged in D.C. with distributing cocaine after they were observed selling two paper packets containing cocaine valued at $50.  And by the end of 1984, 22% of criminal defendants tested in D.C. Superior Court tested positive for cocaine.  Also in 1984, MPD launched Operation Beat It, an attempt to shut down street cocaine sales on Hanover Place, N.W., an area with such a notorious open air drug market that newspapers called it the city's "cocaine supermarket."

185.     Although they are best known for later trafficking massive amounts of crack, Rayful Edmond and his crew began by selling powder cocaine on Hanover Place, N.W.  Rayful, then just a regular street hustler, bought and cut cocaine into $25 and $50 bags and sold them on the block.  The big man on the block until the mid-80s was Cornell Jones.  When the MPD finally busted him in 1985, Rayful Edmond and his associates took his place.  Rayful supplied

his men with a steady supply of cocaine in various amounts to sell on the streets, and took most of the profits.

186.   Trial counsel unreasonably and prejudicially failed to move to exclude Detective Washington's testimony regarding powder cocaine under Federal Rule of Evidence 702 and the Due Process Clause.  Pursuant to Rule 702, expert opinion testimony may only be admitted if it is based upon sufficient facts or data and is the product of reliable principles and methods.  Had counsel moved to exclude the testimony the Court would have been required to conduct a hearing at which counsel would have established that the testimony was not supported by sufficient facts and was not the product of reliable principles or methods.  Detective Washington did not begin working in narcotics enforcement until 1983, and therefore had no personal knowledge of the prevalence of cocaine in Washington, D.C. in the 1970's; and other purported bases for his opinions were wholly inadequate.  Reasonably competent counsel would also have sought production of all transcripts of prior testimony by Detective Washington regarding powder cocaine distribution.  Undersigned counsel will seek such transcripts in discovery and will move to amend this Motion with relevant information contained therein if necessary.

187.   In the unlikely event that attempts to exclude the evidence failed, it was incumbent on counsel to rebut the testimony with contrary evidence.  As outlined above, there was a great deal of contrary evidence readily available.  Reasonably competent counsel would have retained their own expert and presented this evidence to Mr. Hager's jury.  Competent counsel would also have established, using evidence including but not limited to court records, Social Security Administration records and the testimony of Mr. Hager's parents, that in the early 1980s not only was Thomas Hager Jr., steadily employed, but also Leavonia Hager was receiving welfare payments every month for her and her children.  They therefore clearly had the

means to purchase powder cocaine, even if they could not simultaneously pay their rent and utility bills and provide adequately for their children.

188. **Failure to Investigate, Develop and Present Evidence that Mr. Hager is Ineligible for Execution as a Person With Intellectual Disability**.    Trial counsel's unreasonable and prejudicial failure to investigate and present available evidence that Mr. Hager has Intellectual Disability and is ineligible for execution as a result constituted ineffective assistance of counsel. *See* Claim V, incorporated by reference as if fully set forth herein.

189. **Inadequate Presentation of Mr. Hager's Relationship With His Daughters.** Trial counsel unreasonably and prejudicially failed to investigate, develop, and present available evidence of Mr. Hager's longstanding, positive relationship with his two daughters, opting instead to present brief and uninformative testimony about the daughters' relationship with Mr. Hager and to limit the presentation of Mr. Hager's relationship with his daughters to the six months immediately preceding the trial.  The limited, lifeless testimony elicited by trial counsel was so troubling that even the Court became concerned and expressed those concerns to counsel. Indeed, trial counsel's failure to present this evidence in a meaningful way was so complete that little doubt exists about the prejudice that resulted—not a single juror found the mitigating factor that Mr. Hager "has proven himself capable of a positive relationship with his daughters."

190. During the penalty phase of trial, trial counsel called Mr. Hager's two daughters, Tonia Thomas and Anika King, then both thirteen years old.  Both daughters testified that after Mr. Hager was transferred to the Alexandria jail, six months before trial, they visited him every weekend and spoke with him by phone. Trial Tr. Vol. 15 139:5-23, 141:13-23, Oct. 29, 2007. Tonia testified that she spoke to her father by phone about twice a week, and that they discussed "school and stuff that[] [was] going on in [her] life. . . ." *Id.* at 139:24-140:4.  Anika testified

that she spoke to her father almost every day.  *Id.* at 141:22-23.  This is not a truncated summary of Tonia's and Anika's testimony that was initially elicited by trial counsel; it is a fulsome account of it.  The testimony presented was so incomplete that the Court became concerned and encouraged trial counsel to recall Mr. Hager's daughters.  *See id.* at 144:4-9, 146:22-147:9.  Trial counsel then recalled Tonia, but, again, the examination elicited little—specifically, Tonia repeated that she speaks with her father about "school stuff and stuff on a regular basis" and that her father, in response, says "[g]ood," asks her about her grades, and tells her that she "should choose the people I hang around with in school, because some people are not good for me to hang around with for my education."  *Id.* at 151:23-152:19.

191.    In total, Mr. Hager's two daughters' testimony about their relationship with their father takes up approximately three pages of transcript.  Even on its own terms—an unreasonable choice to limit the testimony to a six month period—the testimony reveals little about Mr. Hager's interactions with his daughters, the topics of their discussions, and the positive influence he has had and continues to have on his daughters' lives.  Contrary to the testimony presented at trial, Mr. Hager's communications with his daughters went beyond Mr. Hager uttering "good."  Trial counsel's presentation made Mr. Hager's conversations with his daughters seem superficial and cursory, when in fact the opposite is true.   The actual substance of Mr. Hager's conversations with his daughters—their depth and breadth—should have been brought to life for the jury.  Even as to the conversations elicited, there are obvious follow-up questions that went unasked.  For example, after Tonia testified that Mr. Hager made statements to her about choosing the people with whom she hangs out at school carefully, trial counsel should have asked Tonia, about what she understood her father to mean, and whether she followed his advice.  When Tonia testified that she received good grades, she might have been asked, among other

things, about her father's response to her grades, and whether her father encouraged her to do well in school. The responses to those questions would have been favorable to Mr. Hager. Rather than just eliciting short, out of context snippets about conversations, trial counsel should have given color and context to Mr. Hager's interactions with his daughters to allow the jury to understand the conversations' meaning, their impact, and, ultimately, what they showed about Mr. Hager's strong bond with his daughters and the positive value he added to their lives.

192. Moreover, what the jury never heard was that Mr. Hager, despite the obstacles of incarceration, had enjoyed a positive and rewarding relationship with his daughters for many years. When Mr. Hager was incarcerated in D.C. Department of Corrections' facilities, he communicated with his daughters. They visited him, and he spoke with them by telephone. When Mr. Hager was incarcerated in federal institutions, far from the District of Columbia, his daughters continued to communicate with him through telephone calls and letters. Even when Shenita King was in the witness protection program, she still allowed Mr. Hager to communicate with Anika, highlighting the importance of that relationship, its durability, and the fact that Mr. Hager was not, as the government suggested, a true threat to others.

193. Moreover, whether the testimony about Mr. Hager's relationship with his daughters was limited to six months or many years, counsel should have used additional evidence to assist the jury in understanding the depth and value of the relationship. Counsel had retained a social worker, Hope Hill, who had made a videotape of the daughters speaking with Mr. Hager by telephone. Although the court excluded the videotape from evidence, counsel should have called Dr. Hill to testify more fulsomely than the girls were capable of doing, about the content of the girls' communications to their father and the girls' statements about his positive role in their lives. Tonia and Anika would have been more expressive about those

subjects outside the formal and intimidating environment of the court room, and Dr. Hill's testimony about their statements would have been admissible at the penalty phase of the trial.

194.    The girls' mothers also would have been able to provide testimony about the daughters' relationship with Mr. Hager over the years.  So too would Mr. Hagers' family members, including his sister Tiffany Hager.  The relationship between Mr. Hager and his daughters also would have come alive to the jury through letters and photographs he had exchanged with them over the years.  Trial counsel offered none of that evidence.

195.    In short, in a case where the government sought to portray Mr. Hager as a monster without any redeeming qualities, and deserving to die, trial counsel missed a critical opportunity to present a significant component of Mr. Hager's life that showed his humanity.  Effective representation would have communicated this evidence powerfully and demonstrated to the jury that Mr. Hager would continue to be "capable of a positive relationship with his daughters" and deserving to live in order to positively contribute to his daughters' lives.

196.    **Trial Counsel was Constitutionally Ineffective for Presenting Testimony That Inmates "Age Out" of Violence.**  In an attempt to rebut the government's future dangerousness case, trial counsel presented testimony from Dr. Mark Cunningham, Harvey Cox, and Susan Hines that inmates tend to become less violent as they age, or, in other words, that they "age out" of violent behavior.  Dr. Cunningham testified that "age is one of the most powerful factors associated with delinquency and criminality," Trial Tr. Vol. 13 182:9-10, and that "[the] incidence [of violence] is significantly lower with age," *id.* at 183:16.  Harvey Cox, a former BOP warden, testified that as inmates get older "they kind of mellow out," have "less misconduct reports," and BOP has "fewer problems with them."  Trial Tr. Vol. 14 233:7-11.

Susan Hines, a counselor at USP Pollock, testified that older inmates were helpful in "resolv[ing] conflict[s] between the younger inmates." *Id.* at 261:4-5.

197.    Trial counsel's decision to present an "aging out" case was unreasonable and prejudicial, for at least two reasons. First, it conceded that Mr. Hager was a violent prisoner to begin with and that he needed to "age out" of his earlier violent behavior while incarcerated. Rather than rebutting the government's case, by conceding this point trial counsel strongly reinforced the government's contention that Mr. Hager had been a violent person while incarcerated in the past. This significantly prejudiced Mr. Hager in the eyes of the jury, especially in light of Dr. Cunningham's testimony that Mr. Hager's allegedly poor prison record was the most powerful predictor of his individual future behavior. *See C*laim III, ¶¶ 202-03, incorporated by reference as if fully set forth herein. Second, the decision to present this testimony was unreasonable in light of the fact that the government presented evidence regarding the stabbing of Alphonso Satchell less than a year before trial began, and defense counsel had no plans to contest that allegation. Under these circumstances, it was unreasonable to think that the jury could be persuaded that Mr. Hager had begun "aging out."

198.    Additionally, the claim was rebutted by a litany of government witnesses who testified that there was no relationship between an inmate's age and his behavior during incarceration. *See* Trial Tr. Vol. 12 151:12-14 (no change in behavior of inmates over the age of 40); 183:24-184:3 (age of an inmate has no bearing on that inmate's likelihood of instigating a violent confrontation); 186:7-11 (older inmates are more dangerous because they are more likely to have shanks); 186:22-24 (gangs include people of all ages); 199:17-23 (inmates incarcerated for life are almost uncontrollable and there is no way to modify their behavior); 215:11-15 (there is no hope to modify or change behavior on life sentences); Trial Tr. Vol. 15 167:4-12 (an

inmate's behavior is consistent throughout his incarceration). This testimony was comprised of baseless, unreliable and inadmissible lay opinion and counsel's failure to object and move to exclude it separately violated Mr. Hager's constitutional rights. Nevertheless it was presented, and the defense's aging out testimony was so unpersuasive, and the government's evidence evidently so convincing, that not a single juror found "aging out" as a mitigating factor. Trial counsel was constitutionally ineffective for presenting it.

199. **Trial Counsel was Constitutionally Ineffective for Presenting Testimony Regarding the Ability of the BOP to "Contain" Mr. Hager.** Trial counsel also sought to rebut the government's evidence of future dangerousness by presenting testimony that the BOP had measures in place that it could use to "contain" Mr. Hager and prevent him committing acts of violence while incarcerated. Dr. Cunningham testified that there were "protective factors" in the BOP system, which he described as "[t]he security and structure and staff and confinement and consequences," that are used to "hold in check individuals who, free from those constraints, were seriously violent in the community." Trial Tr. Vol. 14 101:7-11. He testified about different measures that could be brought bear to "control disruptive or violent inmates", including treatment, *id.* at 101:25-102:4-7, disciplinary measures such as the loss of privileges and administrative segregation, *id.* at 102:24-103:11, and moving an inmate to a higher security facility such as ADX Florence, *id.* at 103:19-23. He also testified at length about ADX Florence and the security and control measures in place at that facility to contain the most dangerous inmates. *Id.* at 120:21-134:2.

200. Trial counsel's decision to present this testimony was unreasonable and prejudicial for the same reason that their decision to present "aging out" testimony was: it conceded that Mr. Hager was someone that the BOP needed to "contain" and control, including

by sending him to the most secure facility in the BOP system, ADX Florence. This testimony left the jury with the impression that Mr. Hager needed the highest levels of security to manage him, lest he harm other inmates and correctional staff. Even worse, Dr. Cunningham's testimony was easily rebutted, creating the impression that, in fact, the BOP was *not* capable of controlling him. On cross-examination, Cunningham made numerous harmful admissions, including, but not limited to admissions that Mr. Hager would have physical contact with other inmates in most instances, *id.* at 157:22-23, that inmates cannot be held in a secure housing unit permanently, *id.* at 168:19-21, that not every dangerous prisoner can be sent to ADX Florence, *id.* at 186:20-22, that even at ADX Florence, Mr. Hager would have some contact with guards, *id.* at 184:4-8, that assaults have occurred at ADX Florence, *id.* at 185:15-17, and that inmates and guards have been killed at ADX Florence, *id.* at 173:16-22. Numerous government witnesses gave similarly damaging testimony. *See* Trial Tr. Vol. 12 146:12-14, 147:1-2 (even in a lockdown facility, Mr. Hager would have contact with inmates and guards); 198:13-18 (Mr. Hager could not be sent to ADX permanently); 152:21-25 (there is no BOP facility that can guarantee inmate safety); 214:5-15 (even in control units there is still contact with guards and no facility can guarantee the safety of inmates and guards). The cumulative result of this harmful testimony was that not a single juror found as a mitigating factor that the BOP has facilities adequate to monitor and prevent future assaults and violent conduct by Mr. Hager

201.    Instead of presenting this affirmatively harmful testimony, counsel should have investigated, discovered and presented the available evidence that demonstrates compellingly that Mr. Hager was not a violent prisoner, that some involvement in large prison altercations over the course of a lengthy incarceration in a penitentiary is unavoidable and that, in fact, as the

BOP had found repeatedly, Mr. Hager actually represented a low risk of violence as compared to the average prisoner. *See* Claim II, ¶ 92, incorporated by reference as if fully set forth herein.

202. **Trial Counsel Was Constitutionally Ineffective for Calling Dr. Cunningham to Testify That the Strongest Indicator of Mr. Hager's Future Prison Violence is His Past Prison Violence.** Trial counsel was also constitutionally ineffective for calling Dr. Cunningham as a witness because Dr. Cunningham's opinions on future dangerousness in prison were highly prejudicial to Mr. Hager. On cross examination, the government asked Dr. Cunningham: "Would you agree that the best predictor of [Mr. Hager's] future behavior is his . . . past behavior or past performance in confinement?" Trial Tr. Vol. 14 209:4-6. Dr. Cunningham answered: "Yes, sir. If you assume that no interventions are brought to bear, then that is a very powerful predictor." *Id.* at 209:7-8. To make matters worse, when asked whether "someone who has committed at least three prison assaults is more likely to commit a prison assault than one who has never assaulted anyone in prison," Cunningham responded "[t]hat's correct." *Id.* at 209:24-210:2.

203. In effect, Dr. Cunningham told the jury that the government's argument that Mr. Hager represented a future danger to others in prison based on his prior record was correct. This testimony, coming from the defense's primary mitigation witness, was devastating to Mr. Hager. Reasonably competent trial counsel, in preparing Dr. Cunningham to testify, would have solicited his opinion on this subject and, realizing that Dr. Cunningham's opinion directly supported one of the government's chief arguments for why Mr. Hager should receive a death sentence, decided not to use him as witness. Instead, trial counsel unreasonably and prejudicially put Dr. Cunningham on the stand.

204. **Failure to Remedy the Jury's Receipt of False and Highly Prejudicial Information Regarding the Murder of a Federal Judge.** The government sought to prove, as a non-statutory aggravating circumstance, that Mr. Hager would continue to present a danger to others even if confined in a maximum security federal prison: "The defendant . . . poses a future danger to others in that he is likely to commit, and to direct others to commit, additional acts of violence in any setting." Notice of Intent to Seek a Sentence of Death 6, May 30, 2006.

205. As part of its attempt to rebut the government's evidence of future dangerousness, trial counsel presented the testimony of Dr. Mark Cunningham regarding the amount of violence that occurs in federal prisons, the tendency for violent inmates to become less violent as they age and ability of the BOP to contain violent inmates. The decision to present this testimony was unreasonable and prejudicial for many reasons. *See* Claim III, ¶¶ 196-201. It was additionally prejudicial because it led to the government injecting false and highly prejudicial information into the penalty phase of Mr. Hager's trial.

206. The government's cross-examination of Dr. Cunningham on this topic focused on the possibility that Mr. Hager could cause harm to others even if confined in one of the BOP's most secure facilities. After questioning Dr. Cunningham about assaults on other prisoners, the prosecutor asked whether he was aware that inmates had "in the past [] used telephones to direct hits on people at other facilities." Trial Tr. Vol. 14 187:23-24. Dr. Cunningham responded that he was not aware of such incidents involving telephones, but he did know generally that prisoners had "communicat[ed] to direct hits in other facilities." *Id.* at 188:1-3. Next, the prosecutor asked if "they can direct people on the outside, who are not locked up, to do criminal acts." *Id.* at 188:16-17. Dr. Cunningham acknowledged that they could.

207. The prosecutor then asked Dr. Cunningham if, "in fact, inmates can order a hit on a federal judge." *Id.* at 188:23-24. Dr. Cunningham responded that he was unaware of such an incident. The prosecutor then launched into a series of prepared questions that not only planted false information in the minds of the jury, but also urged the jury to infer that Dr. Cunningham had been less than forthright when he denied knowledge of an incident in which an inmate had directed the killing of a federal judge, or else that he lacked sufficient information to provide a reliable opinion.

208. The prosecutor began the series by trying to connect Dr. Cunningham to the federal courthouse in San Antonio, Texas, named for a judge of the Western District of Texas who was shot and killed by Charles Harrelson in 1979: "You are from Abilene"; "Have you ever been to San Antonio"; "Have you testified in San Antonio"; "Do you know the name of the federal courthouse in San Antonio"? *Id.* at 189:2-9. Failing to elicit any recognition of the courthouse or the murder of the judge, the prosecutor then asked Dr. Cunningham if he knew "that the hit was direct[ed] by the Mexican mafia out of the jail?" *Id.* at 189:20-21.

209. Defense counsel raised no objection to this line of questioning. However, theCourt then, *sua sponte*, offered a comment that greatly amplified the prejudicial impact of the prosecutor's false assertion:

> Let me just make one point, I think, clear, [AUSA]. I think I should. You elicited the testimony about Judge Wood
>
> . . .
>
> to demonstrate that it does happen, *it is possible*. But I want you, the jury, to understand that by no means should any decision you make in this case be based at all on any concern about me or what I may be concerned about. I'm not concerned in the slightest, and you should disregard that insofar as it has anything to do with me. Forget that. All [the AUSA] was doing was simply bringing the point out to show *that those things can happen*. But it has nothing to do with me.

*Id.* at 190:13-191:1 (emphasis added).

210.    Although the Court's statement may (or may not) have relieved any concerns that the jurors felt for the judge himself, it actually vouched for and reinforced the veracity of the prosecutor's false assertion by agreeing that "those things can happen."  The jury would naturally assume that the judge (as well as the prosecutor) would know about and fairly report an event such as an order to execute a federal judge from inside a jail.  Thus, however well-intended, the Court's off-the-cuff intervention was likely interpreted by the jury as a courageous personal disclaimer in the face of a genuine threat, rather than any amelioration of the harmful impact of the prosecutor's question.  It cannot have been lost on the members of the jury—ordinary citizens who are not protected by the U.S. Marshal's Service—that a threat to the judge presiding over the trial might also be a threat to *jurors* who had already convicted Mr. Hager of serious crimes.  Telling the jury, "[t]hose things can happen. But it has nothing to do with *me*," especially after the prosecution attempted to connect Mr. Hager to an alleged prison gang—the D.C. Blacks—would not reassure the jurors that *they* had nothing to fear if Mr. Hager was sentenced to life imprisonment if the "Mexican mafia" could order the killing of a federal judge.

211.    In reality, however, as the Fourth Circuit stated in its opinion affirming Mr. Hager's conviction and sentence on direct appeal, "[t]here is no dispute that the details that the AUSA recited here were inaccurate.  In fact, it appears that the individual who solicited Judge Wood's assassination was not incarcerated but was out on bail on a drug case, which was pending before Judge Wood."  *United States v. Hager*, 721 F.3d 167, 203 (2013).  The court also characterized the prosecutor's statement as "disturbing."

212.    Even after the Court's comment compounded the prejudice to Mr. Hager from the prosecutor's false assertion, trial counsel unreasonably and prejudicially failed to react in any way or to take the necessary steps to remedy the problem. A few minutes of Internet research

would have confirmed that the accused, and later but acquitted, mastermind of the Wood assassination had been out in the community at the time. He was not confined in jail, much less in a maximum security federal prison. Reasonably competent counsel would have immediately moved for a mistrial in light of the reckless falsity of the prosecutor's assertion and its intimidating and prejudicial effect on the jury, and such a motion should have been granted. Even if a mistrial were denied, reasonably competent counsel would have moved to strike the prosecutor's questions and Dr. Cunningham's answers and requested an instruction to the jury that the proposition was false and must be disregarded. Such requests would assuredly been granted. Yet Mr. Hager's counsel stood mute, apparently unaware that the prosecutor's account of events was flat wrong. Counsel's failures in this regard violated Mr. Hager's constitutional rights.

213. **Failure to Object to Impermissible Victim Impact Testimony by Brenda Beer**. The decedent's mother, Brenda Beer, was called as a witness by the government at the penalty phase to provide victim impact testimony. During the course of her testimony, Beer blurted out in front of the jury "Is Mr. Hager's life worth any more than Barbara's?" The Court and the prosecutor both reacted and the Court instructed the witness to only answer the questions put to her, but the jury had heard her statement already.

214. The government is permitted introduce at the sentencing phase of a capital trial evidence about the victim and about the impact of the murder on the victim's family. However, family members and forbidden from stating characteristics about the crime or the defendant, and from offering opinions about the appropriate sentence.

215. Beer's statement clearly conveyed to the jury that, in her view, taking Mr. Hager's life was the appropriate punishment. It was therefore inadmissible and highly prejudicial. While

the Court and the prosecutor appeared to recognize the problem, defense counsel said nothing. They neither objected to the testimony when it was admitted nor moved for a mistrial or to strike the testimony after it came in. Counsel's failure constituted ineffective assistance of counsel in violation of Mr. Hager's constitutional rights.

## IV. THE GOVERNMENT'S CONDUCT VIOLATED MR. HAGER'S RIGHT TO A FAIR TRIAL

1. **Failure to Disclose Evidence that the Gun Used to Hit Ms. White Jammed and Became Inoperable**. The government's witness, Anthony Fields, was told by police during interviews that the reason that Ms. White was not shot to death was that the gun jammed after it was used to hit her in the jaw. To the extent that the government was in possession of evidence that the gun became inoperable and failed to disclose it, Mr. Hager's constitutional rights were violated, for such evidence could have been used both to further discredit the testimony of Charles Johnson and to further demonstrate the inapplicability of the substantial planning and premeditation statutory aggravating circumstance. *See* Claims I and II, incorporated by reference as if fully set forth herein.

2. **Failure to Disclose Evidence Rebutting Testimony Regarding the Use of Powder Cocaine in Washington, D.C. in the Early 1980s**. The government presented the testimony of Detective Anthony Washington regarding the lack of use of powder cocaine in Washington, D.C. in the early 1980s by anyone but the very wealthy. There is overwhelming evidence that this testimony was untrue, including, but not limited to, law enforcement investigations, reports, and records of arrests and criminal convictions that was in the actual or constructive possession of the government. The government's failure to disclose this information to the defense violated Mr. Hager's constitutional rights. *See* Claim III, incorporated by reference as if fully set forth herein.

3. **Presentation of False Testimony Regarding the Use of Powder Cocaine in Washington, D.C. in the Early 1980s**. The government's presentation of the testimony of Detective Anthony Washington regarding the lack of use of powder cocaine in Washington, D.C. in the early 1980s by anyone but the very wealthy violated Mr. Hager's constitutional rights because the government knew or should have known that the testimony was false. *See* Claim III, incorporated by reference as if fully set forth herein.

4. **Presentation of False Testimony Regarding Anthony Fields' Bias and Motive to Fabricate**. The government's presentation of the testimony of Anthony Fields that the extent of his legal troubles was his *current* incarceration on a years-old possession charge violated Mr. Hager's constitutional rights because the Government knew or should have known that the testimony was false. *See* Claim II, incorporated by reference as if fully set forth herein.

5. **Presentation of False Testimony About Whether Barbara White's Bathroom Door Was Open.** The government's presentation of the testimony of Paul White about whether the bathroom door at Barbara White's apartment was open violated Mr. Hager's constitutional rights because the Government knew or should have known that the testimony was false. *See* Claim II, incorporated by reference as if fully set forth herein.

6. **The Government Violated Its Obligations Under the Jencks Act by Failing to Produce Prior Grand Jury Testimony of One or More Witnesses Who Testified at Mr. Hager's Trial.** Investigator Robert Murphy, the lead detective in the Fairfax County Police Department's investigation of the killing of Barbara White, testified at Mr. Hager's trial. Detective Murphy was involved in both the state and federal investigations of Mr. Hager, participating in a joint investigative team that included, among others, the FBI, the Fairfax County Police Department, the Metropolitan Police Department, the United States Park Police

and the DEA.  Detective Murphy was deputized by the FBI to better enable him to assist in the federal investigation.  On May 23, 2005, prior to Mr. Hager's federal trial, Detective Murphy testified about the killing of Ms. White before a Fairfax County Circuit Court grand jury, which returned an indictment for murder against Mr. Hager, Lonnie Barnett, Jr., and Arlington Johnson, Jr. on the day of Detective Murphy's testimony.

7.     At no point prior to or during Mr. Hager's trial did the government provide defense counsel a copy of a transcript of Detective Murphy's testimony before the Fairfax County grand jury.  The government was obligated to do so under the Jencks Act, 18 U.S.C. § 3500, and its failure to do violated Mr. Hager's rights under the Jencks Act.  To the extent that the transcript contains material exculpatory or impeaching evidence, the government was also required to disclose it under *Brady*.

8.     Counsel will shortly move the Court for permission to discover this information in order to determine whether the transcript contains Jencks material for additional witnesses and to make an assessment of the extent to which Mr. Hager was prejudiced by the government's failure to disclose this information, and thereafter seek leave to file an amended section 2255 motion if necessary.

9.     The failure of Mr. Hager's trial counsel to seek to compel production of this transcript was unreasonable and prejudicial and separately violated Mr. Hager's constitutional rights.  *See* Claim I, incorporated by reference as if fully set forth herein.

10.    **The Government Violated Its Obligations Under *Brady*, the Jencks Act, and Fed. R. Crim. P. 16 by Failing to Produce Materials Relating to the Altercations at USP Pollock**.  The government failed to comply with its obligations under *Brady*, the Jencks Act, 18 U.S.C. § 3500, and Federal Rule of Criminal Procedure 16 by failing to produce several

categories of materials relating to the central component of its future dangerousness case—the DC-Memphis and DC-Alabama altercations at USP Pollock in which Mr. Hager allegedly participated. The evidence that the government failed to produce includes, but is not limited to:

11.     The government failed to produce the prior statement of government witness Bruce Davidson. The BOP's report of the DC-Memphis altercation indicates that Davidson submitted a memorandum regarding the incident to investigative staff. A portion of that memorandum was quoted in the report. According to that excerpt, Davidson observed Mr. Hager striking Starks with closed fists and kicks—not stabbing him, as Davidson claimed at trial. *See* Claim II, ¶ 46. The government was required to disclose this memorandum to the defense as Jencks material. To the extent that the memorandum contained other exculpatory or impeaching statements material to Mr. Hager's defense, the government was required to produce it as *Brady* material.

12.     The government failed to produce previous drafts of the DC-Memphis report. Like Davidson, government witness John Feeney testified that Mr. Hager stabbed Starks during the DC-Memphis altercation. *See* Claim II, ¶ 43. When confronted on cross-examination with the fact that the DC-Memphis Report did not state that Mr. Hager stabbed anyone, Feeney said that "[i]t was actually edited from the report. My first copy did say he did." Trial Tr. Vol. 12 162:2-3. Davidson also said he received a copy of an initial report that said Mr. Hager stabbed Starks and was found with a weapon. *Id.* at 197:2-12. Feeney's and Davidson's testimony clearly indicates that there were earlier drafts of the Report. None of these drafts were produced to Mr. Hager. The government was required to disclose the prior drafts to the defense as Jencks material. To the extent that the drafts contained exculpatory or impeaching statements material to Mr. Hager's defense, the government was required to produce them as *Brady* material.

13.     The DC-Memphis report identifies a series of seventeen attachments to the report, including memoranda from USP Pollock staff and photographs from video images.  None of these attachments were produced to Mr. Hager.  At least one of the photographs captures Mr. Hager during the incident, and the report states that this photograph shows Mr. Hager striking and kicking Starks, not stabbing him.  The government was required to disclose the attachments to the defense as Jencks material.  To the extent that the attachments contained other exculpatory or impeaching information material to Mr. Hager's defense, the government was required to produce them as *Brady* material.

14.     Both the DC-Memphis report and the DC-Alabama report contained information reportedly obtained from BOP staff review of video surveillance recordings of the respective incidents.  Like the photographs described above, some of these video surveillance recordings captured Mr. Hager during the incidents, but none of them were produced to him.  The video recordings of the DC-Memphis altercation would have reinforced what the photographic images showed:  that Mr. Hager did not stab Starks.  With regard to the DC-Alabama altercation, Feeney testified on direct examination that one of the photographs from the video images of the incident showed Mr. Hager hitting an inmate.  *Id.* at 134:18-20.  On cross-examination, Feeney admitted that the photograph in question showed Mr. Hager's hands on the inmate, not raised to strike, but he then claimed that an earlier-in-time frame from the video recording itself showed Mr. Hager hitting the inmate.  *Id.* at 155:2-7, 155:15-156:2.  To the extent that the video recordings themselves contained exculpatory or impeaching information material to Mr. Hager's defense, the government was required to produce them as *Brady* material.  It did not do so.

15.     The materials identified above would have shed light on the accuracy and veracity of the witnesses' testimony, and, in certain instances, likely undermined the government's future

dangerousness case. The Court should order the government to produce the materials it failed to produce to trial counsel so that an assessment can be made of the extent of the prejudice to Mr. Hager.

16. **The Government Violated *Brady* and *Giglio* by Failing to Produce Material Impeachment Evidence Concerning Alphonso Satchell**. The government also violated its *Brady* and *Giglio* obligations by failing to produce to Mr. Hager evidence regarding government witness Alphonso Satchell including evidence of his mental health issues and his abuse of prescription and other drugs. As discussed in Claim II, ¶¶ 80-81, the memorandum in aid of sentencing filed in Satchell's own criminal case contains information concerning his various mental health diagnoses, his use of prescription psychotropic drugs to manage those issues, and his substance abuse. The statements in the sentencing memorandum concerning these subjects were derived from Satchell's pre-sentence report, which was not publicly available. The government was obligated under *Brady* and *Giglio* to produce any material information in its possession that could be used to impeach Satchell's credibility. The pre-sentence report was in the possession of the United States Attorney's Office for the Eastern District of Virginia, and should have been disclosed to Mr. Hager, along with any other information in the government's possession concerning Satchell's mental health history and substance abuse.

17. The core of the government's future dangerousness case was that Mr. Hager was a primary aggressor in the DC-Alabama and the DC-Memphis altercations and the sole perpetrator of an unprovoked attack against Satchell. The testimony of the government's witnesses about Mr. Hager's role in these incidents was inconsistent with the conclusions and information contained in the respective BOP reports. Undersigned counsel will shortly seek production of the documents described above and any similar materials in discovery in order to ascertain the

precise scope of the prejudice that Mr. Hager suffered as a result of the government's failure to disclose them and will thereafter seek leave to amend this Motion as appropriate.

18.     The failure of Mr. Hager's trial counsel to seek to compel production of these and other documents was unreasonable and prejudicial and separately violated Mr. Hager's constitutional rights.  *See* Claim II, ¶ 93, incorporated by reference as if fully set forth herein.

19.     **Improper Closing Argument at the Penalty Phase of Mr. Hager's Trial**.  The government made a number of improper and prejudicial statements during its closing arguments at the penalty phase of the trial.  Those statements include:

20.     During its closing argument at the conclusion of the guilt phase, the Government improperly invited the jury to place themselves in the victim's shoes by imagining what it described as her last thoughts:  "The last thoughts of her life are trying to decide and trying to figure out a way to fight off this defendant and his two accomplices, and save her daughter." Trial Tr. Vol. 11 80:8-10.

21.     The Government made additional improper statements "channeling" the decedent during its closing argument at the conclusion of the penalty phase:

> But first, Barbara White was forced to lay down in the tub, terrified, throbbing in pain, crying.  She had no idea what was about to happen to her, at least not until Hager gave the order to Arlington Johnson and Lonnie Barnett to get the knives.  But even then she probably held out some hope, hope that this was a sick game, that it would stop soon.  . . . But worse than the pain of being stabbed 82 times was the fear, the fear that her baby, Alexis, might also suffer the same fate.

Trial Tr. Vol. 16 82:17-22, 83:13-15.

22.     The Government improperly imagined the thoughts of the 13-month-old child: "As this coward gloating [sic], a hungry, lonely, tired and terrified little girl reached into a bathtub for the comfort of her mother."  *Id.* at 70:7-9.  This argument was additionally improper because the evidence that it was purportedly based upon was untrue, and the government knew

or should have known that it was untrue. *See* Claim II, incorporated by reference as if fully set forth herein.

23. The Government also improperly labeled Mr. Hager as evil: "How could anyone be so evil?" *Id.* at 70:1.

24. The Government improperly invited the jury to send a message to the decedent's family with its verdict, and also suggested that the family desired that the death penalty be imposed:

> And so it is that law that must now speak for Paul White, for Brenda Beer, for Paula White-Morales, for Alexis. [The law] says: We, the community know that you are grieving, that you are angry, that you are filled with rage and pain. The law says that we, the community, take your loss with the utmost seriousness, that we believe that Barbara's life was sacred, and we will not let this man cheapen it by his hideous and violent crime. As a decent and just society, we will punish Thomas Hager for what he took from you.

*Id.* at 90:4-14. This argument compounded the prejudice that Mr. Hager suffered when Brenda Beer made clear during her testimony that she wanted to see him sentenced to death. *See* Claim III, incorporated by reference as if fully set forth herein.

25. Trial counsel unreasonably and prejudicially failed to object to any of these statements, and thereby rendered ineffective assistance of counsel. *See* Claim III, incorporated by reference as if fully set forth herein.

26. The Government also improperly urged the jury to sentence Mr. Hager to death because he was already serving a life sentence and so any sentence other than death would be no punishment at all:

> Her fate cannot be compared to that of the defendant's. With life in prison, he gets exactly what he has now. Barbara White has only death. No one can call this justice. And if you're verdict is life, we all know what Thomas Hager will do. He will laugh. He will laugh just as he laughed at Bruce Davidson when Bruce Davidson had to take him to the

ground at Pollock. He will laugh because he will know he got away with murder. . . .

But know in at least one case, a murderer doing life in prison is a significant risk of committing additional crimes. And he is sitting right here (indicating).

Again, the logical extension of [Dr. Cunningham's] position is that we cannot punish, we cannot punish Thomas Hager any more severely for the murder of Barbara White than what he is being punished for now. All we can do is house him differently, to minimize the risk that he not [sic] harm others. But increase punishment, incremental punishment, punish more severely, can't do that.

*Id.* at 83:16-24, 87:21-24, 88:25-89:6.

27.     Defense counsel objected to these remarks and the Court instructed the jury that the government's statement that Mr. Hager was serving a life sentence was not correct; rather, Mr. Hager was serving a term of years. However, in light of the fact that they had been informed that Mr. Hager was already serving sentences on two separate homicide convictions, it is highly unlikely that the Court's instruction convinced the jurors that imposing a life sentence would mean a significant increase in Mr. Hager's punishment, or that the government's error was anything more than a technicality.

28.     Adjudication of this claim requires that the prejudice from each improper statement be assessed cumulatively. Such an assessment demonstrates that Mr. Hager's constitutional rights were violated.

29.     **Injecting False and Highly Prejudicial Information Regarding the Murder of a Federal Judge.** The prosecutor improperly placed false and highly prejudicial information before the jury when he questioned Dr. Mark Cunningham regarding a purported assassination of a federal judge ordered by an inmate when that crime was in fact committed by a person who was not incarcerated. *See*, Claim III, incorporated by reference as if fully set forth herein.

30.     **The Government Violated Its Obligations Under *Brady*, *Giglio*, and the Jencks Act by Failing to Produce Materials Regarding Charles Johnson.**  The government improperly failed to disclose to the defense full information and documents regarding Charles Johnson's criminal cases, agreements with the government, criminal activities, and prior statements. *See* Claim I, incorporated by reference as if fully set forth herein.

31.     The Government Violated Its Obligations Under Brady, Giglio, and the Jencks Act by Failing to Produce to the Defense the Transcripts of the Change of Plea Hearings of Arlington Johnson, Jr., and Lonnie Barnett.  The government improperly failed to disclose to the defense the transcripts of the change of plea hearings of Arlington Johnson, Jr., and Lonnie Barnett.  Their failure to so do prejudiced Mr. Hager.  *See* Claim I, incorporated by reference as if fully set forth herein.

## V.     MR. HAGER IS INELIGIBLE FOR A SENTENCE OF DEATH BECAUSE HE IS A PERSON WITH INTELLECTUAL DISABILITY

Mr. Hager's sentence of death was imposed in violation of his constitutional rights to counsel, the effective assistance thereof, a fair and impartial jury, the presumption of innocence, present a defense, confrontation, compulsory process, due process, freedom from cruel and unusual punishment and a fair, reliable and accurate determination of his sentence as guaranteed by the Fifth, Sixth and Eighth Amendments because he is a person with intellectual disability and therefore ineligible for a sentence of death.

In support of this claim, Mr. Hager alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.     A sentence of death may not be imposed upon an individual who has intellectual disability, the disorder formerly known as mental retardation. Intellectual disability is defined as:

(1) Significant limitations in intellectual functioning, together with (2) significant limitations in adaptive behavior, that (3) originates before the age of 18.

2.     Intellectual functioning is measured by administering an IQ test.  Significantly limited intellectual functioning is established by an IQ score that is approximately two standard deviations below the mean.  On an instrument such as the Wechsler Adult Intelligence Scale – IV, the current gold standard in the field of IQ testing instruments, a score that is two standard deviations below the mean is one that is approximately 70-75 or below, taking into account the standard error of measurement and any necessary correction for outdated test norms.

3.     Adaptive behavior refers to the collection of conceptual, social and practical skills that are learned and performed by people in their everyday lives.  Those skills include language and literacy, number concepts, self-direction, interpersonal skills, social responsibility, self-esteem, social problem-solving, the ability to follow rules and obey laws, personal care, occupational skills and safety.

4.     Mr. Hager's IQ was recently measured on the Wechsler Adult Intelligence Scale – IV (WAIS-IV) and he received a Full Scale IQ Score of 75.  The WAIS-IV was released in 2008 and so the norms of the test are at least 7 years old.  The necessary correction of a score obtained in 2015 to account for such outdated norms results in an IQ score that is properly understood to be approximately 73, which is well within the range of intellectual disability.

5.     Mr. Hager has significant limitations in adaptive behavior, including, but not limited to, difficulties with language and literacy, number concepts, interpersonal skills and social problem solving. Mr. Hager's significant difficulties with language and literacy and with number concepts were evident very early on in his school career and thus his disorder did indeed originate before the age of 18.

6. Trial counsel's failure to investigate, discover and present evidence of Mr. Hager's intellectual disability was unreasonable and prejudicial and separately violated his constitutional rights. *See* Claim III, incorporated by reference as if fully set forth herein.

# PRAYER FOR RELIEF

For the foregoing reasons Defendant, Thomas Morocco Hager, respectfully requests the Court grant the following relief:

1. That discovery be granted as is necessary for the full and fair resolution of the claims in this Motion;

2. That leave to amend this Motion be granted, as appropriate;

3. That an evidentiary hearing be conducted on all disputed issues of fact;

4. That the parties be afforded an opportunity to submit full briefing on the proper resolution of the claims of this Motion;

5. That the Court vacate Mr. Hager's conviction and sentence of death; and

6. That all other appropriate relief be granted.

Dated:  April 27, 2015

Respectfully submitted,

/s/ Blair G. Brown
Blair G. Brown
(Va. Bar No. 29706)
bbrown@zuckerman.com
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Phone: (202) 778-1829
Fax: (202) 822-8106

*Counsel for Thomas Morocco Hager*

/s/ Julie Brain
Julie Brain
Juliebrain1@yahoo.com
916 South 2nd Street
Philadelphia, PA  19147
Phone: (267) 639-0417

*Counsel for Thomas Morocco Hager*

## VERIFICATION UNDER PENALTY OF PERJURY

My name is Blair G. Brown. I am an attorney licensed to practice law in the Commonwealth of Virginia, the States of New York and Maryland, and the District of Columbia. I also am admitted to practice in the United States District Court for the Eastern District of Virginia and other federal district and appellate courts. In May 2014, Julie Brian and I were appointed as post-conviction counsel for Thomas Morocco Hager.

I am authorized by Thomas Morocco Hager to file the foregoing Motion to Vacate, Set Aside, or Correct Sentence, and for a New Trial Pursuant to 28 U.S.C. § 2255. I am filing the motion on Mr. Hager's behalf. Mr. Hager is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing Motion to Vacate, Set Aside, or Correct Sentence, and for a New Trial Pursuant to 28 U.S.C. § 2255 are true except for those matters based upon information and belief, and I believe the latter matters to be true. The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this motion, and items in the possession of other lawyers, investigators, and/or experts connected with the preparation of this motion. I make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings because these matters are more within my knowledge than Mr. Hager's knowledge.

I declare, under penalty of perjury, that the foregoing verification is true and correct.

Executed by me this 27th day of April, 2015, in Washington, District of Columbia.

/s/ Blair G. Brown
Blair G. Brown

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of April, 2015, I have caused a copy of the

**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND FOR NEW**

**TRIAL PURSUANT TO 28 U.S.C. § 2255** to be served on the following by filing it through

the Court's ECF system:

> James L. Trump
> United States Attorney's Office
> Eastern District of Virginia
> 2100 Jamieson Avenue
> Alexandria, VA 22314
> jim.trump@usdoj.gov

> /s/ Blair G. Brown
> Blair G. Brown